1145

1                UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF NEW YORK
2
   - - - - - - - - - - - - - - - X
3
   UNITED STATES OF AMERICA,    : 19-CR-00223(BMC)
4                             :
                             :
5                             :
        -against-          : United States Courthouse
6                             : Brooklyn, New York
                             :
7                             :
                           : Tuesday, July 1, 2021
8   AKMAL NARZIKULOV,          : 9:30 a.m.
9         Defendant.        :
                           :
10  - - - - - - - - - - - - - - - X

11        TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
          BEFORE THE HONORABLE BRIAN M. COGAN
12           UNITED STATES DISTRICT JUDGE

13           A P P E A R A N C E S:

14  For the Government:   JACQUELYN M. KASULIS, ESQ.
                     Acting United States Attorney
15                   Eastern District of New York
                   271 Cadman Plaza East
16                   Brooklyn, New York 11201
                BY:  VIRGINIA NGUYEN, ESQ.
17                   F. TURNER BUFORD, ESQ.
                   Assistant United States Attorneys
18

19  For the Defendant:   LAW OFFICE OF PETER J. GUADAGNINO
                   50 Court Street
20                   Suite 702
                   Brooklyn, New York 11201
21                BY:PETER J. GUADAGNINO, ESQ.
                   ILEANA MONTES, ESQ.
22                   (Of Counsel)

23

   Court Reporter:  Stacy A. Mace, RMR, CRR, RPR, CCR
24                 Official Court Reporter
                 E-mail:  SMaceRPR@gmail.com
25  Proceedings recorded by computerized stenography.  Transcript
   produced by Computer-aided Transcription.

Proceedings                                        1146

1              (In open court - jury not present.)

2          (Defendant entered the courtroom.)

3          THE COURTROOM DEPUTY:  All rise.

4          (Judge BRIAN M. COGAN entered the courtroom.)

5          THE COURT:  All right, good morning.

6          Any reason we shouldn't bring in the jury?

7          Okay, let's have the jury.

8          (Witness entered and resumed the stand.)

9          (Jury enters.)

10          THE COURT:  All right, everyone be seated.

11          Good morning, ladies and gentlemen.

12          THE JURY:  Good morning.

13          THE COURT:  We are making good progress.  We will

14  continue with cross-examination.

15

16          (Continued on the following page.)

17

18

19

20

21

22

23

24

25

1   **MELISSA GALICIA**,

2         called as a witness by the Government, having been

3         previously duly sworn/affirmed by the Courtroom Deputy,

4         was examined and testified further as follows:

5   CROSS-EXAMINATION

6   BY MR. GUADAGNINO:

7   Q    Good morning, again, Agent Galicia.

8              How are you?

9   A    Fine, thank you.

10  Q    You're good?

11  A    Yes.

12  Q    Okay.  So, yesterday before we broke for the day we were

13  talking about your surveillance.

14             Do you recall that?

15  A    I do.

16  Q    Okay.  And you had testified that you had taken a few

17  photographs of Jasur Kamolov and Firdavs Giyasov?

18  A    Yes.

19  Q    And that they had left the minivan that they were in?

20  A    Correct.

21  Q    One of the people, Mr. Giyasov, was wearing a recording

22  device, correct?

23  A    Correct.

24  Q    And that you said that the objective was that they were

25  going to pay some money to someone?

Galicia - cross - Guadagnino                    1148

1   A    Yes, that's what I understood the operation.

2   Q    And the objective was that you were present to photograph

3   this event, if it happened?

4   A    Correct.

5   Q    And at the time the two individuals, Kamolov and Giyasov,

6   when they got out of the van there was another person sitting

7   behind them in the van, is that right?

8   A    That's correct.

9   Q    Okay.  Who was that person, if you know?

10  A    I don't know.

11  Q    And there came a time when they got out to meet this

12  individual they were going to pay money to, correct?

13  A    Yes.

14  Q    And do you know how much money they were going to pay?

15  A    I believe the amount was to be a thousand dollars.

16  Q    Okay.  And at some point do you know why they got out of

17  the van?

18  A    I don't, no.

19  Q    Okay.  But they did get out?

20  A    Yes.

21  Q    And they walked behind the van, I believe you lost the

22  line of sight, correct?

23  A    That's correct.

24  Q    And at that point you were unable to take any photographs

25  with respect to this person that they met, correct?

1    A    Correct.

2    Q    So, we have no photographs indicating that this person

3    was Mr. Narzikulov?

4    A    That's correct.

5    Q    And also, that Giyasov was wearing this recording device

6    at the time when he was allegedly to meet this person,

7    correct?

8    A    Yes.

9    Q    And with respect to the recording device, you don't know

10   what is on that device, if Mr. Narzikulov's voice is on there?

11   A    That's correct.  I never heard the recording, so I don't

12   know the contents.

13   Q    Okay.

14          Now, I want to talk to you about your involvement in

15   recovering property from this apartment on April 18th, 2019.

16   Okay?

17          You testified that you were involved in another

18   arrest, correct?

19   A    That's correct.

20   Q    Okay.  And this was the arrest of Sherzod Mukumov,

21   correct?

22   A    Correct.

23   Q    And you were then called to assist in the processing of

24   the search -- withdrawn.

25          You were called to assist at the other location with

Galicia - cross - Guadagnino                    1150

1    respect to Mr. Narzikulov, correct?

2    A    That's correct.

3    Q    Now, you testified that you were present when property

4    was recovered, correct?

5    A    During the search, yes.

6    Q    Okay.  After they got the -- after the Government got the

7    search warrant, they began the search of the apartment,

8    correct?

9    A    Correct.

10   Q    And the mother was there, right?

11   A    Yes.

12   Q    Mr. Narzikulov had already been taken out of the

13   apartment?

14   A    Yes.

15   Q    And the search commenced.

16        You testified that one of the items that were seized

17   was a gun, right?

18   A    Yes.

19   Q    Now, you're a special agent in the FBI, right?

20   A    I am.

21   Q    And you went to Quantico, Virginia, to the academy,

22   correct?

23   A    Correct.

24   Q    And at the Quantico Academy, it's like a police academy

25   but for federal agents, for FBI, you're trained there,

Galicia - cross - Guadagnino                    1151

1    correct?

2    A     Yes.

3    Q     And part of the training that you get involves firearms?

4    A     Yes.

5    Q     It involves shooting firearms?

6    A     Correct.

7    Q     Pistols, right?

8    A     Yes.

9    Q     And you're trained in identifying the different kinds of

10   firearms, in terms of like brand names, correct?

11   A     There is some exposure.  We see different manufacturers.

12   We see different guns made by different manufacturers.

13   Q     And FBI agents carry Glocks, don't they?

14   A     Yes.

15   Q     And so you're familiar with a Glock pistol?

16   A     I am.

17   Q     Are you familiar with a Sig Sauer pistol?

18   A     Some of the agents -- or, I'm sorry, some of the

19   detectives that I worked with, I think, carried that weapon,

20   but I wouldn't say that I'm overly familiar with them.

21   Q     Okay, a Smith & Wesson?

22   A     I don't know if I've -- I've seen one --

23   Q     Okay.

24   A     -- in my -- in my work.

25   Q     Okay.

SAM        OCR        RMR        CRR        RPR

Galicia - cross - Guadagnino                1152

1           How about a Colt pistol, have you ever seen a Colt

2    pistol?

3    A    I don't think I've seen one in my work.

4    Q    So, I want to ask you about the pistol that is in

5    evidence now.

6           I believe you have the pistol --

7           MR. GUADAGNINO:  Or can it be provided?

8    Q    Yes, if you wouldn't mind taking a look at what's in

9    evidence.

10          MR. GUADAGNINO:  I forget which exhibit it is, 3 --

11          SPECIAL AGENT CALHOUN:  330.

12   Q    330, please.

13          MR. GUADAGNINO:  Thank you.

14   A    Sure.

15   Q    And while you're looking at that pistol, there's another

16   piece of evidence, which is some photographs of what appears

17   to be other pistols.

18          MR. GUADAGNINO:  If we can have that put up for the

19   jury.  Thank you.

20   BY MR. GUADAGNINO:

21   Q    Are you able to look at that pistol?

22   A    The physical one?

23   Q    Yes.

24   A    Yes.

25   Q    Can you -- I'm sorry.

Galicia - cross - Guadagnino                    1153

1       MR. GUADAGNINO:  Can the jury see the other exhibit
2  that's in evidence?
3            THE COURT:  Why don't you hold it up?
4            Which one do you mean?
5            MR. GUADAGNINO:  I believe it's the --
6            MR. BUFORD:  Government laptop.
7            MR. GUADAGNINO:  What number is that?
8            MS. PARSHAD:  It's part of 401.
9            MR. GUADAGNINO:  It's part of 401, Your Honor.  It's
10  a photograph of different guns in holsters.
11           MR. BUFORD:  There we go.
12           (Exhibit published.)
13  BY MR. GUADAGNINO:
14  Q    Now, Agent Galicia, can you look at the pistol that's in
15  evidence and can you tell the members of the jury what brand
16  of pistol is that?
17  A    The brand is SCCY.
18  Q    SCCY, correct?
19  A    Correct.
20  Q    Okay.
21           Now, if you wouldn't mind taking a look at the four
22  firearms or the indications of the four firearms that are in
23  evidence or that is on the screen.
24           Do you see the first one, it appears to be a holster
25  and it says Glock 19, carbon fiber; do you see that?

Galicia - cross - Guadagnino                    1154

1    A     I do.

2    Q     Okay.  Would you agree that that is not the type of

3    holster for the gun that's in evidence?

4    A     (No response.)

5    Q     It doesn't say the brand of the gun that you have before

6    you?

7    A     It does not say the brand of the gun in the bag that I

8    have before me.

9    Q     And if you look at the next one down, it says Galco

10   Corvus belt holster, Colt 1911.  Right?

11   A     Yes.

12   Q     Okay.  Would you also agree that that is not a holster

13   for the gun that you have before you in evidence?

14   A     It lists Colt as the gun for the holster, and this is an

15   SCCY.

16   Q     Okay.

17               Now, the next one is a holster for a Glock 26.  Do

18   you see that one?

19   A     I do.

20   Q     And you're familiar with Glocks because that's the brand

21   the FBI carries, right?

22   A     That's correct.

23   Q     And would you agree that that holster is not for the gun

24   that's in evidence?

25   A     This holster states that it's for a Glock 26.

1    Q    Okay, thank you.

2          And then finally, we're getting to the last one,

3    which it says there Galco Corvus belt, and then there's

4    another and IWB, in the waistband, I believe that means,

5    correct me if I'm wrong, holster Smith & Wesson M&P 940.

6          Are you familiar with the brand Smith & Wesson?

7    A    Again, I might have seen one on other searches that I've

8    done or at the academy, but I carry a Glock and most of the

9    individuals that I work with also carry a Glock or Sig Sauer.

10   Q    Okay.  And you also carry your weapon in a holster,

11   correct?

12   A    I do.

13   Q    And would you agree that every single holster is custom

14   fit for a particular type of gun?

15   A    That -- that has been my experience, yes.

16   Q    Right.

17         So if you -- which one do you carry, I'm sorry?

18   A    I carry a Glock.

19   Q    What number Glock do you carry?

20   A    19.

21   Q    A Glock 19, would that be a 9-millimeter?

22   A    Yes, it would.

23   Q    And would you carry a very specific holster for that

24   Glock 19?

25   A    I would purchase a specific holster that matched the

Galicia - cross - Guadagnino                    1156

1  manufacturer and model of the gun I carry.

2  Q    Right.

3         And would you agree then that all of the holsters

4  that are depicted in this, none of them are for the gun that's

5  in evidence?

6  A    I agree that none of them state that they are

7  specifically for SCCY manufactured pistols.

8  Q    Thank you.  Thank you, Agent Galicia.

9         Now, I want to ask you questions about some of the

10 other evidence that you recovered.

11        MR. GUADAGNINO:  We're finished with the gun that's

12 in evidence, and we are also finished with what's on the

13 monitor.  Thank you.

14 BY MR. GUADAGNINO:

15 Q    When you assisted during the search, you never found a

16 taser, did you, in the apartment?

17 A    No, we did not.

18 Q    You never found any mace?

19 A    No, we did not.

20 Q    You never found a baseball bat?

21 A    No, we did not.

22 Q    Okay.  Now, you did find a lot of identification cards

23 that were put into evidence, correct?

24 A    Correct.

25 Q    And they appeared to be a lot of identification from

SAM      OCR      RMR      CRR      RPR

Galicia - cross - Guadagnino                    1157

1  Uzbekistan, correct?

2  A    That's correct.

3  Q    Driver's licenses and things of the sort, correct?

4  A    Sure, passports.

5  Q    Were you able to ascertain whether any of those

6  identifications were fake?

7  A    I personally did not, no.

8  Q    Okay.  And did you ever find any evidence such as

9  commercial driver's license applications that were filled out

10 that corresponded with the identification cards that were

11 found at the location?

12 A    Could you repeat that one?

13 Q    Yes, I can.

14      So, you found a lot of ID cards, right?

15 A    Correct.

16 Q    Did you find any filled out applications that matched

17 those ID cards for commercial driver's licenses?

18 A    No.

19 Q    Okay.  You said that you also found money that was

20 $293,000 in cash, about that, right?

21 A    Correct.

22 Q    Okay.  And you said that you had also found a lot of

23 books, some of them written in Cyrillic, correct, like if they

24 were ledgers?

25 A    Sure, yes.

Galicia - cross - Guadagnino                    1158

1   Q    Right.  And you also stated that some of the money that

2   you found were put into like, wrapped pieces of paper towel;

3   is that right?

4   A    That's correct.

5   Q    And that on the wrapped pieces of paper towel, there was,

6   like, an amount written on there, correct?

7   A    Yes.

8   Q    And then there was an interest rate, it looked like a

9   percentage rate, right?

10  A    It did, yes.

11  Q    Some of the -- some of the pieces that we saw in evidence

12  said 3 percent, I believe, if you remember from yesterday?

13  A    That sounds correct.

14  Q    And 4 percent, right?

15  A    Yes.

16  Q    Now, Special Agent Galicia, as part of your duties have

17  you ever investigated loansharking?

18  A    I, personally, have not.

19  Q    Okay.  Well, do you know, you were taught at the FBI

20  academy about loansharking is, the crime of loansharking?

21  A    I think it was covered generally.

22  Q    Okay.  Do you recall that loansharking is when you lend

23  money at a very high interest rate?

24  A    That generally fits with my understanding of

25  loansharking.

Galicia - cross - Guadagnino                1159

1    Q    Would the term be usurious loan, if you know?

2    A    Yes.

3    Q    And you also, before you became an FBI agent, I believe

4    you testified you were a corporate lawyer?

5    A    That's correct.

6    Q    So, you have legal training, correct?

7    A    Yes.

8    Q    You have a Juris Doctorate degree?

9    A    I do.

10   Q    A degree in law, right?

11   A    Yes.

12   Q    So, usurious means illegal or high interest rate, correct?

13   A    I believe that's correct.

14   Q    Okay.  So, a loanshark would lend you money, like a

15   hundred dollars, at something like 25 percent maybe a month,

16   something like that, correct?

17   A    I don't know specifically at what rate it then is

18   considered to be extremely high or usurious.

19   Q    And you saw that the interest rates were like 3 and

20   4 percent, correct?

21   A    That's correct.

22   Q    It's safe to say that that's not usurious?

23   A    I don't feel like I'm qualified to -- to give an opinion

24   on whether that rate would be usurious or not, if the rate was

25   3 or 4 percent like you stated.

SAM     OCR     RMR     CRR     RPR

1   Q    The rate was 3 or 4 percent, right?

2   A    Yes.

3   Q    And you wouldn't be able to tell us whether in your

4   opinion that was a high or low rate?

5   A    Again, it -- it seems to me that the rate listed was 3 or

6   4 percent.

7   Q    Okay.

8   A    I'm just personally not sure that I'm qualified to -- to

9   say what is a high interest rate or not.

10  Q    Fair enough.

11       Now, I want to ask you some questions also about

12  some of the equipment that you found.  You found some wires

13  and some phones of that nature, correct?

14  A    That's correct.

15  Q    Right.

16       You -- the books, I'm sorry, before we move on to

17  that, you did find books, right, in the apartment, correct?

18  A    Journals, handwritten.

19  Q    Journals, handwritten, right?

20  A    Yes.

21  Q    And to your knowledge, the handwriting, there was

22  different types of handwriting in those journals, correct, not

23  just one kind?

24  A    I'm not sure off the top of my head.

25  Q    All right.  You're not a handwriting expert?

Galicia - cross - Guadagnino                1161

1   A    I'm not, no.

2   Q    And to your knowledge, there were no handwriting analysis

3   done in this case between Mr. Narzikulov and the handwriting

4   in these journals, to your knowledge?

5   A    To my knowledge, I -- I don't have any idea if that was

6   done.

7   Q    To match his type of handwriting with the handwriting

8   that was found in those books, it wasn't done?

9   A    To my knowledge, I just have no information on -- on

10  whether it was done.

11  Q    Okay.

12        Now, you testified that the layout of the apartment

13  was such that there were, I think, two bedrooms, is that

14  correct?

15  A    Yes.

16  Q    All right.  And you had found certain identification

17  items of Mr. Narzikulov in the apartment, correct?

18  A    That's correct.

19  Q    And you had found some New York State driver's licenses,

20  some commercial driver's licenses, and things of that nature,

21  correct?

22  A    Yes.

23  Q    Did you find any identification cards with that

24  particular address that you were located at on April 18th, if

25  you recall from the evidence?

1    A    I would have to look again.  I apologize.

2    Q    It's all right.

3         Well, does anything off the top of your head stand

4    out?

5    A    There were -- I'm sorry, could you repeat your question?

6    Q    Did you find any evidence of that being his address?

7    A    Being 2302?

8    Q    Yes.

9    A    Off the top of my head, I can't think of anything

10   specific.

11   Q    Okay.  So, I believe you testified that you did find some

12   equipment, you found some wires, some earpieces, and things of

13   that nature, correct?

14   A    Yes.

15   Q    Had any of those items ever been tested to see whether or

16   not they work, if you know?

17   A    I'm not sure.  I -- I believe that they -- they were, but

18   I -- I'm not sure.

19   Q    You're not sure, I got you.

20        And I believe that you also testified that you

21   photographed the apartment after the search, is that right?

22   A    Yes.

23   Q    Okay.  And you photographed many different areas of the

24   apartment, correct?

25   A    Yes.

Galicia - cross - Guadagnino                    1163

1    Q    Did you also photograph the closet that you searched
2    where the gun was found?
3    A    Photographs were taken of that closet.
4    Q    And did you take those photographs?
5    A    I did not, Special Agent Michael Buscemi took all of the
6    photographs.
7    Q    Agent Buscemi.
8         That day did you see Detective Dominic Jaworski from
9    the NYPD?
10   A    I did.
11   Q    And you're aware that he recovered the gun?
12   A    Yes.
13   Q    From the closet, right?
14   A    Yes.
15   Q    Did you take the picture that showed the gun in the box
16   and the magazines?
17   A    I, personally, did not.
18   Q    Okay.  And you testified, I believe yesterday, that you
19   found some -- a box of bullets, is that right?
20   A    A box of bullets was found, yes.
21   Q    Right.  And the bullets, the caliber that were found was
22   9-millimeter?
23   A    That's correct.
24   Q    And the gun that was found in the closet was a
25   9-millimeter?

1   A     Yes.

2   Q     Okay.  Do you know if the gun that was found in the

3   closet was tested for operability?

4   A     I know it was taken to be tested, but I don't know what

5   tests they -- were run on the gun --

6   Q     Okay.

7   A     -- specifically.

8   Q     Are you trained in firearm analysis, not DNA, I'm not

9   asking you about DNA profile, firearm analysis, ballistics?

10  A     Again, we do general overview at the academy, but I have

11  no specific training on ballistics.

12  Q     You testified that some of the bullets, most of the

13  bullets that you found were bullets that were not fired,

14  correct?

15  A     I would say yes, the majority of the bullets we found

16  were not fired.

17  Q     And then yesterday I believe you did circle some expended

18  shells that were in the bag?

19  A     Yes, that's correct.

20  Q     Which would indicate that the bullet had left the shell,

21  so it was fired?

22  A     Yes.

23  Q     Are you familiar with testing spent shells to see whether

24  that particular shell was fired from a particular gun called a

25  microscopy?

Galicia - redirect - Nguyen                1165

1  A    Again, I have a general awareness, but no specific

2  training on that process.

3  Q    Well, as an agent who participated in this case, are you

4  aware if microscopy was done to match the spent shell with

5  that particular gun to see if that gun fired that bullet, that

6  shell?

7  A    I have no information on whether that type of examination

8  was completed.

9       MR. GUADAGNINO:  Thank you, Agent Galicia.  I have

10  no further questions.

11       THE COURT:  All right, any redirect?

12       MS. NGUYEN:  Yes, Judge.

13  REDIRECT EXAMINATION

14  BY MS. NGUYEN:

15  Q    Agent Galicia, good morning.

16  A    Good morning.

17  Q    Agent Galicia, I'd like to go back to the surveillance

18  operation we spoke about that you -- that you testified about.

19       I believe you were asked if the objective of the

20  surveillance was to take photographs.

21       Was that the only objective?

22  A    No, the primary objective was to observe what happened

23  during the operation and to document what happened

24  accordingly.  And also, to ensure the safety of Mr. Giyasov.

25       Taking photographs was one part of documenting what

SAM      OCR      RMR      CRR      RPR

Galicia - redirect - Nguyen                1166

1   happened and being able to observe what happened.

2            MS. NGUYEN:  I'd like to show, for the witness only,

3   what's been marked for identification as Government

4   Exhibit 111.

5   BY MS. NGUYEN:

6   Q    Agent Galicia, this is a three-page exhibit, which I'd

7   like for you to review.

8            Do you recognize this exhibit or what's contained in

9   this exhibit?

10  A    Yes.

11  Q    What are they generally?

12  A    These are generally surveillance photos.

13  Q    Are they from the surveillance operation on April 7th?

14  A    Yes.

15  Q    And do they fairly and accurately depict your

16  observations while you were conducting surveillance on that day?

17  A    They do.

18            MS. NGUYEN:  The Government offers Exhibit 111 into

19  evidence.

20            MR. GUADAGNINO:  No objection, Your Honor.

21            THE COURT:  Received.

22            (Government's Exhibit 111 was received in evidence.)

23  Q    Generally speaking, what's the difference, if any,

24  between these three photographs that's contained in

25  Exhibit 111 and if you recall the Exhibit 109 that we reviewed

1   yesterday?

2          (Exhibit published.)

3   A    Well, these ones are a bit more blurry than the ones from

4   yesterday.

5   Q    And where were you positioned -- well, who took these

6   photographs, if you know?

7   A    I took these photographs.

8   Q    And where were you positioned when you took these

9   photographs?

10  A    I was in the back seat of a vehicle.

11  Q    And you mentioned that some of these appear a little bit

12  blurry.

13          Can you describe the process you were going through

14  as you were taking these photographs?

15  A    While they were pulled up outside of the -- the

16  apartment, while we were observing what was happening, I

17  thought it would be a good idea to -- to document what was

18  happening.  And so, I took these photos, as best I could,

19  while Mr. Giyasov and Mr. Kamolov were -- were parked outside

20  the car -- I'm sorry, while they were parked outside the

21  building and as they were exiting the vehicle.

22  Q    And looking at page 3 of Exhibit 111, can you describe

23  what's happening here?

24          (Exhibit published.)

25  A    So, Mr. Giyasov is -- I can't tell from the photo if

SAM      OCR      RMR      CRR      RPR

1  they're getting back into the car or they're exiting the

2  vehicle.

3  Q    And were you able to take any photographs after they

4  exited their -- their vehicle and your obstruction was

5  blocked -- your view was obstructed, excuse me?

6  A    I -- I don't believe I took any further photos.

7  Q    And you agree that if you got out of the car, you would

8  have been able to take additional photos?

9  A    Yes, I could have.

10 Q    Can you explain to us why you didn't do that?

11 A    We were observing these activities covertly.  We didn't

12 want either Mr. Giyasov or Mr. Kamolov to -- to realize that

13 we were there watching them and keeping an eye on the

14 operation.

15         So, we thought it would be, you know, strange to get

16 out of the car and to, obviously, take photos in a better

17 vantage point.  So, I stayed where I was, as did my partner,

18 to observe as best we could from where we were.

19 Q    And you testified that the purpose of this outing was, as

20 you understood it, a delivery of a payment of about a thousand

21 dollars, is that right?

22 A    Yes.

23 Q    And if everything had gone to plan, were you planning on

24 making an arrests?

25 A    We were not planning on -- on making an arrest that

1    night, unless there was a reason to.

2    Q    And what kind of reason would cause you to make an

3    arrest, if it wasn't already part of the plan?

4    A    If there was some sort of threat to Mr. Giyasov, we

5    would, of course, intervene to prevent any harm coming to him

6    and effect an arrest there.

7             MS. NGUYEN:  Thank you, Agent.  I have no further

8    questions for you.

9             THE COURT:  All right, you may step down.

10            (Witness steps down and exits the courtroom.)

11            THE COURT:  Government's next witness.

12            MR. BUFORD:  Your Honor, the Government recalls

13   Hislatjon Sadizoda.

14            THE COURT:  All right.

15            (Witness entered and resumed the stand.)

16            THE COURT:  Welcome back.

17            THE WITNESS:  Thank you.

18            THE COURT:  You're still under oath.

19            THE WITNESS:  Thank you, Your Honor.  May I be

20   seated?

21            THE COURT:  Yes.

22            You can take your mask off if you want.

23            THE WITNESS:  Gotcha; thank you.

24            MR. BUFORD:  Your Honor, may I proceed?

25            THE COURT:  Yes.

Sadizoda - direct - Buford                    1170

1    **HISLATJON SADIZODA**,

2         recalled as a witness by the Government, having been

3         previously duly sworn/affirmed by the Courtroom Deputy,

4         was examined and testified further as follows:

5    DIRECT EXAMINATION

6    BY MR. BUFORD:

7    Q    Good morning, Mr. Sadizoda.

8    A    Good morning.

9    Q    I'd like to ask you about a couple additional materials

10   that you were asked to translate in this case, but before I

11   do, can you remind the jury what languages in which you are

12   fluent?

13   A    Tajic, Uzbek and Russian, and English.

14   Q    I'd like to show you what's been marked as Government

15   Exhibit 514A in evidence.

16         (Exhibit published.)

17   Q    And ask if you recognize that?

18   A    Yes, I do.

19   Q    What is it?

20   A    This is a --

21         THE COURT:  Hold the mic a little closer, please.

22   A    This is a recording of a chat.

23   Q    Does the chat contain written textual messages, as well

24   as audio files?

25   A    Yes, both.

1   Q    In what language were the written textual messages?

2   A    Tajic.

3   Q    And what language was spoken in the audio files?

4   A    Tajic, as well.

5        MR. BUFORD:  And I'd like to show for the witness

6   only now what's been marked for identification as Government

7   Exhibit 514B.

8   Q    And we will show you a couple of pages of it.

9        Do you recognize this?

10  A    I do.

11  Q    What is this?

12  A    This is the transcription of the 514A that we just saw

13  before this, in Tajic and English.

14  Q    Did you prepare this document?

15  A    I translated it, what's inside.

16  Q    Does 514B contain the original textual messages that were

17  exchanged?

18  A    Yes.

19  Q    And does it contain transcriptions of the audio files in

20  the original language in which -- in which they were spoken?

21  A    It does.

22  Q    And does it contain corresponding English translations

23  for both of those things?

24  A    Yes.

25  Q    And are the transcriptions of the audio files accurate to

SAM     OCR     RMR     CRR     RPR

Sadizoda - direct - Buford          1172

1    the best of your knowledge?

2    A    To the best of my knowledge, yes.

3    Q    And are the translations of the text messages and the

4    transcripts of the audio files accurate to the best of your

5    knowledge?

6    A    To the best of my knowledge, yes.

7    Q    Is the entire chat longer than what's transcribed and

8    translated in Government Exhibit 514B?

9    A    Yeah, I believe so.

10   Q    And so, Government Exhibit 514B is an excerpt, is that

11   right?

12   A    Correct.

13   Q    And the entire chat spans a longer period of time than

14   the excerpt?

15   A    I believe so, yes.

16        MR. BUFORD:  Your Honor, we would offer Government

17   Exhibit 514B into evidence.

18        MR. GUADAGNINO:  I have no objection, Your Honor.

19        THE COURT:  Received.

20        (Government's Exhibit 514B was received in

21   evidence.)

22        MR. BUFORD:  And looking at the first page, if we

23   could zoom in on the writing in the middle.

24        (Exhibit published.)

25   BY MR. BUFORD:

Sadizoda - direct - Buford                1173

1  Q    Does this chat involve someone identified as Firuz 88?

2  A    Yes.

3  Q    And is it your understanding there's one other person

4  involved in the chat, is that right?

5  A    Yes.

6  Q    And does this chat come from a device that was used by a

7  person?

8  A    It appears to be, yes.

9  Q    And is it your understanding that the other person

10 involved in the chat is the user of the device?

11 A    Correct.

12        MR. BUFORD:  If we go to the second page of the

13 exhibit, and zoom in on the top few rows there.

14        (Exhibit published.)

15 BY MR. BUFORD:

16 Q    Can you walk us through the information that's contained

17 in each of the columns beginning with the Date/Time column?

18 A    Yeah, all the way on the left you'll see the date and

19 time.  And if you look at the second row, it shows the time in

20 the second -- the second column.

21        And then the second row you will see I/O.  That

22 stands for incoming and outgoing.  So, as you can see, the

23 first message is an outgoing since it has an O in the second

24 row.  And if you look at the third row, that is the English --

25 English translation of the transcription that's located all

1    the way on the right, which is Original Text written in

2    Cyrillic, in Tajic language.

3    Q    And when you look at column 2, you testified that this

4    is, your understanding is that this is an outgoing message, is

5    that correct?

6    A    Correct.

7    Q    Does that mean the user of the device sent this message?

8    A    That's what I understand, yes.

9    Q    And an incoming message would be a message received by

10   the user of the device, is that right?

11   A    Correct.

12   Q    And going to the far right column, Original Text, it says

13   there:  Voice message, and then duration 9 seconds.

14         What does that mean?

15   A    Voice message meaning it's a voice message, the audio

16   that has been sent.  And duration is telling us how long it

17   is.  And 63.wav, that's the name of that audio file, I

18   believe.

19   Q    And right below that there is a transcription.

20         Is that in Cyrillic?

21   A    That's in Cyrillic, yes.

22   Q    And is that a transcript of what is said, to your

23   knowledge, in the voice message?

24   A    Correct.

25   Q    And can you read for us your translation of that voice

Sadizoda - direct - Buford                1175

1   message?

2   A    "Can you call me urgently?  After you drop off the

3   clients.  I think you are with clients.  After you drop off

4   the clients, I have to talk to you for one minute.  After

5   clients, can you call me urgently right now?  Thank you, I am

6   waiting."

7   Q    And what was the date and time for that message?

8   A    That's March 27, 2019, 4:33 p.m.

9   Q    And can you read for us your translation of the next

10  message?

11  A    Yes.  Date of it is March 28, 2019, 9:09 a.m.

12       It says, "Take his/her phone and do not give it

13  back."

14  Q    And that's a translation of a text message, right, as

15  opposed to an audio file, right?

16  A    Correct.

17  Q    And can you read first your translation of the next one?

18  A    It is on March 28, 9:10 a.m.

19       It says, "of course."

20  Q    And what does it mean when it says "misspelled" in

21  brackets?

22  A    Well, one of the letters is something else.  Like, for

23  example, instead of -- in the -- if you want to imagine an

24  English alternative of it, imagine that the word of course,

25  instead of the S there was a N.  So, there was one letter

1    misspelled.

2            MR. BUFORD:   If we could zoom back out and go to the

3    next set of messages.

4            (Exhibit published.)

5    BY MR. BUFORD:

6    Q    Can you read us your translation of the next message?

7    A    "We will not give."

8    Q    How about the next one?

9    A    "His/her green card."

10   Q    Are those both outgoing messages?

11   A    Yes, they're both outgoing.

12   Q    And what are the dates and times associated with those

13   messages?

14   A    They're both March 28, 2019, 9:11 a.m.

15   Q    Can you read us the -- is the next message, does the next

16   message consist of text or is it a picture?

17   A    It seems leak a thumb's up emoji.

18   Q    What's the date and time of that thumb's up emoji?

19   A    That's March 29, 2019, 1:39 p.m.

20   Q    Is that an incoming message?

21   A    Yes.

22   Q    If we go to the next two rows, what are the dates and

23   times for the messages in the next two rows?

24   A    Both dates are March 29, 2019, the first one is 1:39

25   p.m., the other one is 2:18 p.m.

Sadizoda - direct - Buford                1177

1    Q     Starting with the first message, the second row from the

2    bottom, is that another audio file?

3    A     Yes, it is.

4    Q     What is your translation Of the audio file there?

5    A     Unintelligible.  Did you take 1,000 currency units,

6    Firuz, 1,000 units?  Or 1,000 units are not enough?

7    Q     And can you read your translation of the next message?

8    A     "Yes, I took $1,000."

9    Q     And going back to the previous message, in brackets it

10   says "currency."  What does that mean?

11   A     They use the word currency for -- that's for Uzbekistan,

12   but that's usually refer to a currency.  So, you put currency

13   for that.

14         MR. BUFORD:  Okay, we are going to set that exhibit

15   aside now.

16         THE COURT:  What is the currency in Uzbekistan?

17         THE WITNESS:  Soum.

18         THE COURT:  Soum.  So, it would be 1,000 soum?

19         THE WITNESS:  Yes.

20   BY MR. BUFORD:

21   Q     Showing you what's been marked as Government Exhibit 510A

22   in evidence.

23         (Exhibit published.)

24         MR. BUFORD:  I'm sorry, not 510A.  I apologize, that

25   was my mistake.  515A.

1              (Exhibit published.)

2    BY MR. BUFORD:

3    Q    Do you recognize this?

4    A    Yes, I do.

5    Q    What is it?

6    A    This is a chat.  I believe this is a Facebook messenger

7    chat.

8              MR. BUFORD:  If we could zoom in on the top.

9    Q    Can you tell who the chat is between?

10   A    Yes.  It's Jasur Kamolov, which happens to be the owner,

11   and Firdavs Giyasov.  These two are exchanging messages.

12   Q    And in what language is the chat?

13   A    Tajic and Russian.

14   Q    I'd like to show you what's been marked, for the witness

15   only, as Government Exhibit 515B.

16              Do you recognize this?

17   A    Yes.

18   Q    What is it?

19   A    This is the transcription and translation of the previous

20   chat that we saw, which is -- I believe, is 515A exhibit.

21   Q    We can show you a couple of the pages.

22   A    Sure.  Yes, it is.

23   Q    Did you prepare this document?

24   A    I translated its contents, yes.

25   Q    And does it contain transcriptions or, at least, I'm

1  sorry, not transcriptions, does it contain the original

2  messages in the language in which they were written?

3  A    Yes, it does.

4  Q    And does it contain English translations of those

5  messages?

6  A    Yes.

7  Q    And are the translations accurate, to the best of your

8  knowledge?

9  A    To the best of my knowledge, yes.

10        MR. BUFORD:  Your Honor, we would offer Exhibit 515B

11  into evidence.

12        MR. GUADAGNINO:  No objection, Your Honor.

13        THE COURT:  Received.

14        (Government's Exhibit 515B was received in

15  evidence.)

16        MR. BUFORD:  And if we could start at page 2 of the

17  document and zoom in on the first few rows.

18        (Exhibit published.)

19  BY MR. BUFORD:

20  Q    Can you explain for us the information in the columns

21  here?

22  A    Yes.  You can see on the left participants, date and

23  time; meaning who is sending the message, its date and its

24  time.  The middle row is the English Translation of the

25  Original Text, which is all the way on the right.

Sadizoda - direct - Buford                1180

1  Q    And looking at the first column, Participants, Date/Time,

2  is it your understanding that the participant identified there

3  is the sender or speaker of the message?

4  A    Yes, he is the sender.

5  Q    And looking at that first row, when does the chat begin

6  or what is the earliest message in the chat?

7  A    March 28, 2019, 8:30 p.m.

8  Q    And can we go with the English translations of the

9  messages, beginning with the first row?

10 A    The first one says:  "Jasur."

11         Going on?

12 Q    Yes.

13 A    "Now, you can call each other and see information, such

14 as the 'online status,' as well as what time you read

15 messages."

16 Q    How about the next message?

17 A    "Firdavs missed a video chat call."

18         "Good."

19         MR. BUFORD:  Can you show the next few rows?

20         (Exhibit published.)

21 A    "Are you alone?"

22         "Where are you"?

23         "Yes, at my home."

24         "Did Akmal give you my phone?"

25         "The number?"

Sadizoda - direct - Buford                    1181

1    Q    Okay.

2              MR. BUFORD:   Could we go to the next page?

3    A    "Akmal said that he will tell Jasur to take it to you."

4              "No, he did not give it."

5              "Tell him to call, tomorrow I have to go to work."

6              "Go outside now."

7              "I am coming to you."

8              "Come on."

9              "In how long will you come"?

10             "10 minutes."

11             "Ok."

12             "Write to me when you come."

13             "Ok."

14             "Firdavs missed your call."

15             "Firdavs missed your call."

16             "You missed a video chat call with Firdavs."

17             "Firdavs missed your call."

18             "Firdavs missed your call."

19             "Firdavs missed your call."

20             "Go out to the street, I have to talk to you."

21             "Ok."

22             "Where are you"?

23             "Come out."

24             "Damn it, I am standing in the cold."

25             "Did you arrive yet?"

Sadizoda - direct - Buford                1182

1              "Come out you fucker."

2              "Ok."

3              "In how long until you come out."

4              "?"

5    Q    And what is the date and time of the last message in the

6    chat?

7    A    March 28th, 8:30 p.m.

8              MR. BUFORD:  We can set that aside now.

9    BY MR. BUFORD:

10   Q    And I am going to show you what's in evidence as

11   Government Exhibit 510A.

12             (Exhibit published.)

13   Q    Do you recognize that?

14   A    Yes.

15   Q    And what is it?

16   A    I believe this is a video of recording of three

17   participants.

18   Q    Have you had a chance to review the video --

19   A    Yes.

20   Q    -- before you testify?

21   A    Yes.

22   Q    From your review, what languages are spoken in the video?

23   A    Russian and English.

24

25             (Continued on following page.)

SAM      OCR      RMR      CRR      RPR

Sadizoda - direct - Buford                    1183

1    BY MR. BUFORD:

2    Q    Showing now for the witness only what is marked for

3    identification as 510B.  Do you recognize this?

4    A    Yes, I do.

5    Q    What is this?

6    A    This is a English transcript of the video recording of

7    the three participants from 510A.

8    Q    To be clear, is this a transcript or a translation?

9    A    This is both.  Whenever you see italics, that is the

10   transcription of the original language that was spoken in

11   English.  If it's regular text, then it's a translation from

12   Russian.

13   Q    But the Russian language is not reproduced in this

14   document?

15   A    It's not.

16   Q    Did you prepare this document?

17   A    Yes.

18   Q    Is it an accurate translation of the Russian part of the

19   video to the best of your knowledge?

20   A    To the best of my knowledge, yes.

21           MR. BUFORD:  We would offer Government's Exhibit

22   510B into evidence.

23           MR. GUADAGNINO:  No objection, your Honor.

24           THE COURT:  Received.

25           (Government's Exhibit 510B was received in

Sadizoda - direct - Buford                1184

1    evidence.)

2    BY MR. BUFORD:

3    Q    If we can zoom in on the very top.  When you're listening

4    to the video how many total speakers did you hear?

5    A    Three.

6    Q    Are those identified as UM or unidentified male one, UM2,

7    and UM3?

8    A    Correct.

9    Q    From your review of the video, who does most of the

10   talking in the video?

11   A    From what I remember, UM1 and UM2 speak the most; I

12   believe UM3 speaks only one sentence.

13   Q    Again, just for clarity's sake, the parts of this

14   document that are in italics mean they are spoken in English

15   on the video; is that correct?

16   A    Correct.

17   Q    If its non-italicized, it was originally in Russian and

18   this is a translation?

19   A    Yes.

20   Q    If we can focus on the non-English parts.  Can we look at

21   the first part of the translation?  Can you read that for us?

22   A    UM1:  No, listen to me.  Whatever, whatever he even hints

23   that you have to leave.

24        I am telling you that this is a hint and this is

25   obstruction of justice.  Don't do it.  You will be arrested.

Sadizoda - direct - Buford                    1185

1    You will be jailed.  And him too.

2              For what?

3              Him for what?

4              If he runs away.

5              He is not running away.

6              I'm not running away -- I -- they said.

7    Q    That last line is that from unidentified male three?

8    A    Yes.  I believe that's the only one.

9    Q    Go to the bottom part of the translation, first page?

10   A    UM1:  Fine.  I'll tell you how it has to be done.  You

11   have to hire a lawyer, right.  Who will contact the

12   prosecutors and will find out what they want to do, why they

13   need you.  And from that point to come to an agreement with

14   them in a professional way.

15             Not the way you're saying, but how fine.

16             Not the way you are saying.

17             Fine, to come to an agreement in a professional way

18   what do you mean by it?

19   Q    If we can go to the top of the next page?

20   A    I know what I mean.  I will get in touch with them.  What

21   you mean, pardon me, you don't not understand at all.  Because

22   I met with these agents.  I am telling you they are very

23   serious.  And if they would want him to testify in court, you

24   will not be able to do anything.  And he will have to testify

25   in court.  And what you offered me now, if he has to go away,

Sadizoda - direct - Buford                    1186

1   as I understood it already, you want him to leave, not

2   testify.

3            I did not say anything like this you went too far

4   again.

5            No, I went straight forward.  It is you who is going

6   in a roundabout way.

7            No, I do not say that.  Murodjon, when I heard your

8   voice on the other line.

9            I know you were not happy.  I know about it.

10           Because I know what you will do to him.  You will

11  fuck him over and you will fuck yourself over.

12           Who did I fuck over before this?

13           You will screw him over by even giving him this

14  indirect advice.  This is wrong here.  You will set him up.

15           How can I set him up?

16  Q    Is the next the translation in English as it was

17  originally spoken?

18  A    Yes, just a few words, but the majority of it is in

19  Russian, yes.

20  Q    Go to the next page.  Zoom in on the top.  Is this

21  continue to be in italics indicating it was spoken originally

22  in English?

23  A    Correct.

24  Q    Go to the bottom.

25  A    2:53, UM2: He is saying.

Sadizoda - direct - Buford                1187

1           I am saying because I want to be clearly understood.

2           May I telephone.

3           No.  I am saying it specifically because it is

4    wrong.  Murodjon, what you are doing is wrong.  This is wrong.

5           I, I nothing.

6           I am telling you this is wrong.

7    Q    Then go to the top of the next page.

8    A    The first part is in italics, spoken in English.

9           UM2, 3:44:  You are recording conversation for no

10   reason at all.

11          No, there is a reason.  I am saving you.  I am

12   saving you.

13          Or setting me up.

14          No, I would set you up if I quietly recorded you,

15   set you up, and telling you calmly walk away.

16          Noise in background.

17          Step away quietly, step away from this business

18   quietly.  That is it.  We forget that this meeting ever took

19   place.  If you want me to help him, help in a clean way, you

20   are not here at all.  He came in, hired me.  I calmly do

21   everything.  If you have this level of trust of me, yes, I

22   will do it.  I will help them.  You have nothing to do with

23   this.  Think about it, okay.  Think about it.  If you know me

24   for as many years as you know me, you should know that I

25   treated you in truly fraternal way.  I'm telling you, walk

Sadizoda - direct - Buford                    1188

1    away.  So long.  Guys this is not something for me.  No.  This

2    business is not for me.  Sorry.  Sorry guys this is not for me

3    so long.

4            Not at all.  I did not meet you, with you at all.  I

5    did not even have a meeting with you.  I'll prove it to you in

6    life.  Not just in business, in life.  I did not even meet

7    you, that is it.

8            End of recording.

9    Q    We can set that aside.

10           I'm going to show you what is marked as Government's

11   Exhibits 511A and 512A, do you recognize this?

12   A    Yes, I do.

13   Q    Generally speaking what are they?

14   A    These are phone call conversations, audio files, between

15   two people.

16   Q    You listened to the audio files on those?

17   A    Yes.

18   Q    What languages are spoken on the files?

19   A    Tajik.

20   Q    I'm going to show you now for identification purposes,

21   only for the witness, first Government's Exhibit 511B.  Do you

22   recognize this?

23   A    Yes, I do.

24   Q    Showing you for identification 512B.  Do you recognize

25   that?

1    A    Yes.

2    Q    What are Government's Exhibit 511B and 512B?

3    A    These are transcripts of the original language and their

4    translations of the 511A and 512A I believe.

5    Q    Are the transcripts and translations in 511B and 512B

6    accurate to the best of your knowledge?

7    A    To the best of my knowledge, yes.

8          MR. BUFORD:  At this time, based on the testimony of

9    Ronald Fields, these audio files were made and kept by the MDC

10   in the normal course of business and the testimony of Firuz

11   Juraev regarding his identification of the voices on the

12   recordings, the Government would offer 511A, 511B, 512A, 512B

13   into evidence.

14          MR. GUADAGNINO:  No objection, your Honor.

15          THE COURT:  Received.

16          (Government's Exhibits 511A, 511B, 512A and 512B

17   were received in evidence.)

18   BY MR. BUFORD:

19   Q    Starting with Government's Exhibit 511A, I'd like to play

20   the first minute or so of the recording.  There is a delay in

21   the beginning before there is any sound, so it is playing.

22          (Audio played.)

23          We can stop the recording there.  Look at 511B in

24   evidence.  If we zoom in on the middle there, on the first

25   page.  What is your understanding of the date and time for

1  this call?

2  A    My understanding the date is October 16, 2019, the time

3  is 7:29 a.m.

4  Q    Go to page two of the exhibit, zoom in on the top row.

5  Can you remind us what information is contained in the columns

6  of this document?

7  A    On the left row, first row on the left, are the

8  participants.  Middle row are the English translations,

9  transcriptions from the original language, which are located

10 all the way on the right row.

11 Q    Are the transcriptions in Cyrillic?

12 A    Yes.

13 Q    Go to page three of the document, the bottom three rows.

14 Could you read for us your translations of the audio recording

15 for that part of the call?

16 A    Unidentified male one:  If you are behind the wheel, can

17 you stop the car?  We need to talk.  It's urgent.  Listen.

18          Yes.

19          Could you call your friend Zufar right now.  Because

20 it is a task that can be done over-the-phone.  In short, you

21 have to contact mine, my boss needs to be contacted, like a

22 back to back call needs to be made, if possible.  If he

23 doesn't pick up then try every 30 minutes, one hour.  Maybe

24 try to call him from different number, maybe he will pick up.

25 Because I'm --

1   Q    You can stop there.  Go to page six now.  Starting with

2   the fourth row from the bottom, just the fourth row from the

3   bottom.  Can you read your translation of that portion of the

4   call for us?

5   A    Over there, this and that.  He will not say how much and

6   what, even if he says how much like from 100 to 150K for

7   example, then you know.  Re's younger brother.  You

8   understand.

9   Q    Can we go to page 21 of the exhibit?  Third row from the

10  bottom.  Read the translation of that portion of the call.

11  A    He should say it for sure.  Ultimately when it is eight

12  keep calling, maybe it is already almost eight.  He will wake

13  up.  If he does not, then he should start calling from 8:30,

14  nine.  Ultimately if he has two connections, the first one

15  should be called from this.  If he does not pick up, then

16  after 30 minutes he should call from the other one.  You

17  understand?  If he calls from the two times then you know

18  still.

19  Q    If we go to the next page, read your translations

20  starting from row two going through row five.

21  A    The main thing in short we say that thing to him or not.

22  Or not; is that right?

23            Say it, I'm saying that it needs to be said.  I'm

24  telling you to say it.  I wanted to say it today this bastard.

25            No, this must be said.  Then we say it to him, then

Sadizoda - direct - Buford                 1192

1   we will ask him should we tell him or not, if we should tell

2   them or not.

3           Yes.  It needs to be said.

4   Q    Finally if we go to the last page, page 24, read the

5   translations there except for the last row.

6   A    Will say.  This one in depth.  Starting from eight do it,

7   eight, 8:30 latest nine.  Call at eight too if he does not

8   pick up then call again two times.  Hey, you know his second

9   one right, 566-2242.  It begins with 212-566-2242.  His

10  mobile.

11          Unintelligible.

12          You know, right.

13          Mhmm, yes.

14          Write it down (212)566-2242.

15          Aha.

16  Q    Can we now go to Government's Exhibit 512A and play the

17  first minute or so of the recording?

18              (Audio played.)
            Mr. Sadizoda, can you describe the dial tone we just

19  heard?

20  A    I think if you grow up listening to it, it might may

21  sense, but right now it may not.  It's a little bit not clear,

22  it's a little bit longer than the one we hear in the U.S.

23  Q    Keep playing.

24              (Audio played.)

25          We can stop it there.  Can we bring up Government's

Sadizoda - direct - Buford                1193

1   Exhibit 512B and zoom in on the middle.  What is your

2   understanding of the date and time of this call?

3   A    My understanding is it's October 16, 2019, time

4   12:28 p.m.

5   Q    Go to page three of this document and zoom in on the

6   bottom four rows.  Can you read your translations of this part

7   of the call?

8   A    Zufar called and spoke to your boss.

9        Okay, okay.

10       He did Ar Ar to Zufar saying why did you tell me

11  this like this.  Why did you tell me?  You should not have

12  told me.  Like this, like that.  Understand?

13       Yes, yes.

14  Q    Go to the next page, can we read your translations,

15  starting from the beginning and going down to the end?

16  A    This is bad, such and such, damn it.  Something else.  In

17  short it is like that.  He's doing that about that.  And he

18  told me that it ruined his mood by doing Ar Ar to me he was

19  like, no, why are you saying this?  Okay.  You should not have

20  told me these things, like this and like that.  Do you know

21  what kind of thing this is?  This thing is this and that.  He

22  did that by saying these.

23       Hmmm.

24       I told Zufar, I told him, talk about the Qe.

25       Right.

Sadizoda - direct - Buford                 1194

1    He said, oh, shit, fuck.  At the end he said okay.
2  Imagine that you did not hear this thing and hung up.  What
3  else he can say.
4          Hmmm.
5          Do you understand?
6  Q    If we go to the next page can you read these
7  translations?
8  A    Yes, I understand.  I understand.
9          He said, ah shit, and hung up.  And he's doing that
10 to me.  He's not messaging me saying shit I probably should
11 have told him this and that.  I said I don't know.
12         Okay.
13         He said about all those numbers.  Understand?  By
14 saying how that happens.  Unintelligible.  The number that it
15 has?  Then something, something.
16         No, I got it.  He explained it, right?
17         Right.  He said, do you know that it's this and
18 that?  Yes.  Why are you telling me this kinds of things.  Do
19 you understand he was fucking shocked and hung up.
20         Okay.  No, okay.  It's fucking nothing.  He's a
21 bastard.
22 Q    You can set that aside.  I'd like to play the beginning
23 of Government's Exhibit 504A in evidence.
24         (Audio played.)
25 Q    Stop it there.  Is that a different dial tone than the

Sadizoda - cross - Guadagnino                1195

1  one on the previous calls?

2  A    Yes.  It's kind of hard to tell.  When you go on

3  listening to it, it's like and instant déjà vu, when you hear

4  dials from back home, calls we made from -- the dial tone back

5  in Uzbekistan is different than the dial tone in the U.S.

6           MR. BUFORD:  Your Honor, can I have a minute?

7           No further questions.

8  CROSS-EXAMINATION

9  BY MR. GUADAGNINO:

10 Q    You said the dial tone in Uzbekistan is different?

11 A    Yes.

12 Q    Do you know what the dial tone is say from Puerto Rico to

13 the United States would be?

14 A    To any other country, no.  I'm only familiar with the one

15 that I made, regular phone calls to my Mom, for example, here

16 in the United States.  And if I made a phone call back in

17 Uzbekistan or while I lived in Uzbekistan, if somebody called

18 me or I called somebody, the dial tone.

19 Q    But you're not sure if that dial tone that you say is

20 particular to Uzbekistan could be particular to another

21 country, correct?

22 A    Correct.

23 Q    You can't say that dial tone is specifically Uzbeki?

24 A    I didn't say specifically, only used in Uzbekistan.  But

25 I said that when I hear that dial tone, it is a dial tone that

Sadizoda - cross - Guadagnino                    1196

1   I heard growing up in Uzbekistan.

2   Q    But you're not familiar with -- in other words you don't

3   know if that dial tone that you're familiar with from

4   Uzbekistan comes from another country?

5   A    Right.

6   Q    Or even another location in the United States?

7   A    It's possible.

8            MR. GUADAGNINO:  I have no further questions.

9            THE COURT:  All right.  You may step down.  Thank

10  you.

11           (Whereupon, the witness was excused.)

12           THE COURT:  Government's next witness.

13           MS. NGUYEN:  The Government calls David Rivera.

14           (Witness takes the witness stand.)

15           THE DEPUTY CLERK:  Please raise your right hand.

16           THE WITNESS:  I do.

17           (Witness sworn.)

18           THE DEPUTY CLERK:  State your name.

19           THE WITNESS:  David Rivera, D-A-V-I-D, R-I-V-E-R-A.

20           THE DEPUTY CLERK:  Thank you.  You may be seated.

21

22           (Continued on the following page.)

23

24

25

Rivera - direct - Nguyen                    1197

1  **DAVID RIVERA**,

2       called as a witness by the Government, having been first

3       duly sworn/affirmed by the Courtroom Deputy, was examined

4       and testified as follows:

5  DIRECT EXAMINATION

6  BY MS. NGUYEN:

7  Q    Good morning, Mr. Rivera.

8  A    Good morning.

9  Q    Are you currently employed Mr. Rivera?

10 A    Yes, I am.

11 Q    What do you do?

12 A    I'm a police officer with the Palm Beach County School

13 Police Department.

14 Q    How long have you been doing?

15 A    That I was recently hired about approximately two weeks

16 ago.

17 Q    What did you do before that?

18 A    Before that I was a detective investigator with the NYPD

19 Internal Affairs Bureau.

20 Q    So you recently moved to Florida?

21 A    Yes.

22 Q    What did you do at the Internal Affairs Bureau at the

23 NYPD?

24 A    As a detective investigator I investigated allegations of

25 corruption and serious misconduct against members of the New

Rivera - direct - Nguyen                    1198

1   York City Police Department.

2   Q     During your work at the Internal Affairs Bureau, did you

3   have occasion to work with the FBI?

4   A     I did.  The team or the group that I was assigned to at

5   the time in Internal Affairs was Group 25, and we were focused

6   on working with federal agencies within New York City and

7   assist them with their investigations, particularly pertaining

8   to members of the New York City Police Department.

9           THE COURT:  Pull the mic closer.

10  Q     Did you have a title as a Task Force officer as well?

11  A     I did.  In 2014 I was part of a team that would be

12  specifically dedicated to assist the FBI's public corruption

13  Task Force.  I was given the title of Task Force officer.

14  Q     Were you part of that Task Force from approximately 2014

15  to when you left the NYPD?

16  A     Yes, I was.

17  Q     While you were a Task Force officer, did you participate

18  in an investigation relating to an individual named Firdavs

19  Giyasov?

20  A     I did.

21  Q     Generally, what was your role in that investigation?

22  A     I wasn't the case agent or the primary investigator, but

23  when asked to assist I would assist with whatever was needed

24  for their case.

25  Q     Before we talk about some of the things that you

Rivera - direct - Nguyen                    1199

1  specifically did with regard to that investigation, I'd like

2  to review a few records with you.

3  A     Okay.

4          MS. NGUYEN:   The Government has previously marked

5  for identification records from Greyhound that are marked as

6  Government's Exhibit 296 through 299.   Pursuant to a Federal

7  Rule of evidence 803(6) the Government offers these exhibits

8  into evidence.

9          MR. GUADAGNINO:   No objection, Judge.

10          THE COURT:   Received.

11          (Government's Exhibits 296 through 299 were received

12  in evidence.)

13  BY MS. NGUYEN:

14  Q     I'd like to start with Government's Exhibit 299.   We'll

15  zoom in for you and ask you to read this exhibit, please.

16  A     George Cervantes submits this certification pursuant to

17  Rules 803(6) and 902(11) of the Federal Rules of Evidence and

18  states as follows:

19          One, I am the subpoena compliance person of

20  Greyhound Lines Incorporated.   As such, I am familiar with

21  Greyhound Lines Incorporated's practices and procedures

22  regarding the collection and maintenance of business records.

23          Two, attached to this certification are records

24  subpoenaed by the Government for all records of travel for

25  passengers identified as Jasur Kamolov and Firdavs Giyasov for

Rivera - direct - Nguyen                    1200

1    the period of June 1st, 2018 to April 30, 2019.

2           Three, the information contained in the above

3    records were recorded and maintained in the ordinary course of

4    business.  It was and is the regular practice of Greyhound

5    Lines Incorporated to record and maintain this information

6    correct least.

7           Four, Greyhound Lines Incorporated recorded and

8    maintained the information at or near the time of their making

9    and/or from information made or transmitted by a person with

10   knowledge of those matters.

11          Five, I declare under penalty of perjury that the

12   foregoing is true and accurate.

13          Dated June 11, 2021, Dallas, Texas.

14   Q    This Exhibit 299, was that signed by the individual

15   George Cervantes on the bottom?

16   A    Yes.

17   Q    Now I'd like to go to Government's Exhibit 298.  Can you

18   describe for us what this exhibit depicts?

19   A    This exhibit depicts a bus ticket from Greyhound Lines

20   Incorporated from purchased from Cleveland, Ohio, destined to

21   New York City, New York on July 18, 2018 at 10:40 p.m.  The

22   ticket is in the name which is noted on the left for Kamolov

23   Jasur.

24   Q    I'd like to set that exhibit aside, and move on to

25   Exhibit 297.  Can you describe this one, please?

Rivera - direct - Nguyen                    1201

1   A     This is a one-way economy purchased bus ticket from

2   Greyhound for one adult, passenger's name is Kamolov Jasur,

3   departing at 6:00 p.m. from Richmond, Virginia, arriving at

4   12:45 a.m. New York City, New York purchased on -- leaving on

5   Thursday, October 18, 2018,.

6   Q     Next we can move on to Government's Exhibit 296.  Please

7   describe this exhibit?

8   A     This is another economy, one-way bus ticket purchased

9   from Greyhound, one adult, passenger's name is Giyasov

10  Firdavs, 11:00 p.m. from New York, arriving at 6:20 a.m. in

11  Pittsburgh, Pennsylvania.

12  Q     Can you tell from this exhibit if there was a different

13  final destination than Pittsburgh, Pennsylvania?

14  A     Yes.  On the bottom of the ticket under the category of

15  trip destination is Los Angeles, California.

16  Q     We can set of exhibit as side.  I'd like to show you what

17  is in evidence as Government's Exhibit 214.  Have you had an

18  opportunity to review this exhibit?

19  A     I have.

20  Q     And is this exhibit a collection of certain account

21  statements from Bank of America?

22  A     Yes.

23  Q     Do these account statements range for the period of time

24  of June 20, 2018 through April 18 of 2019 -- we can go to the

25  last page.  Directing your attention to page 35 of this

Rivera - direct - Nguyen                    1202

1    36-page exhibit.

2    A     I see it.

3    Q     Is there a date indicated there July 19, 2018?

4    A     Yes.

5    Q     With the beginning date of June 20, 2018?

6    A     Yes.

7    Q     Going back to page one of Exhibit 214, I'd like to zoom

8    in on the top left and ask you to describe the account name

9    and address?

10   A     The account name and name address Firdavs, Giyasov, 901

11   Avenue H, Apt 2E, Brooklyn, New York, 11230.

12   Q     Looking at page one, can you tell us the account number

13   for toward the middle, right?

14   A     4830 7219 3863.

15   Q     Now I'd like to start with the account statement oldest

16   in time beginning on page 35.  Is this the bank statement for

17   that same account for the period of June 20, 2018?

18   A     Yes, it is.

19   Q     Can you tell us what the beginning balance is as of

20   June 20, 2018?

21   A     The beginning balance for this account is on June 20,

22   2018, reported to be .40.

23   Q     And the ending balance July 19?

24   A     The ending balance as of July 19, 2018, is .40.

25   Q     Based on the statement, does it appear there was no

Rivera - direct - Nguyen                    1203

1    activity in this account?

2    A    That's correct.

3    Q    I'd like to go to the account statement beginning on page

4    35 -- excuse me 33.  Is this the account statement for the

5    same account for the period of July 20 to August 21, 2018?

6    A    Yes, it is.

7    Q    Do we have the same beginning balance and ending balance

8    of .40 with no activity?

9    A    Yes, you do.

10   Q    Next I'd like to go to page 31.  Is this the account

11   statement for the same account for the period of August 22 to

12   September 18 of 2018?

13   A    Yes, it is.

14   Q    Is the beginning and ending balance the same of .40

15   without any activity?

16   A    Yes, that's correct.

17   Q    Next I'd like to go page 27, is this an account statement

18   for the same account between September 19 to October 19, of

19   2018?

20   A    Yes, it is.

21   Q    Are we seeing the same beginning and ending balance

22   without activity leaving a balance of .40?

23   A    Yes, you do.

24   Q    I'd like to go to page 21.  Is this an account statement

25   for the period of October 20, 2018 through November 19, 2018?

Rivera - direct - Nguyen                    1204

1    A    Yes, it is.

2    Q    Is there any activity in this statement?

3    A    There is a deposit indicated in the second line from the

4    top for $20.

5    Q    We can go to page 23 of the exhibit.  I'd like to

6    describe what activity is depicted here.

7    A    On November 19, 2018, in the description column there is

8    detailed Bank of America ATM transaction deposit conducted at

9    1502 Kings Highway, Brooklyn, New York for the amount of $20.

10   Q    I'd like to go to another account statement beginning on

11   page 17.  Is this the account statement for the period of

12   November 20 to December 18 of 2018?

13   A    Yes.

14   Q    Can you describe what the beginning balance is?

15   A    The beginning balance on November 20, 2018 was $20.40.

16   Q    There appears to have been a withdrawal of $20 during

17   this activity period; is that correct?

18   A    That's correct.

19   Q    Next I'd like to move on to page 15 and ask you, is this

20   the account statement for the period ending -- December 19,

21   2018 to January 18 of 2019?

22   A    Yes.

23   Q    Same account we've been looking at?

24   A    Yes, ma'am.

25   Q    Here the balance is back to .40; is that correct?

Rivera - direct - Nguyen                    1205

1    A    That's correct.

2    Q    I'd like to go to the top of this page and ask you to

3    read for us the address associated for the account statement

4    beginning on page 15.

5    A    Firdavs Giyasov 103 6150 Reseda Boulevard in Tarzana,

6    California, 91335.

7    Q    Go to page 11 of this exhibit.  Is this an account

8    statement for the same account for the period of January 19 to

9    February 15 of 2019?

10   A    Yes, it is.

11   Q    What is the beginning balance on January 19?

12   A    The beginning balance on January 19, 2019 is .40.

13   Q    Were there any deposits or additions to the account

14   during this period?

15   A    Yes.  In the second line there is an indication of a

16   deposit that happened in the total amount of $1,500.

17   Q    I'd like to go to the third page of this account

18   statement, and ask you to look at the section indicated

19   deposits and other additions.  Can you describe what deposits

20   are listed?

21   A    Yes.  On February 4, 2019 in the description on the first

22   line, Bank of America, ATM transaction, deposit conducted in

23   Los Angeles, California, total cash amount of $1,300.

24   Q    Is there another transaction with the same posting date

25   of February 4, 2019?

Rivera - direct - Nguyen                              1206

1   A    Yes, there is.

2   Q    How much is that transaction for?

3   A    That transaction was in the amount of $200.

4   Q    Does that also appear to be an ATM deposit in Tarzana?

5   A    Yes, it is.

6   Q    I'd like to scroll down to lower in the page to the

7   section of withdrawals and subtractions.  Looking at the

8   transactions let's start with the second row, can you describe

9   that transaction, please?

10  A    Yes.  In the second row on February 4, 2019, appears to

11  have been a purchase at H&M retail clothing store in Los

12  Angeles, California, amount of $60.20.

13  Q    I'd like to direct your attention to some transactions

14  listed on February 8, 2019 at what appears to be Hudson News.

15  Do you see that transaction?

16  A    Yes, I do.

17  Q    And are you familiar with Hudson News?

18  A    I am.

19  Q    What is Hudson News?

20  A    Hudson News is a newsstand that apparently has a few

21  chains located throughout traveling terminals throughout the

22  country.  You see them in Port Authority, you'll see them at

23  state and local airports, bus stops, major transportation hub

24  terminals.

25              (Continued on next page.)

Rivera - Direct - Nguyen                    1207

1    DIRECT EXAMINATION

2    BY MS. NGUYEN:   (Continuing.)

3    Q    And right below Hudson News, can you describe that

4    transaction below that, please?

5    A    Yes.   On February 11, 2019, there is a check card

6    transaction to American Airlines located in Fort Worth, Texas

7    in the amount of $30.

8    Q    And I'd like to direct your attention to the last row of

9    the withdrawals and subtractions on this page.  Can you

10   describe that last transaction, please?

11   A    On February 11, 2019, there was a check card transaction

12   at the Harbor Motor Inn located in Brooklyn, New York, total

13   amount of $80.

14   Q    Now I would like to go to a different account statement

15   in this exhibit that begins on page 8.

16              I'm sorry, page 7.

17              Is this the account statement for February 16th

18   through March 19th of 2019?

19   A    Yes, it is.

20   Q    And is the beginning balance $6.14?

21   A    Yes, it is.

22   Q    And there appears to have been some deposits and

23   additions during this period of activity; is that right?

24   A    That's correct.

25   Q    I'd like to move on to the next page, page 8 -- I'm

Rivera - Direct - Nguyen                    1208

1  sorry, page 9, and ask you to describe the two largest amount

2  deposits indicated.

3  A    Yes.  On February -- I'm sorry.

4        On March 13, 2019, there is a deposit for -- into

5  the Bank of America account.  It appears to be a mobile

6  deposit in the amount of $500.

7        And then on March 15th, approximately two days

8  later, there is a transaction from the New York State

9  Department of Tax and Finance indicating a refund in the

10 amount of $635.

11 Q    And I'd like to scroll down to the bottom of this same

12 page to look at some of the withdrawals and other subtractions

13 from this account.

14       From your review of these transactions, generally

15 where are these transactions taking place?

16 A    The majority of these transactions are taking place in

17 Brooklyn, New York.

18 Q    And I want to direct your attention to the transaction

19 which is the second row from the bottom.  Can you just

20 describe what that transaction is?

21 A    In the second row from the bottom indicated or

22 highlighted is a transaction that occurred on March 18, 2019,

23 and it's a CVS pharmacy located in Sheepshead Bay, Brooklyn,

24 totaling in the amount of $48.38.

25 Q    And next I would like to go to page 1 -- back to page 1,

Rivera - Direct - Nguyen          1209

1    I should say.

2             And just to review some of the transactions that are

3    in this account statement for the period beginning March 20th

4    of 2019, I would like to go to page 3 and zoom in on the

5    withdrawals and other subtractions.

6             Do you see any purchases listed here at McDonald's

7    locations?

8    A    Yes, I do.

9    Q    And approximately how many do you see?

10   A    I see approximately three transactions that occurred at

11   McDonald's.

12   Q    Do you see a transaction that occurs at a Haagen-Dazs in

13   Brooklyn on March 22nd of 2019?

14   A    I do.  Haagen-Dazs in Brooklyn, New York, totaling the

15   amount of $31.79.

16            MS. NGUYEN:  So we can set this exhibit aside now,

17   please, and I'd like to move on to a different set of records.

18            Your Honor, the government has previously marked for

19   identification certain records received from T-Mobile.

20   They're marked as Government Exhibit 253, including

21   Sub-exhibits 253.1 to 253.8.  Pursuant to Federal Rule of

22   Evidence 803, Subsection 6, the government offers these

23   exhibits into evidence.

24            MR. GUADAGNINO:  No objection, Your Honor.

25            THE COURT:  Received.

Rivera - Direct - Nguyen                    1210

1            (Government's Exhibit 253, Sub-exhibits 253.1 to

2   253.8 were received in evidence.)

3   Q    I would like to begin with Exhibit 253.1.  Looking at

4   this exhibit, I would like to zoom in on the description of

5   records in the center.

6            Can you tell us what phone numbers or identifiers

7   are associated with these records and what relevant time

8   period is described?

9   A    Yes.  There are two sets of phone numbers.  First one is

10  (646) 642-0124.  The time frame it started was January 1st,

11  2019 and the end date is December 9, 2019.

12           The second set is the phone number (917) 332-7259.

13  The start date period is January 1st, 2019.  The end date is

14  December 9, 2019.

15  Q    And does this record appear to be a certification from

16  T-Mobile relating to those phone numbers and that period of

17  time?

18  A    Yes, it is.

19  Q    I'd like to next move on to exhibit 253.6.

20           Can you describe what phone number this exhibit

21  relates to?

22  A    Yes.  The phone number that the exhibit is relating to is

23  (646) 642-0124.

24  Q    And is the subscriber name listed for that phone number?

25  A    There is a subscriber name listed in the name of Murodjon

Rivera - Direct - Nguyen                    1211

1   Sultanov.

2   Q    And the address associated with that individual, is it in

3   Brooklyn, New York?

4   A    Yes, it is.

5   Q    Next I'd like to go to Exhibit 253.2.

6        Are these the call detail records for the phone

7   number you just described in the name of Murodjon Sultanov?

8   A    Yes, it is.

9   Q    And I'd like to just do a search for certain telephone

10  numbers and --

11       MS. NGUYEN:  Excuse me.  Before we do the searching

12  of certain telephone numbers, I'd like to show, for the

13  witness only, Government Exhibit 259.

14  Q    Have you had a chance to examine this exhibit prior to

15  your testimony today?

16  A    Yes, I did.

17  Q    And generally, does it list different phone numbers and

18  the identified users of those phone numbers?

19  A    Yes, it does.

20  Q    And did you review the information contained in this

21  exhibit and compare it to other exhibits and evidence that has

22  been admitted during the course of this trial?

23  A    Yes, I have.

24  Q    Did that include certain business records which are

25  the -- have been previously marked as government exhibits?

Rivera - Direct - Nguyen                    1212

1    A     Yes, we have.

2    Q     Does this exhibit fairly and accurately summarize that

3    information relating to specific telephone numbers?

4    A     Yes, it does, with the exception of the top row, the --

5    it seems to be the number was inverted.  It should be

6    (646) 642-0124, not 6-4-4.

7    Q     Let me show for the witness Exhibit 253.6, which is in

8    evidence.

9    A     Oh.

10   Q     Is this the phone number you're referring to?

11   A     Yes, it is.

12         MS. NGUYEN:  One moment, please.

13   Q     And that's the correct phone number for which there's a

14   typo on the other exhibit; is that correct?

15   A     That's correct.

16   Q     So aside from that typo, is Government Exhibit 259

17   accurate?

18   A     Yes, it is.

19   Q     Thank you.

20         MS. NGUYEN:  The government offers Exhibit 259 into

21   evidence.

22         MR. GUADAGNINO:  No objection.

23         THE COURT:  Received.

24         (Government's Exhibit 259 was received in evidence.)

25         MS. NGUYEN:  And if we may, Your Honor, we would

Rivera - Direct - Nguyen                    1213

1    like to distribute a copy of Exhibit 259 to the jurors.

2              THE COURT:  Should we do that now or after morning

3    break?

4              MS. NGUYEN:  After the break would be great so we

5    could correct the typo.

6              THE COURT:  Okay.  Let's do that.

7              Ladies and gentlemen, we will take our 15 minutes.

8    Please remember not to talk about the case amongst yourselves

9    or anyone else.

10             (Jury exits the courtroom.)

11             THE COURT:  Is this your last witness?

12             MS. NGUYEN:  It is, Your Honor.

13             THE COURT:  All right.  We will take our 15 minutes.

14             (Court in recess.)

15             (Witness enters the courtroom.)

16             THE COURT:  All right.  Let's have the jury, please.

17             (Jury enters the courtroom. )

18             THE COURT:  Everyone be seated.

19             We will continue direct examination.

20             MS. NGUYEN:  We left off talking about Government

21   Exhibit 259 and we have since distributed a copy for the

22   jurors.

23             And I would like to hand a copy to the witness, if I

24   may, Your Honor.

25             THE COURT:  You may.

Rivera - Direct - Nguyen                    1214

1   DIRECT EXAMINATION

2   BY MS. NGUYEN:   (Continuing.)

3   Q    And I'd like to go back now to the T-Mobile exhibit,

4   253.6, which relates to the phone number subscribed to by

5   Murodjon Sultanov and the call detail records of Exhibit

6   253.2.

7            Now, I'd like to do a search or a filter for the

8   calling number column for a phone number, (917) 332-7259.

9   That's indicated in Government Exhibit 259 as the phone number

10  used by Firuz Juraev, correct?

11  A    That's correct.

12  Q    Looking at your screen at Exhibit 259.2, do you see

13  communications with the phone number of Murodjon Sultanov and

14  the phone number that was used by Firuz Juraev?

15  A    I do.

16  Q    And approximately how many communications do these

17  records reflect where the calling number belongs to

18  Firuz Juraev?

19  A    There are a total points of contact of 31 records found.

20  Q    So now let's look for a different phone number, the phone

21  number (929) 327-5474.

22           Do you see that phone number first reflected on

23  Government Exhibit 259?

24  A    I do.

25  Q    And is that identified as the phone number of Jasur

1   Kamolov?

2   A    Yes, it is.

3   Q    And do you see, looking at Exhibit 253.2, any

4   communications between the phone number of Murodjon Sultanov

5   and the phone number of Jasur Kamolov?

6   A    I do.

7   Q    Approximately how many communications do you see from

8   filtering on the calling number?

9   A    There are approximately 13 points of communication.

10  Q    Next I'd like to look for calls with the phone number

11  (929) 245-2855.  Going back to the summary chart on

12  Exhibit 259, do you see that phone number as a phone number

13  also used by Firuz Juraev?

14  A    Yes, I do.

15  Q    And now looking back at the phone records of 253.2, do

16  you see any communications between the phone number identified

17  as Murodjon Sultanov and the phone number of Firuz Juraev?

18  A    Yes, I do.

19  Q    Approximately how many communications do you see when we

20  filtered on the calling number?

21  A    There are 55 points of contact between the two numbers.

22          MS. NGUYEN:  And I think we can set aside this

23  exhibit and if we could clear the screen.

24  Q    I'd next like to show you what's in evidence as

25  Government Exhibit 253.7.

Rivera - Direct - Nguyen                    1216

1       Do you see what phone number this record relates to?

2  A    Yes, I do.

3  Q    What phone number is that?

4  A    The phone number listed is (917) 332-7259.

5  Q    Now, if we compare -- sorry.

6       On this record, does it indicate the subscriber

7  name?

8  A    No, it does not.

9  Q    It appears to be a prepaid phone with no customer listed;

10 is that right?

11 A    That is correct.

12 Q    If we look for this same phone number on the summary

13 chart on Exhibit 259, is this phone number identified as a

14 phone number used by Firuz Juraev?

15 A    Yes, it is.

16 Q    So now let's look at the call detail records associated

17 with this phone number.  I'd like to focus on Exhibit 253.3

18 and I'd like to do some filtering and searching for some of

19 the same numbers again.

20      Let's first look for (929) 327-5474, which is

21 identified in Government Exhibit 259 as the phone number used

22 by Jasur Kamolov.  Do you see any communications between the

23 number that was identified as being used by Firuz Juraev and

24 the number used by Jasur Kamolov?

25 A    Yes, I do.

Rivera - Direct - Nguyen                1217

1    Q    Approximately how many communications did you see when we

2    filtered for the calling number that is Jasur Kamolov's?

3    A    There are 12 points of contact between the two numbers.

4    Q    And just looking at the date column for those 12

5    communications or so, does the dates of those communications

6    occur between October 9th of 2019 and October 11th of 2019?

7    A    Yes, they do.

8    Q    So I'd now like to filter on another phone number.  It's

9    a phone number (929) 245-2855.  Looking at Government -- the

10   chart -- 259, the phone number that we just filtered on is

11   identified as a phone number used by Firuz Juraev; is that

12   right?

13   A    That is correct.

14   Q    And when we compare or search for that phone number, for

15   the phone number that is in Exhibit 253.3, did you see any

16   communications between those two phone numbers?

17   A    Yes, I do.

18   Q    Approximately how many communications came up?

19   A    There are a total of 110 points of contact between the

20   two numbers.

21   Q    And finally, I'd like to filter on another phone number.

22   That phone number is (646) 642-0124.  And looking back at the

23   summary chart, that's the phone number identified as belonging

24   to Murodjon Sultanov; is that right?

25   A    That's correct.

Rivera - Direct - Nguyen                    1218

1   Q    So did you see any communications between this phone

2   number that's in Government Exhibit 253.3 and the phone number

3   of Murodjon Sultanov?

4   A    Yes, I do.

5   Q    And approximately how many data points of communication

6   were there when we filtered on the calling number?

7   A    There are 14 points of contact between those two numbers.

8   Q    Next I'd like to discuss a different set of exhibits also

9   from T-Mobile.  This is Government Exhibit 255, including

10  Sub-exhibits 255.1 to 255.6, marked for identification.

11         MS. NGUYEN:  The government moves those records into

12  evidence -- offers those records into evidence pursuant to the

13  Federal Rules of Evidence.

14         MR. GUADAGNINO:  No objection, Judge.

15         THE COURT:  All right.  Received.

16         (Government Exhibit 255, including Sub-exhibits

17  255.1 to 255.6 were received in evidence.)

18  Q    I'd like to begin with 255.1.  Is this a record

19  certification from T-Mobile?

20  A    Yes, it is.

21  Q    And looking at the portion of the records that includes

22  the description, what phone number do these records relate to?

23  A    The phone number that the records relate to is listed as

24  (929) 245-2855.

25  Q    And does it give us a period of time for the relevant

Rivera - Direct - Nguyen                    1219

1    records?

2    A    Yes, it does.  The period of time listed is the start

3    date of November 1st, 2018 with an end date of November 25th,

4    2019.

5    Q    So I'd now like to turn to a different exhibit, 255.5.

6    Are these the subscriber records for that same phone you just

7    read to us?

8    A    Yes, they are.

9    Q    And who is the subscriber of that phone number?

10   A    The subscriber name listed is Firuz Juraev.

11   Q    And does it include a subscriber address in Brooklyn, New

12   York?

13   A    It does.  The subscriber address listed is 7902

14   Bay Parkway, Apartment B, as in boy, 1, Brooklyn, New York

15   11214.

16   Q    Now I'd like to go to a different exhibit, 255.2.  These

17   are call detail records associated with that same telephone

18   number.

19        Looking at row 10 of this exhibit, does it indicate

20   a phone number of (929) 245-2855?

21   A    Yes, it does.

22   Q    And I'd like to do some searches for certain phone

23   numbers within these call detail records.

24        MS. NGUYEN:  Can we look for the phone number

25   identified on Government Exhibit 259 as belonging to Jasur

Rivera - Direct - Nguyen                    1220

1    Kamolov, that phone number being (929) 327-5474?

2    Q    Do you see any communications between the phone number of

3    Firuz Juraev and the phone number of Jasur Kamolov?

4    A    Yes, I do.

5    Q    Approximately how many communications do you see when we

6    filtered for the calling number of Jasur Kamolov?

7    A    There are approximately 24 points of contact between the

8    two numbers.

9    Q    Now I'd like to filter on a different telephone number,

10   that telephone number that was previously identified as the

11   phone number belonging to Murodjon Sultanov, specifically

12   (646) 642-0124.

13          Do you see any communications with the phone number

14   of Firuz Juraev and the phone number of Murodjon Sultanov?

15   A    Yes, I do.

16   Q    Approximately how many communications came up when we

17   filtered on the phone number of Murodjon Sultanov?

18   A    There are approximately 20 points of contact between the

19   two numbers.

20          MS. NGUYEN:  I'd like to set aside these T-Mobile

21   records and move on to a different set of records.  These are

22   a set of records from Verizon which have been previously

23   marked for identification as Government Exhibit 258, including

24   Sub-exhibits 258.1 to 258.16.  The government offers that

25   exhibit and its sub-exhibits into evidence pursuant to the

Rivera - Direct - Nguyen                    1221

1    Federal Rules of Evidence.

2              MR. GUADAGNINO:  No objection, Your Honor.

3              THE COURT:  Received.

4              (Government Exhibit 258, including Sub-exhibits

5    258.1 to 258.16 were received in evidence.)

6    Q    I'd like to go directly to Exhibit 258.1.  Can you tell

7    us what two phone numbers this record relates to?

8    A    Yes.  The two numbers that the record is relating to is

9    (212) 566-2242 and (917) 453-0034.

10   Q    And is there an account name listed for each of those

11   telephone numbers?

12   A    Yes.  The account name listed for each of those phone

13   numbers is M. Golub, PLLC.

14   Q    And are those same two phone numbers reflected as the

15   last two rows of the summary chart that's Exhibit 259?

16   A    Yes, it is.

17   Q    Now I'd like to go to the call detail records for -- that

18   are shown in Government Exhibit 258.14.

19             Oh, I'm sorry, these are not call detail records;

20   these are descriptions of call detail records.

21             MS. NGUYEN:  Can we zoom into the description?

22   Q    And starting with what is indicated in the third row,

23   does it indicate the direction of the calls listed in call

24   detail records and the code to identify the direction of the

25   calls?

Rivera - Direct - Nguyen                    1222

1    A    Yes, it does.

2         MS. NGUYEN:  I think we can zoom in a little bit.

3    Q    Can you tell us what the directional codes are?

4    A    The directional codes are for -- the Verizon program

5    lists MO as an outbound call, MT indicates an incoming call,

6    MF indicates voice mail or mobile-forwarded call.

7    Q    And the two columns to the left of the direction, they

8    indicate a date and time.  Does the information reflect that

9    the times and dates are reflected in Greenwich Mean Time?

10   A    Yes.

11   Q    And is Greenwich Mean Time approximately four hours ahead

12   of Eastern Standard Time?

13   A    Greenwich Mean Time?  Yes.  I'm sorry, yes.

14   Q    No problem.

15        I'd like to move over to the fifth column where it

16   says called number.  Can you tell us what that means?

17   A    So called number indicates -- going to the legend here,

18   it says:  This is the number dialed to initiate the call.  For

19   inbound calls, this number will be the same as the mobile

20   directory number column.  And for outbound calls, this is the

21   number your target called -- or dialed.

22   Q    And moving onto the next column listed as CPN, what is

23   that definition?

24   A    The definition for CPN is this is the calling party that

25   initiated the call.  If the call is outbound, this column will

Rivera - Direct - Nguyen                    1223

1    be the same as the mobile directory number.  If the call is

2    inbound, this is the number that dialed your target.

3    Q    And then what is the column description directly to the

4    right of that?

5    A    SOU or --

6    Q    SOU, what does that mean?

7    A    SOU means the call duration in seconds or how long the

8    call lasted.

9    Q    We can set this exhibit aside and move on to

10   Exhibit 258.15.

11         And looking at the -- at Column A, do these appear

12   to be the call detail records for the phone number ending in

13   -2242, identified as belonging to Mitchell Golub?

14   A    Yes.

15   Q    And just looking generally at the dates here, the

16   beginning, does it begin on, approximately, October 18th of

17   2019?

18   A    Yes, it does.

19   Q    And scrolling to the bottom of this exhibit, the earliest

20   call reflected is October 14, 2019?

21   A    Yes, it is.

22   Q    I'd like to direct your attention to rows 60 to 61 of

23   this exhibit.  I think we can highlight those rows for you.

24         Looking at Column G, can you -- and I think we have

25   to go up to show you what the column header is.

Rivera - Direct - Nguyen                         1224

1                Column G is CPN; is that right?

2    A    That's correct.

3    Q    And CPN is the phone number that called this number; is

4    that right?

5    A    That is correct.

6    Q    What is the phone number listed in rows 60 to 61?

7    A    Phone -- the phone number listed in rows 60 to 61 is

8    989- -- apologies, 989-91-1 -- sorry, 989-15- -- 1-5259158.

9    Q    I don't know if I missed it, but it begins 998-9?

10   A    Yeah.  Sorry, I'm reading that wrong.

11   Q    No problem.

12   A    My apologies.

13   Q    And looking at column 60 and Column D, it indicates a

14   direction MT.  I believe you told us that according to the

15   records definition, MT is an incoming call; is that right?

16   A    That's correct.

17   Q    And this appears to be an incoming call from that longer

18   phone number to the phone number ending in 2242; is that

19   right?

20   A    That is correct.

21   Q    And then looking at row 61, we have a call where the

22   direction is indicated MF?

23   A    That is correct.

24   Q    Did you tell us from the last exhibit that that could be

25   a mobile-forwarded call?

Rivera - Direct - Nguyen                1225

1   A    Yes, it can be a mobile-forwarded call or a voice mail.

2   Q    And if we scroll over to Columns E and F, it appears that

3   this was an MF call to a phone number (917) 453-0034?

4   A    That's correct.

5   Q    And is that the same phone number listed in Exhibit

6   259 on the --

7   A    Yes, it is.

8   Q    -- bottom row identified as Mitchell Golub?

9   A    Yes, it is.

10  Q    And looking at Column H of this exhibit -- I believe

11  that's a column for seconds of use that you defined for us --

12  how long is the call reflected in row 61?

13  A    The duration of the call in row 61 is 12 seconds.

14  Q    And I'd like to zoom out a little bit and filter for a

15  particular number that seems to recur on these records,

16  looking in the CPN column.  In particular, I would like to

17  filter for a number that's not on the summary chart, that

18  phone being (980) 28 -- I'm sorry, (980) 985-8238.

19          Do you see any calls from that phone number?

20  A    Yes.

21  Q    And approximately how many records were returned when we

22  searched for that phone number as the calling number?

23  A    There are approximately 70 points of contact between

24  those two numbers.

25  Q    And just looking at Column D, does that include both

Rivera - Direct - Nguyen                    1226

1  incoming calls and MF calls, which are forwarded calls?

2  A    Yes.

3  Q    I'd like to now go back to some of the call detail

4  records that we previously reviewed and search for this

5  number, (980) 985-8238.  So let's start with the phone number

6  that was identified as the phone number belonging to Murodjon

7  Sultanov.  That is Government Exhibit 253.2.  When we filter

8  these records for that same phone number, (980) 985-8238, what

9  do we find?  Do you see any communications with that phone

10 number?

11 A    Yes.

12 Q    And approximately how many did you find when we filtered

13 on the calling number column?

14 A    There are approximately 19 points of communication

15 between those two numbers.

16 Q    So now I'd like to search for that same phone number on

17 another set of call detail records that we reviewed.  That

18 would be in Exhibit 253.3 for the phone number that was

19 identified as being used by Firuz Juraev.  That phone number

20 we're searching for is (980) 985-8238.

21      Did you see any communications with Firuz Juraev and

22 this particular phone number?

23 A    Yes.

24 Q    Approximately how many communications appeared when we

25 filtered on the calling number column?

Rivera - Direct - Nguyen                    1227

1  A    There are approximately 298 points of contact between
2  those two numbers.
3  Q    And next I'd like to go to the other phone number that
4  was identified as being used by Firuz Juraev that's contained
5  in Government Exhibit 255.5.  I'm sorry, 255.2.
6         When we filter for that same phone number in the
7  calling number column, (980) 985-8238, what do you observe?
8  A    I observe 217 points of contact between those two
9  numbers.
10 Q    So now I'd like to return to the call detail records for
11 the phone number ending in -2242 that was identified as
12 belonging to Mitchell Golub.  That was Exhibit 258.15.
13 Reviewing the phone records for this particular phone number
14 of Mitchell Golub and searching for that phone number,
15 (980) 985-8238, I'd like to scroll over to Column H.
16        And would you agree that most of the duration for
17 those communications are precisely 70 seconds of use?
18 A    Yes.
19 Q    And now scrolling down towards the bottom, are there
20 communications with this phone number that are longer than 70
21 seconds?
22 A    Yes, many.
23 Q    And can you describe for us row 74?  Approximately, how
24 long was that particular incoming call from that particular
25 phone number?

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Rivera - Direct - Nguyen                    1228

1  A     In row 74, approximately five minutes and -- or I don't

2  want to say five minutes.  I'll say 575 seconds.

3  Q     And then just looking at row 78, do you see another

4  communication with that same phone number?

5  A     Yes.

6  Q     And approximately how long is that communication?

7  A     Approximately 341 seconds.

8  Q     And all of the other communications except those are

9  70 seconds?

10 A     That's correct.

11 Q     And just taking a look, scrolling over to the first

12 couple of columns of this exhibit where we filtered for that

13 particular phone number, can you just take a look and look,

14 approximately, how frequently are incoming calls coming from

15 that particular number?  You can begin at the beginning and

16 slowly scroll down for you to review it to yourself.

17        How would you describe the frequency of those calls?

18 A     I would say there's a lot of calls occurring on that

19 specific day.  And the frequency is within minutes of each

20 other, of the first original call, and the call gets

21 forwarded.  Then there's maybe another hour that passes and

22 then, within those minutes, there's calls coming in and then

23 forwarded, calls coming in and then forwarded.

24 Q     And in particular, is there a high volume of incoming

25 calls from that phone number on October 17th of 2019?

Rivera - Direct - Nguyen                    1229

1    A    Yes.

2    Q    We can set aside this exhibit now and I'd like to talk

3    about something other than phone records.

4              I'd like to talk to you about what is in evidence as

5    Government Exhibit 225 as Chase bank records.

6

7              (Continuing on the following page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rivera - direct - Nguyen                    1230

1   (Continuing.)

2           (Exhibit published.)

3   BY MS. NGUYEN:

4   Q    Looking at page 213 of Government Exhibit 225.

5           MS. NGUYEN:  Can we zoom in on that?

6   Q    Does this appear to be accountholder information for a

7   particular Chase Bank account?

8   A    Yes.

9   Q    Do you see the name of the accountholder?

10  A    I do.

11  Q    What is the name indicated?

12  A    The name indicated is Murodjon Sultanov.

13  Q    And I'd like to ask you to look a little bit lower down.

14          Is there an e-mail associated with this user --

15  A    There is.

16  Q    -- accountholder I mean?

17          What is that e-mail address?

18  A    The e-mail address indicated is 777OwlWhite777@gmail.com.

19  Q    And is there a phone number included in this

20  accountholder's information?

21  A    There is.

22  Q    What is that phone number?

23  A    646-642-0124.

24  Q    And now I'd like to go to page 256 of this exhibit.

25          (Exhibit published.)

SAM      OCR      RMR      CRR      RPR

Rivera - direct - Nguyen                    1231

1    BY MS. NGUYEN:

2    Q    And looking at the bottom portion, can you identify, is

3    this an account statement for an individual named Murodjon

4    Sultanov?

5    A    Yes, it is.

6    Q    And is it related -- is there an account number listed?

7    A    Yes, it is.

8    Q    Can you read for us the account number?

9    A    Sure.  The account number listed for Murodjon Sultanov is

10   4266841588792828.

11   Q    Now, I'd like to move on to page 258, which is part of

12   this same account statement.

13            MS. NGUYEN:  And zoom into the transaction portion.

14   We can just look at the purchase section.

15   Q    Just taking a look at the purchases listed in this

16   particular account statement.

17            Do you see any charges to TLC Taxi and Limousine?

18   A    I do.

19   Q    Approximately how many entries do you see associated with

20   TLC?

21   A    Approximately, eight transactions with TLC.

22   Q    And directing your attention to about midway down the

23   page, do you see any transaction for PSI Services?

24   A    Yes, I do.

25   Q    And is that for $49?

SAM       OCR       RMR       CRR       RPR

Rivera - direct - Nguyen                    1232

1   A    Yes, it is.

2   Q    And these transactions, do they occur on multiple dates

3   within this account statement period?

4   A    Yes.

5   Q    Let's look at another account statement contained in

6   these records.  Let's look at the account statement beginning

7   on page 260.

8           And just looking at the bottom half, is this for the

9   same account that we were just talking about?

10  A    Yes, it is.

11          MS. NGUYEN:  And now, scrolling down two pages after

12  this for the same account statement on page 258, I'd like to

13  zoom in on the transactions.

14  BY MS. NGUYEN:

15  Q    And generally, do you see purchases charged to PSI

16  Services?

17  A    Yes.

18  Q    Approximately how many charges to PSI Services do you

19  see?

20          I don't need a precise number, but just take a look

21  and see if you see any.

22  A    Yeah, there are several purchases made to PSI Services.

23  Q    And are those across different dates during this account

24  period statement?

25  A    Yes, they are.

Rivera - direct - Nguyen                    1233

1   Q    Now, I have what's been previously received into
2   evidence, Government Exhibit 307.
3        Is this something you've had an opportunity to
4   review before?
5   A    Yes.
6   Q    In particular, did you look at a green notebook?
7   A    Yes.
8        (Exhibit published.)
9   BY MS. NGUYEN:
10  Q    Did you compare the information written in the green
11  notebook on this particular page with the information for the
12  records that we just reviewed in Government Exhibit 225?
13  A    Yes.
14  Q    What did you determine?
15  A    The e-mail address and the name are exactly identical to
16  the record in the bank document.
17  Q    And do you see that there's an account number listed in
18  the green notebook that's part of Exhibit 307?
19  A    There is an account number listed.
20  Q    Did you have an opportunity to compare that account
21  number with an account number in Exhibit 225?
22  A    Yes.
23  Q    And what did you determine?
24  A    That is the identical account number that's listed in the
25  bank statement.

SAM     OCR     RMR     CRR     RPR

Rivera - direct - Nguyen                    1234

1           MS. NGUYEN:  We can go ahead and set aside the green

2    notebook.  And I'd ask to go back to Government Exhibit 225,

3    so that we could see where that account number appeared.

4           (Exhibit published.)

5    BY MS. NGUYEN:

6    Q    Directing your attention to page 101 of this exhibit.

7           MS. NGUYEN:  Zooming into the right side of that

8    page.

9    Q    Is that account number identified in the account number

10   portion of the table?

11   A    Yes, it is.

12          MS. NGUYEN:  So, we can set aside the Chase Bank

13   records now and I'd like to focus on a different set of

14   records.  The Government has previously marked for

15   identification a set of records identified as Exhibits 286

16   through 290.

17          Pursuant to the Federal Rules of Evidence, the

18   Government offers these exhibits.

19          MR. GUADAGNINO:  No objection.

20          THE COURT:  Received.

21          (Government's Exhibits 286 through 290 were received

22   in evidence.)

23   BY MS. NGUYEN:

24   Q    I'd like to start with Government Exhibit 290 in

25   evidence.

Rivera - direct - Nguyen                    1235

1           (Exhibit published.)

2    BY MS. NGUYEN:

3    Q    And can you read for us, we'll zoom in for you, the

4    certification here?

5    A    Yes.

6           The certification states:  The American Association

7    of Motor Vehicle Administrators, a District of Columbia

8    nonprofit corporation, submits this certificate pursuant to

9    Rules 803(6) and 902(11) of the Federal Rules of Evidence.

10   The undersigned, Vikas Jain, states as follows:

11          Number 1.  I am the project manager, commercial

12   skills test management system for AAMVA.  As such, I am

13   familiar with AAMVA's practices and procedures regarding the

14   collection and maintenance of business records pertaining to

15   CSTIMS.  CSTIMS is a web application that was developed by

16   AAMVA under contract with the Federal Motor Carrier Safety

17   Administration and that AAMVA operates and maintains to help

18   states comply with FMCSA regulations concerning commercial

19   driver's license skills tests that are administered to a CDL

20   applicant.

21          Number 2.  Attached to this certificate are records

22   subpoenaed by the Government.

23          Number 3.  CSTIMS enables persons engaged in CDL

24   skills testing to enter data in the ordinary course of

25   business at or near the time that the activities or

Rivera - direct - Nguyen                    1236

1    information relating to CDL skills testing take place.

2            Number 4.  The information maintained in CSTIMS is

3    kept in the course of regularly-conducted activities relating

4    to CDL skills testing as required by FMCSA regulations.

5            Number 5.  I declare under penalty of perjury that

6    the foregoing is true and correct.

7    Q    And zooming out from this, was this certification

8    electronically signed?

9    A    Yes, there is a digital signature on there from Vikas

10   Jain, dated June 26, 2021, Arlington, Virginia.

11   Q    I'd like to focus now on Government Exhibit 288 in

12   evidence that relates to the certification you just read.

13           Zooming in on the top portion of this exhibit, can

14   you describe for us the title of this document?

15   A    The title of this document is "Pennsylvania Department of

16   Transportation Third-Party Tester CDL Driver's Examination

17   Report."

18   Q    Is there a customer name indicated for this particular

19   driver examination report?

20   A    There is a customer name listed on there in the name of

21   Jasur Kamolov.

22   Q    Does it indicate the date of the exam on the far right?

23   A    Yes.  The exam date is September 22nd, 2018.

24   Q    And below the customer's name, are you able to determine

25   the relevant permit class being sought?

Rivera - direct - Nguyen                    1237

1   A    Yes, the permit class that was sought is indicated as

2   Class A.

3            MS. NGUYEN:  And we can zoom back out.

4   BY MS. NGUYEN:

5   Q    And looking at the bottom portion of this exhibit, what

6   are the results of this person's skills test results?

7   A    The skills test results indicate that as far as vehicle

8   inspection, the person scored a number of 70, which passed.

9   In the basic control skills portion, they scored a number of

10  4, which they passed.  And then on the road they scored a

11  number of 23, which is also indicated as they passed.

12  Q    And does it indicate right below the results that the

13  commercial driver's should be issued?

14  A    Yes.  The tester indicates that the person should be

15  issued a commercial driver's license.

16  Q    Does there appear to be a signature of the customer on

17  this exhibit?

18  A    There is a customer signature on there.

19            MS. NGUYEN:  We can zoom back out.

20            And going to the next page of this exhibit.  I'd

21  like to zoom in on the portion called CDL Skills Test Score

22  Sheet.

23  Q    Looking at the top left, does it indicate a site name?

24  A    Yes, the site name indicated is BCTC.

25  Q    Is this for the same applicant/customer that we were

SAM     OCR     RMR     CRR     RPR

Rivera - direct - Nguyen                    1238

1   talking about, Jasur Kamolov?

2   A    Yes, it is.

3          MS. NGUYEN:  And zoom back out.

4   BY MS. NGUYEN:

5   Q    And is there in the middle portion what appears to be a

6   signature of this customer?

7   A    Yes, it is.

8          MS. NGUYEN:  Zoom back out, and I'd like to scroll

9   towards the last pages of the exhibit.

10  Q    And ask if you see any identification documents?

11  A    Yes.

12  Q    Go ahead, what does page 6 show?

13  A    It shows a photo of a New York State commercial learner's

14  permit in the name of Jasur Kamolov.

15  Q    And page 7, what is that?

16  A    It's also a New York State driver's license issued to

17  Jasur Kamolov.

18  Q    And finally, page 8.

19          Can you read the name of the document about a third

20  of the way down?

21  A    Yes, the name on the document is Jasur Kamolov, and this

22  appears to be a medical examiner's certification card.

23  Q    Thank you.

24          MS. NGUYEN:  We can set that exhibit aside, and I'd

25  ask to look at Government Exhibit 287.

SAM     OCR     RMR     CRR     RPR

Rivera - direct - Nguyen                    1239

1            (Exhibit published.)

2            MS. NGUYEN:  Scrolling to the top portion of this.

3    BY MS. NGUYEN:

4    Q    Can you describe what this document is?

5    A    This is the Pennsylvania Department of Transportation

6    Third-party Tester, CDL Driver's Examination Report.

7    Q    And who does it relate to?

8    A    It relates to Ibodullo Muratov.

9    Q    And what was the exam date for this customer?

10   A    The exam date is listed as June 30th, 2018.

11   Q    What permit class is being sought?

12   A    This person is also seeking a Class A permit.

13   Q    And I'd like to scroll down lower to the page and ask

14   you, did this person pass the skills test results?

15   A    Yes, according to the information indicated on vehicle

16   inspection, they received a score of 69.  On basic control

17   skills, they received a score of 5.  And on the road, they

18   received a score of 17, which all indicate they passed.

19   Q    And does it appear to have been signed by the customer on

20   June 30th, 2018?

21   A    Yes, there is a signature there.

22           MS. NGUYEN:  I'd like to go on to page 2 of this

23   exhibit, and scroll, zoom into the top portion where it lists

24   CDL Skills Test Score Sheet.

25   Q    Do you see the site name?

Rivera - direct - Nguyen                          1240

1    A    Yes, I do.

2    Q    What's the site name?

3    A    BCTC.

4    Q    And the applicant is the same applicant/customer we were

5    speaking of before?

6    A    Yes, it is.

7         MS. NGUYEN:  We can zoom back out.

8    BY MS. NGUYEN:

9    Q    And does this appear to include the signature of the

10   customer, as well?

11   A    Yes, ma'am.

12   Q    And I'd like to scroll through the exhibit, through its

13   pages, and let me know if you see any identification

14   documents.

15        (Scrolling.)

16   A    Yes, I do.

17   Q    Is that on page 6?

18   A    Yes, ma'am.

19   Q    What do you see?

20   A    I see a photocopy of a -- well, a photograph taken of a

21   New York State commercial learner's permit for Ibodullo

22   Muratov.

23   Q    And page 7?

24   A    Page 7 is also a New York State driver's license issued

25   to Ibodullo Muratov.

SAM      OCR      RMR      CRR      RPR

Rivera - direct - Nguyen                    1241

1   Q    And what does page 8 show?

2        MS. NGUYEN:  We can zoom into the top portion.

3   A    Yes, so, page 8 also indicates a medical examination --

4   I'm sorry, medical examiner's certificate issued to Ibodullo

5   Muratov.

6   Q    Now, I'd like to go to a different exhibit, 286.

7        (Exhibit published.)

8   BY MS. NGUYEN:

9   Q    Is this the same type of CDL Driver Examination Report

10  we've been looking at?

11  A    Yes, it is.

12  Q    And zooming in on the top portion, can you tell us the

13  name of the customer?

14  A    The name listed on the Pennsylvania Department of

15  Transportation CDL report or CDL Examination Report is

16  Dilmurod Rahmonov.

17  Q    And was this exam date indicated as March 3rd of 2018?

18  A    Yes.

19  Q    And this person is seeking a Class A permit, is that

20  right?

21  A    That's correct.

22       MS. NGUYEN:  Just zooming back out.

23  BY MS. NGUYEN:

24  Q    The person has indicated, according to this record, that

25  the person passed the skills portion test, is that correct?

SAM      OCR      RMR      CRR      RPR

Rivera - direct - Nguyen                          1242

1   A    That is correct.

2   Q    And there is a signature of the customer, is that right?

3   A    That is correct.

4   Q    And going to page 2 of this exhibit, zooming in on the

5   top portion.

6              What is the site name?

7   A    The site name is BCTC.

8   Q    For the same customer that we've been discussing, is that

9   right?

10  A    That is correct.

11  Q    Okay.

12             MS. NGUYEN:  Scrolling towards the end of this

13  exhibit.

14  BY MS. NGUYEN:

15  Q    Do you see copies of identification documents related to

16  that applicant Dilmurod Rahmonov?

17  A    I do.

18  Q    And is that on page 6?

19  A    Yes, ma'am.

20  Q    What do you see?

21  A    I see at the top of the photo a copy of a New York State

22  driver's license issued to Dilmurod Rahmonov, and then at the

23  bottom is a New York State commercial learner's permit issued

24  to Dilmurod Rahmonov.

25  Q    And we can set this exhibit aside and look at Government

Rivera - direct - Nguyen                1243

1   Exhibit 289.

2           Zooming in on the top portion, is this the similar

3   testing results CDL Driver Examination Report?

4   A    Yes, it is.

5   Q    What's the name of this customer?

6   A    The name is Jasur Sobirov.

7   Q    What is this exam date?

8   A    Exam date is February 16, 2019.

9   Q    And is this, right at the very bottom of the window, do

10  you see that this is for a permit Class A?

11  A    Yes, it is.

12          MS. NGUYEN:  Zoom out.

13  BY MS. NGUYEN:

14  Q    And looking at the middle section, did this person pass

15  the skills test?

16  A    According to what's indicated, yes.

17  Q    And moving on to page 2, zooming in on the top portion.

18          What's the site name here?

19  A    The site name listed is Shelly Truck Driving School.

20  Q    And it's dated February 16th of 2019?

21  A    That's correct.

22          MS. NGUYEN:  And we can zoom back out.

23  BY MS. NGUYEN:

24  Q    And does this appear to have been signed by the customer

25  in February of 2019?

Rivera - direct - Nguyen                        1244

1   A    There is an indication of a signature, yes.

2   Q    Okay.

3            MS. NGUYEN:  We can set aside these records.

4            And I'd like to move on to a different set of

5   records.  The Government has previously marked for

6   identification Exhibits 201 through 207.  Pursuant to the

7   Federal Rules of Evidence, the Government offers into evidence

8   these exhibits as the records of Delia's Gun Shop.

9            MR. GUADAGNINO:  No objection, Your Honor.

10            THE COURT:  Received.

11            (Government's Exhibits 201 through 207 were received

12   in evidence.)

13   BY MS. NGUYEN:

14   Q    I'd like to start with Exhibit 207.

15            (Exhibit published.)

16   Q    Zooming in to this certificate, can you read paragraph 1

17   for us?

18   A    Yes.

19            I, Kimber Zerweck, attest, under penalties of

20   perjury under the laws of the United States of America

21   pursuant to Section 28 of the United States Code Section 1746,

22   that the information contained in this declaration is true and

23   correct.  I am employed by Delia's Gun Shop, Mad Minute

24   Enterprises, LLC, and my official title is owner.  I am a

25   custodian of records for Delia's Gun Shop.  I state that each

Rivera - direct - Nguyen                    1245

1   of the records attached hereto is the original record or a

2   true duplicate of the original record in the custody of

3   Delia's Gun Shop, and that I am the custodian of the attached

4   records that are identified as Government Exhibits 201 and

5   206.  I further state that:

6            A.  All records attached to this certificate were

7   made at or near the time of the occurrence of the matter set

8   forth, by, or from information transmitted by, a person with

9   knowledge of those matters;

10           B.  Such records were kept in the ordinary course of

11  a regularly scheduled -- I'm sorry -- regularly conducted

12  business activity of Delia's Gun Shop; and

13           C.  Such records were made by Delia's Gun Shop as a

14  regular practice.

15           I further state that this certification is intended

16  to satisfy Rule 902(11) of the Federal Rules of Evidence.

17           MS. NGUYEN:  I'd like to move on to Government

18  Exhibit 203.

19           (Exhibit published.)

20           MS. NGUYEN:  I'd like to zoom in on the top half,

21  Sections A and B of this exhibit.

22  BY MS. NGUYEN:

23  Q    Can you tell us what this is?

24  A    Yes.  This is a record from the Pennsylvania State Police

25  Application/Record of Sale.

SAM      OCR      RMR      CRR      RPR

Rivera - direct - Nguyen                    1246

1   Q     And does this relate to what appears to be a purchase of

2   a firearm?

3   A     Yes, in Section B indicates the transferee's/purchaser's

4   information.

5   Q     What's the name of the purchaser listed?

6   A     The name listed is Zulaykho Kurbanova.

7   Q     And what is the sex of this individual?

8   A     The sex of this individual is listed as female.

9   Q     And what is the address associated with this individual?

10  A     The address associated to this individual is 9921

11  Bustleton Avenue, an apartment located within Philadelphia,

12  Pennsylvania, 19115.

13  Q     And does there appear to be the signature of the

14  purchaser towards the middle of what we're looking at now?

15  A     Yes, in box number 34, the individual signs the

16  application.

17  Q     And is the date of the application indicated,

18  February 23rd of 2019?

19  A     Yes, ma'am.

20  Q     And what's written above that person's signature?

21  A     Written above the actual signature is a statement

22  indicating the following:

23        I verify the facts that I have set forth in blocks 5

24  through 33 of this form are true and correct to the best of my

25  knowledge, information and belief.  This verification is made

1  subject to both the penalties of Section 4904 of the Crimes

2  Code 18 P.A.C.S. 4904 relating to unsworn falsification to

3  authorities and the Uniform Firearms Act.

4          I also understand that the making of any false

5  written statement of the exhibiting of any false

6  misrepresented identification with respect to this application

7  is a crime punishable as a felony.

8  Q    Before we move on, I just want to direct your attention

9  to box number 4 on the upper right.

10         Is there an approval number and approval date

11 indicated?

12 A    There is an approval number indicated in box number 4.

13 Q    And that approval number is 19W0105067?

14 A    Yes, ma'am.

15 Q    And the date of approval is February 26th, 2019?

16 A    Yes, it is.

17 Q    I'd like to go on to the bottom portion of this same page

18 where it indicates Section E, Firearm Information.

19         Can you describe the make, model and serial number

20 of the particular firearm listed in this exhibit?

21 A    Yes.  In Box 51 indicates the make of the firearm is

22 SKY-SCCY/SKYY/and then SKKY or parentheses SKY.  The model

23 number is CPX1.  The caliber is a 9-millimeter.  The length of

24 the barrel is three inches.  And then in Box 55 indicates the

25 serial number, which is considered the DNA of the firearm,

Rivera - direct - Nguyen                    1248

1   780189.

2   Q    Next I'd like to turn to a different exhibit.  That's

3   Government Exhibit 206.

4            (Exhibit published.)

5            MS. NGUYEN:  Just zooming in to this.  Actually,

6   sorry, let's zoom back out to include the caption or title.

7   BY MS. NGUYEN:

8   Q    Is there an approval number on this document that appears

9   to be from the Pennsylvania State Police?

10  A    Yes.

11  Q    And does that approval number match the approval number

12  that we just read from Exhibit 203?

13  A    Yes.

14  Q    And what is the purchaser named indicated?

15  A    The purchaser named indicated is Zulaykho Kurbanova.

16  Q    Next, I'd like to look at Government Exhibit 204.

17           (Exhibit published.)

18           MS. NGUYEN:  And just zooming in on the top portion.

19  BY MS. NGUYEN:

20  Q    Does this appear to be a firearms transaction record?

21  A    Yes, it is.

22  Q    And is the information contained in this record for the

23  buyer the same information that was contained on

24  Exhibit 203 --

25  A    Yes, it was.

Rivera - direct - Nguyen                    1249

1    Q      -- looking at the name and address?

2    A      Yes, it was.

3    Q      And looking at page 3 of this exhibit, is the description

4    of the firearm included on the top?

5    A      Yes, it is.

6    Q      And is that the same serial number that you read to us

7    before?

8    A      Correct.

9    Q      And I'd like to go back briefly to Exhibit 203.

10             (Exhibit published.)

11   BY MS. NGUYEN:

12   Q      And scrolling to the next page.

13             MS. NGUYEN:  I'm sorry.

14   Q      Right below in Section C where it indicates

15   acknowledgement on the one page of Exhibit 203, does it

16   indicate the date that the transfer actually took place?

17   A      Yes.

18   Q      What date is that?

19   A      February 26, 2019.

20   Q      And finally, as part of this series of exhibits I'd like

21   to look at Exhibit 205.

22             (Exhibit published.)

23   Q      What is this?

24   A      This appears to be a photocopy of what's indicated as

25   research.

SAM      OCR      RMR      CRR      RPR

1  Q    And we can zoom into the right portion.  Well, why don't

2  we start with the top two identifications.

3           Can you tell us what you see?

4  A    Yes, I see what appears to be personal identifying

5  information, one of which is a Pennsylvania -- Pennsylvania

6  identification card belonging to Zulaykho Kurbanova of 9921

7  Bustleton Avenue, Philadelphia, Pennsylvania.

8  Q    And what do you see below that identification photocopy?

9  A    Below that is another piece of what appears to be

10 personal identifying information.  I can't tell what kind of

11 card it is, but it appears to have the same name or does have

12 the same name and same surname as the top.

13          MS. NGUYEN:  We can zoom back out, and I'd like to

14 direct your attention to the bottom portion.

15 BY MS. NGUYEN:

16 Q    Are you able to make out what type of identification

17 document this is?

18 A    No.

19 Q    Can you see the name on this identification document?

20 A    I can see the name.

21 Q    What is the name?

22 A    The name is Sukhrob Khamrokulov.

23 Q    And right above that identification, is there a -- well,

24 two phone numbers listed?

25          MS. NGUYEN:  You can zoom back out.

Rivera - direct - Nguyen                    1251

1   A    Yes, there are.

2   Q    And looking at the second phone number listed, can you

3   read that to us?

4   A    The second phone number listed is 802-289-0909.

5   Q    And what is written next to that phone number?

6   A    Written next to the phone number are the words "call

7   this" with an arrow pointing directly at the 802 number.

8   Q    So, I'd like to set aside all the records at this time

9   and talk about your involvement in the investigation relating

10  to Firdavs Giyasov.

11          In particular, I'd like to ask you some questions

12  about April 18th of 2019.

13          On that day, were you assigned to participate as

14  part of an arrest team for Sherzod Mukumov?

15  A    Yes, I was.

16  Q    What was your role on that arrest team?

17  A    My role was to act as a contact officer with the -- with

18  another agent at the scene, and then also to handle any kind

19  of calls that may have been made after the arrest of the

20  target to the NYPD.  I would handle communicating with the

21  NYPD and letting them know what was going on, why the FBI was

22  here, and what we were doing.

23  Q    And was Mr. Mukumov arrested by you and your team that

24  day?

25  A    Yes, without incident.

Rivera - direct - Nguyen                    1252

1   Q     After the arrest of Mr. Mukumov, did you respond to a

2   different location?

3   A     I did.

4   Q     Where did you go?

5   A     I was redirected to respond to the location of the

6   secondary team that was executing an arrest warrant for a

7   Mr. Akmal.

8   Q     What happened when you arrived to that second location?

9   A     When I arrived to the location, I spoke with the field

10  team leader who informed me that the team had attempted to

11  make contact with Mr. Akmal, but there was an indication of a

12  clicking sound once they made their presence known at the

13  door.

14         So, as a precaution, they were directed to back away

15  from the door because there was an indication that there may

16  be a firearm in the location.  And so, to avoid any kind of

17  unfortunate incident, it was decided that Emergency Services

18  would be contacted and they would breach the door with the

19  FBI.

20

21         (Continued on the following page.)

22

23

24

25

1   BY MS. NGUYEN:

2   Q    Was there a time when the door was breached and the

3   individual who was a target was arrested?

4   A    Yes.

5   Q    Were you present for that?

6   A    Yes.

7   Q    Tell us what your role was?

8   A    After the door was breached and Mr. Akmal was taken into

9   custody, the FBI then -- the case agent secured Akmal.  There

10  was also an indication during the breach there was another

11  individual in the apartment, which turned out to be

12  Mr. Akmal's mother.

13           After he was arrested it was decided a search

14  warrant would be appropriate at this time because there was an

15  indication there was a firearm in the location.  So we were

16  told to standby.  They would have a female agent secure the

17  mother where she was at.  Then we were all waiting to get the

18  okay to then begin a search of the apartment for the firearm.

19  Q    Did you personally participate in the search of the

20  apartment?

21  A    I did.

22  Q    Generally, what was your role in the search of that

23  apartment?

24  A    I was assigned to search a specific room in the

25  apartment.  And I searched the room, turning in anything that

Rivera - direct - Nguyen                    1254

1   we found, and assist anyone else that was searching in other

2   areas of the apartment.

3   Q     Do you remember what particular room you were assigned to

4   search?

5   A     The mother's bedroom.

6   Q     I'm going to show you what is in evidence as Government's

7   Exhibit 301.  Are you familiar with this exhibit?

8   A     Yes.

9   Q     We can zoom in for you and just ask that you describe for

10  us, using this exhibit, what part of the apartment you were

11  assigned to search?

12  A     So what we're looking is a floor plan of the apartment.

13  And I was initially assigned to search room B.  And then if I

14  was done with room B, I would go ask, hey, does anyone else

15  need help?  Then I was assigned to a different area.

16  Q     Did you end up searching any other areas besides room B?

17  A     Yes.

18  Q     What areas do you recall searching?

19  A     Indicated on the bottom left of the floor plan is room F,

20  which is actually one of three closets in the apartment.

21  Q     Is that one of the areas that you searched?

22  A     Yes.

23  Q     I'd like to set this exhibit aside and show you what is

24  in evidence as Government's Exhibit 302A.  And I'd like to

25  show you two pages from this exhibit, starting with page 11

1    and then moving on to page 20.  Do you recognize what was

2    depicted in page 11 and page 20?

3    A    Yes.

4    Q    What was depicted?

5    A    In room F, according to this photo, number 20, there is

6    contents in the closet in the bottom portion of it, in the top

7    are boxes.

8    Q    We can go back to page 11.

9    A    Yes.

10   Q    Are both of those images, pages 11 and 20, depicting the

11   closet identified as room F?

12   A    Yes.

13   Q    You had described there were some boxes shown in page 11,

14   is that on the top-right corner?

15   A    Yes, ma'am.

16   Q    Can we just zoom in on that for a moment?  We can zoom

17   back out.

18        I'd like to direct your attention to a different

19   exhibit, exhibit 302B, page one.  Do you recognize what is

20   shown here?

21   A    Yes.

22   Q    What is it?

23   A    The boxes that I mentioned in room F and then in black --

24   yellow envelope at the top, the yellow bag underneath the

25   envelope and what appears to be a black item underneath the

Rivera - direct - Nguyen                    1256

1   yellow bag.

2   Q    Are you referring to the area that we just zoomed in on?

3   A    Yes, ma'am.

4   Q    Let's zoom back out and this image, 302B, page one, is it

5   this a similar photo to Exhibit 302A, page 11?

6   A    Yes.

7   Q    We'll show you 302A again.  I'd like to show you a

8   different set of pages from 302A, that is pages 30 through 32.

9   Generally looking at page 30 of Exhibit 302A, what do you see?

10  A    I see documents and also some other items in there.

11  Q    We can set aside Exhibit 302B for the moment and just

12  focus on Exhibit 302A.  Does page 30 of 302A depict the

13  contents of closet F?

14  A    Yes.

15  Q    And let's turn to page 31.  Is this a close-up of some of

16  the items depicted in page 30?

17  A    Yes, ma'am.

18  Q    I'd like to zoom in on a portion of this page 31 for you,

19  sort of the bottom middle.  Do you see that document on the

20  very bottom of the page?

21  A    Yes.

22  Q    Did you have an opportunity to compare that document with

23  the contents of Government's Exhibit 304?

24  A    Yes.

25  Q    I'm referring to what is in evidence as Government's

Rivera - direct - Nguyen                    1257

1    Exhibit 304, a particular page within that Exhibit.  Is that
2    the document that you compared from Government's Exhibit 304
3    with the document pictured in Exhibit 302A, page 31?
4    A    Yes, it was.
5    Q    When you made that comparison, what did you determine?
6    A    I determined that the name is identical to what was found
7    in the black item.
8    Q    We now have displayed for you Exhibit 304, an item from
9    within 304; is that right?
10   A    Yes.
11   Q    I'd like to switch back to page 31 of Exhibit 302A.  Did
12   you compare the document that's contained or depicted on the
13   bottom of Exhibit 31 with the document we just saw in
14   Exhibit 304?
15   A    Yes.
16   Q    Do they appear to be the same document to you?
17   A    Yes.
18   Q    Next I'd like to move to page 32 of Exhibit 302A.  What
19   is this?
20   A    These are the items that were recovered out of the
21   closet/room F that we searched.
22   Q    I'd like to zoom in to the right side of the photograph.
23   Can you describe what you see in the zoomed-in portion?
24   A    I see the black item that was in the closet on the top
25   shelf and also plastic bag with.  I think those were -- I'm

1    not sure what they were, but it was something.

2    Q    The black object that you had observed in the closet that

3    is now shown in page 32, what does it appear to be?

4    A    Appears to be a wallet.

5    Q    Were these some of the items that you collected and other

6    agents collected during your search of the apartment?

7    A    Yes.

8    Q    Were you there at the conclusion of the search?

9    A    Yes, I was.

10   Q    After all the evidence had been collected, after the

11   conclusion of the search, did there ever come a time that you

12   reviewed some of the evidence that had been collected during

13   the search?

14   A    Yes.

15   Q    Can you describe the circumstances under which you did

16   that?

17   A    Sure.  So the day after the search warrant, I came into

18   the office and I saw the case agent and all the items that

19   were recovered from the day before.  I'm just helping and I'm

20   not going to leave someone there going through a lot of stuff,

21   so I started going through with her.

22            And I see the wallet.  And I opened the wallet.  And

23   I see personal identifying information, meaning driver's

24   license, social security card, other items that you or I would

25   keep in our wallet and keep with us for that day.  It's a

Rivera - direct - Nguyen                    1259

1   person's wallet.

2   Q    Do you recall the name included on the belongings in that

3   wallet?

4   A    I believe the name was the same name that was found on

5   the previous item that was shown with a person's name on it.

6   Q    I'd like to show you what is marked for identification as

7   Government's Exhibit 333.  I'd like to show the witness all

8   the pages of Exhibit 333.  Do you recognize what these 11

9   pages of Exhibit 33 are?

10  A    Yes.

11  Q    Generally what are they?

12  A    They are the items that were in the wallet that was

13  recovered from the closet in room F with the name Firdavs

14  Giyasov.

15  Q    Are these fair and accurate images, depictions, of the

16  property you observed and collected in connection with the

17  search of the apartment on April 18, 2019?

18  A    Yes.

19         MS. NGUYEN:  The Government offers Exhibit 333 into

20  evidence.

21         MR. GUADAGNINO:  No objection, your Honor.

22         THE COURT:  Received.

23         (Government's Exhibit 333 was received in evidence.)

24  BY MS. NGUYEN:

25  Q    What happened to this property that's shown in

Rivera - direct - Nguyen                    1260

1    Government's Exhibit 333?

2    A    So when I saw the wallet, I recognized the name.  I

3    brought it to the attention of the case agent.  And I believe

4    shortly after that, after the search warrant, I think sometime

5    in May, she made arrangements to return the items immediately

6    to Mr. Giyasov.

7    Q    I'd like to review all the pages of Exhibit 333.  We can

8    start with page two.  What do you see?

9    A    Page two at the top is a New York City identification

10   card with the photo and the name of Firdavs Giyasov.  On the

11   bottom is what appears to be a California identification card

12   with the name Firdavs Giyasov, also with a photo.  To the

13   right is a Bank of America card.  And underneath that is a New

14   York state learner's permit.

15   Q    The wallet depicted here with the various identification

16   documents, is that the condition in which you found the wallet

17   which you were reviewing the evidence?

18   A    Yes.

19   Q    I'd like to move on to page three.  Generally what are

20   these documents?

21   A    These are what you consider personal or identifying

22   information.  These are cards that are issued by a state and

23   given to the cardholder.

24   Q    We can move on to page four.  Can you describe each of

25   the identification documents presented on page four?

Rivera - direct - Nguyen                    1261

1    A    Starting with the top left is a New York City

2    identification card with the name Firdavs Giyasov.  To the

3    bottom left is a California driver's license with the name

4    Firdavs Giyasov.

5    Q    Before we move on, is the California driver's license,

6    does it include an address in Tarzana, California?

7    A    6150 Receda Boulevard, Apartment 103, Tarzana,

8    California, 91325.

9    Q    Sorry, please continue.

10   A    To the bottom right is a New Jersey auto driver's license

11   issued to Firdavs Giyasov with an address of 45 Bayberry Court

12   Eatontown, New Jersey, 07724.  Finally, at the upper,

13   right-hand corner is a Bank of America temporary business

14   debit card.

15   Q    What is embossed on the bottom, left of that business

16   debit card?

17   A    Embossed is the words:  Small business value customer.

18   Q    We can scroll through page five and page six.  What are

19   these documents on page six?

20   A    Another set of cards that are personal identifying

21   information.  The top left appears to be a --

22   Q    We can zoom in.

23   A    Yes.  The top left appears to be a health benefit plan

24   card from Fidelis Care issued to Firdavs Giyasov.  Underneath

25   that is a social security card issued to Firdavs Giyasov.

1    Underneath on the bottom left is a Bank of America debit card.

2    Q    Can you see the name embossed on this Bank of America

3    debit card?

4    A    Yes.  The name embossed on that Bank of America card is

5    Firdavs Giyasov.  Then to the upper, right-hand corner is a

6    New York state learner's permit issued to Firdavs Giyasov with

7    the address 2775 East 12th Street, 621, Brooklyn, New York

8    11235.  Finally, a United States of America permanent resident

9    ID card issued to Firdavs Giyasov with his photo as well.

10   Q    We can zoom out and move on to page seven, page eight,

11   what does page eight show?

12   A    Page eight shows what appears to be money from -- I'm not

13   sure -- is that Uzbekistan money?

14   Q    Would you be able to say that looks like foreign

15   currency?

16   A    Foreign currency, yes.

17   Q    If we can zoom in on the upper, left you may be able to

18   make out information about the currency?

19   A    Yes.  According to what is on the document or the

20   currency:  O'zbekiston Respublikasi.

21   Q    We can zoom out, go to page nine, page ten, and page 11.

22          MS. NGUYEN:  I have no further questions for you,

23   Mr. Rivera.  Thank you.

24          THE COURT:  Any cross?

25          MR. GUADAGNINO:  A few items, your Honor.

Rivera - cross - Guadagnino                    1263

1                THE COURT:  Okay.

2    CROSS-EXAMINATION

3    BY MR. GUADAGNINO:

4    Q     Detective Rivera, good afternoon.

5    A     Good afternoon.

6    Q     You just testified that there was a wallet that was

7    found, do you remember that?

8    A     Yes.

9    Q     The wallet belonged to Mr. Firdavs Giyasov?

10   A     That's correct.

11   Q     You just said that the agent met with Mr. Giyasov to

12   return it to him, correct?

13   A     That's correct.

14   Q     And obviously the FBI spoke to him?

15   A     I'm not sure.  I wasn't there for that.

16   Q     Were you there for any of the interviews with

17   Mr. Giyasov?

18   A     Yes, I was actually.

19   Q     Okay, which one?

20   A     There was an interview that was conducted shortly after

21   an incident happened with Mr. Giyasov.

22   Q     You were there for that?

23   A     Not for the incident, but I was there for the follow-up

24   interview with the FBI translator and case agent.

25   Q     So you had an opportunity to speak to him, correct?

Rivera - cross - Guadagnino                    1264

1    A    Well, I don't think he spoke English, but I did see him.

2    I was there to back up the case agent.  I got an opportunity

3    to talk to him.

4    Q    Do you recall the date again?

5    A    After the incident he had in the street in Brooklyn.

6    Q    Okay.  So you had met with him.  Did you meet with him

7    any other time?

8    A    No.

9    Q    Just one time?

10   A    Personally face-to-face one time.

11   Q    During an interview.

12   A    Yes.

13   Q    But that wasn't the time that the wallet was returned to

14   him, that was after?

15   A    That was the -- the wallet was returned after the search

16   warrant, the arrest and search warrant was executed.

17   Q    Do you know how soon after the wallet was returned to him

18   you had that interview with him where you were present -- not

19   you had the opportunity, the agent did, but you were present

20   there, right?

21   A    Not for the interview, for the returned wallet.  When I

22   met with him and the agent, it was after he had the incident

23   with someone in the street.  The agent wanted to do a

24   follow-up interview to talk to him.  And this was before the

25   arrest of Mr. Akmal.

1    Q    So this was sometime in early April of 2019?

2    A    I believe that the incident with Mr. Giyasov, and whoever

3    was associated to your client, happened sometime in late

4    March.  And then a few days later, the FBI went out to talk to

5    him and I was present for that interview.

6    Q    Okay.  And then later on you said that you were

7    participating in a search and the wallet was found?

8    A    Correct.

9    Q    And then later on, the wallet was returned to him,

10   correct?

11   A    To my knowledge, yes, the wallet was returned to him.

12   Q    Then later on you know there were other interviews of

13   Mr. Giyasov -- or you don't know?

14   A    I don't know that.

15   Q    Because you didn't participate in any more interviews?

16   A    No, I wasn't the primary on it.

17   Q    You weren't the primary investigator in this case,

18   correct?

19   A    Correct.

20   Q    You testified and you were shown that there was some

21   document that was recovered in the apartment, correct?

22   A    Yes.

23   Q    That document apparently had Mr. Giyasov's signature on

24   it, correct?

25   A    Yes.

Rivera - cross - Guadagnino                    1266

1   Q    Let me ask you a question, there was a notary public that

2   signed that document.  Do you remember that?

3   A    If you bring it up I can probably tell you.

4          MR. GUADAGNINO:  Can we see the document, please?

5   What's the exhibit number?

6          MS. NGUYEN:  Of part of 304.

7   BY MR. GUADAGNINO:

8   Q    Can you see the document that I'm referring to?

9   A    Yes.

10  Q    The document has a notary public State of New York stamp

11  on it, doesn't it?

12  A    Yes, it does.

13  Q    And I believe the name is Nodirijon Kirgizbaev, am I

14  right about that?

15  A    Sounds good to me.

16  Q    Qualified in Rockland County, correct?

17  A    That's correct.

18  Q    Expiration 12/19/2020; is that right?

19  A    That's correct.

20  Q    Did you speak to that person?

21  A    No.

22  Q    Do you know if anybody did in this case?

23  A    I have no idea.

24  Q    Now, I want to ask you a question, you had said that when

25  you arrived at the scene or at the location where

Rivera - cross - Guadagnino                    1267

1  Mr. Narzikulov was arrested you had spoken to a case agent

2  about hearing the clicking sounds of a gun?

3  A    Not the case agent, but the field team leader.

4  Q    They had mentioned to you, I believe you testified as to

5  what that person told you, correct?

6  A    Correct.

7  Q    And repeat that again, please, what they told you about

8  the clicking noise?

9           MS. NGUYEN:  Objection.

10          THE COURT:  Overruled.

11 Q    Go ahead.

12 A    What I was told was we're going to wait and because they

13 heard a clicking sound at the door.  Once they said FBI, there

14 was a clicking sound, and it sounded remotely close to

15 preparation of a firearm.

16 Q    Okay, now let's talk about that.  That was before a

17 search warrant was gotten in this case, correct?

18 A    Correct.

19 Q    So based on that clicking sound, you called Emergency

20 Services Unit?

21 A    I didn't call.

22 Q    Well, the team called the Emergency Service?

23 A    They made me aware that the Emergency Services, or ESU,

24 was en route.

25 Q    Let's go over the sequence of how this went down.

Rivera - cross - Guadagnino                    1268

1          Emergency Services made a break through, meaning
2   they got in, correct?
3   A    Correct.
4   Q    And the police were already inside the apartment, right,
5   they got into the apartment?
6   A    Yes.
7   Q    After they were in, they got a search warrant to search?
8   A    Correct.
9   Q    So the police just didn't break in and start searching,
10  they had to get a warrant, right?
11  A    I believe.
12  Q    When they broke in, there was no gun out?
13  A    I don't believe there was.
14  Q    Right.  In fact, the gun that was recovered in this case
15  was found in a closet, right?
16  A    I believe so.
17  Q    It was inside of a box, right?
18  A    I believe so.
19  Q    And there was no bullets in it?
20  A    There were bullets on the floor.
21  Q    I'm talking about inside the gun.
22  A    Correct.
23  Q    As a police officer you know that you would charge a gun
24  to lodge a bullet in the barrel, right?
25  A    Yes.

Rivera - cross - Guadagnino                    1269

1  Q    Because this is a pistol, it's not a resolver.

2  A    Uh-huh.

3  Q    You wouldn't have to do that with a revolver, right?

4  A    I'm not sure.

5  Q    You can't charge a revolver, can you?

6  A    If the revolver is used in the commission of a crime you

7  can.

8  Q    No, no not charge a crime.  I'm talking about --

9          THE COURT:  Charge, make ready to fire.

10 Q    Make ready to fire.  Thank you, your Honor.

11 A    What was the question?

12 Q    You're familiar --

13         THE COURT:  An automatic weapon or semi-automatic

14 weapon has to be charged by wracking the slide.  A revolver

15 doesn't have to be charged.

16         THE WITNESS:  That's correct.

17 Q    Yes.  Exactly.

18 A    Thank you.

19 Q    And we ca agree that this was a pistol that was recovered

20 not a revolver, right?

21 A    Correct.

22 Q    You would put a bullet in the chamber of a pistol, like

23 the one that was recovered, by charging it, correct?

24 A    Correct.

25 Q    My question is, when you found the pistol -- you didn't

1   find the pistol.

2   A    I didn't find the pistol.

3   Q    Detective Jaworski.

4   A    Yes.

5   Q    You're familiar with Detective Jaworski?

6   A    Yes.

7   Q    You met him at the scene?

8   A    Yes.

9   Q    He showed you the pistol that he recovered, right?

10  A    I don't recall.

11  Q    Did you see it in person?

12  A    I think I saw it, yes.

13  Q    When you saw it, you saw it in the box, right?

14  A    Yes.

15  Q    And when you saw it, you stated that there was no

16  bullets.  It was unloaded, right, it was unloaded?

17  A    I said I saw bullets on the floor.  I didn't say it was

18  unloaded.

19  Q    Did you see the gun loaded or unloaded?

20  A    I saw the gun in the box.

21  Q    Did you check the gun to see if was loaded or unloaded?

22  A    I don't recall if I checked it to make it safe.

23  Q    You didn't make it safe.

24  A    No.

25  Q    Some other detective did.

Rivera - cross - Guadagnino                      1271

1    A    Correct.

2    Q    So you won't know.

3    A    Correct.

4    Q    You did see the gun in the box, it was in a kit, like

5    when you buy a gun brand new, right, in the Styrofoam,

6    correct?

7    A    Right.

8    Q    There were no magazines in the gun, do you remember that?

9    A    I don't remember for sure.

10              (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION

2    BY MR. GUADAGNINO:   (Continuing.)

3    Q     Do you remember that?

4    A     I don't remember for sure.

5    Q     Okay.  Well, you didn't see the gun in a position like it

6    was cocked backwards, did you?  You just saw it in a normal

7    state?

8    A     Correct.

9    Q     Right.  Now, you also testified with respect to some

10   documents that were shown in -- that relate to a gun purchase

11   in Pennsylvania; is that right?

12   A     Yeah.

13   Q     And you worked with the New York City Police Department

14   as an Internal Affairs officer, correct?

15   A     That's correct.

16   Q     You're a detective?

17   A     Yes.

18   Q     Okay.  And before you became a detective, you were a

19   patrol officer?

20   A     That's correct.

21   Q     And you dealt a lot with gun crimes in the past, right?

22   A     Well, I was assigned in the Transit Bureau, we didn't get

23   a lot of gun crimes, but I came across a few.

24   Q     Is it your experience that a lot of the gun crimes that

25   you came across involved guns that were illegal, stolen with

Rivera - Cross - Guadagnino                1273

1   like serial numbers like scratched off?

2   A    You had a combination of either illegal or legal that

3   were in the possession of people, but it depends on what was

4   happening at the time.

5   Q    Right.  It all depended on the circumstances, right.

6           Now, you saw that there was paperwork in this case

7   relating to the purchase of a gun in Philadelphia, right?

8   A    Yes.

9   Q    And there was paperwork that was filled out to purchase

10  this gun?

11  A    Yes.

12  Q    It was purchased at Delia's Gun Shop in Torresdale Avenue

13  in Pennsylvania, right?

14  A    Right, in Philly.

15  Q    In Philadelphia, right?

16  A    Mm-hm.

17  Q    And the gun had to have a State Police -- a Pennsylvania

18  State Police check to make sure that the person purchasing the

19  firearm could actually purchase it, correct?

20  A    Correct.

21  Q    The State Police check has to check the person's

22  identification, correct?

23  A    Yes.

24  Q    And that would also involve the person's social security

25  number, correct?

Rivera - Cross - Guadagnino                1274

1  A    Yeah.

2  Q    Now, in this case you testified that you found

3  identification belonging to a Zulaykho, is that correct?  A

4  female.  Do you recall that?

5  A    The --

6  Q    Zulaykho?

7  A    Yeah, if you could bring that back up again?  That was

8  the --

9  Q    Kurbanova.  Kurbanova, right, the identification?

10 A    Yeah.

11 Q    Right?

12 A    Yeah.

13 Q    Okay.  So this person, Zulaykho Kurbanova, gave her

14 social security number to Delia's Gun Shop?

15 A    There is a social security number indicated on there.

16 Q    And that would be to do a Pennsylvania State Police

17 background check, correct?

18 A    Yes.

19 Q    And once the Pennsylvania State Police background check

20 is done, if the person had a criminal record or if the person

21 was not authorized to purchase the gun, they would reject the

22 purchase?

23 A    Correct.

24 Q    And in this case the purchase was not rejected?

25 A    It appears not because she got an approval code.

1    Q    Right.  Now, it's not just based on I.D., isn't it?  It's

2    also based on social security?

3    A    I'm not sure what their policy is up there.

4    Q    Okay.  So, but in any event, you agree that this weapon

5    that you recovered or that Officer -- Detective Jaworkski

6    recovered was legally purchased in Pennsylvania?

7    A    It appears so, yeah.

8    Q    Okay.  So at that point the gun was recovered and then it

9    was taken away by Jaworkski, Detective Jaworkski, correct?

10   A    I believe they invoiced it, yeah, but it wasn't

11   immediately taken away.

12   Q    Well, it was sent away to the NYPD to voucher, correct?

13   A    Correct.

14   Q    Now, you also testified that you had reviewed some Chase

15   bank records, correct?

16   A    Yes.

17   Q    Okay.  And those Chase bank records were in relationship

18   to a Murodjon Sultanov, correct?

19         You remember the bank records?

20   A    I remember the bank records.

21   Q    Okay.  You just reviewed those records that were

22   recovered in evidence, but you didn't do any investigation on

23   what those records were in reference to, correct?

24   A    That's correct.

25   Q    You testified today in court based on evidence that was

Rivera - Cross - Guadagnino                1276

1   recovered, but you actually didn't do any investigation with

2   respect to that evidence, correct?

3   A    Correct.

4   Q    You're just identifying certain things that the

5   government pointed out to you and you're corroborating that,

6   correct?

7   A    That's correct.

8   Q    But you didn't verify any of that information, correct?

9   A    No.

10  Q    And you didn't investigate -- for example, there was some

11  purchases made by Mr. Firdavs Giyasov of some McDonald's,

12  correct?

13  A    Mm-hm.

14  Q    Did you ask him why he bought McDonald's?

15  A    No.

16  Q    So you didn't know why those purchases were made,

17  correct?

18  A    No.  It just appears that he likes McDonald's.

19  Q    And the other thing is there were some purchases -- one

20  of the purchases I think had to do with something in London

21  and -- you remember that or no?

22  A    Yeah.  That's right before the Hudson News thing.

23  Q    Right.  What was that about, if you know?

24  A    No idea.

25  Q    Okay.  But you were able to just identify, oh, he bought

1    something in London or something having to do with London,

2    correct?

3    A    According to what's printed on the bank record, yeah.

4    Q    Right.  But you didn't go deeper than that?

5    A    No, I didn't go canvassing video or anything like that.

6    Q    What about the Hudson News purchase?  Do we know what

7    that's about or no?

8    A    No idea.

9    Q    Okay.  Now, you had testified before that you had

10   recovered -- I believe in the apartment there was some

11   identification cards or driver's licenses?

12             If I can have a moment here to find the reference.

13             It appeared to be some identification cards that

14   belonged to some people in connection with Pennsylvania

15   applications for commercial driver's licenses.  Do you recall

16   that, that you testified to, or no?

17   A    The driver's license was referring to Mr. Giyasov.

18   Q    Mr. Giyasov?

19   A    Yeah.

20   Q    Is that the one that's up on the screen?

21   A    No.  This is Jasur Sobirov.

22   Q    Yes.  Jasur Sobirov, right?

23   A    Yes.  Those are the applications.

24   Q    And where did they come from?

25   A    The CDL applications?

1  Q     Yes.

2  A     Pennsylvania DOT.

3  Q     Did you recover those in the apartment?

4  A     There were a lot of documents that were recovered.

5  Q     Do you know if these were recovered in the apartment?

6  A     I don't know if that was in the room I had, which is

7  either Room B or Room F.

8  Q     Well, do you know if these documents were actually

9  recovered from the apartment or not?

10  A     I don't know for sure.

11  Q     But you did recover some identification cards associated

12  with those documents, correct?

13  A     Yes.

14  Q     Okay.  And those were recovered from the apartment?

15  A     Yeah.

16  Q     But you don't know if those people had borrowed money

17  from Mr. Narzikulov; is that right?

18  A     I don't know for sure.

19  Q     You don't know what relationship to Mr. Narzikulov, if

20  any, those documents had; in other words, the identification

21  documents?

22  A     Correct.

23          MR. GUADAGNINO:  Thank you.  I have no further

24  questions.

25          THE COURT:  Any redirect?

```
                        Proceedings                    1279
```

 1          MS. NGUYEN:  Yes, Your Honor.  And there's something

 2   I would like to address with the Court.  Perhaps we could take

 3   our lunch break?

 4          THE COURT:  Okay.  Let's go to lunch, ladies and

 5   gentlemen.  Your lunch is waiting for you next door.  Remember

 6   not to talk about the case amongst yourselves or with anyone

 7   else.  We'll see you at, say, 2:00, a little early today.

 8          (Jury exits the courtroom.)

 9          THE COURT:  Okay.  Let's have the witness excused.

10          You may sit down.

11          (Witness exits the courtroom.)

12          THE COURT:  Okay.

13          MS. NGUYEN:  Your Honor, as you're aware, the felon

14   in possession count in this case was severed, for good reason,

15   by Judge Glasser.

16          The government's view now is that there was a lot of

17   cross-examination of this witness about whether the firearm

18   was legally purchased.  The government's theory of this case

19   is that Ms. Kurbanova was a straw purchaser.  So she did

20   provide accurate doc -- well, she provided documentation and

21   got approved, but the government's view is that the evidence

22   supports she was a straw purchaser, obtained a Pennsylvania

23   address when she resided in Brooklyn and purchased this

24   firearm for the defendant, who has a prior felony conviction.

25   The jury is now left with the impression that there was

Proceedings                                    1280

1  nothing problematic with this purchase.  And the government's

2  view is that this purchase was particularly and specifically

3  made with the documentation of the mother because she would be

4  able to pass that background check, whereas the defendant

5  would not.  And I believe that the cross-examination of this

6  witness has opened the door to the straw purchasing scenario.

7          THE COURT:  Does that purchase only relate to the

8  severed count?

9          MS. NGUYEN:  The purchase itself I think relates to

10  the fact that the gun is possessed, but the reason the felon

11  in -- and used in the extorsion count.

12          THE COURT:  I mean, that is what is before us.  Even

13  if it was a legitimate gun, right, it does not affect the

14  nonsevered charge of using a gun in connection with what we

15  are trying, right?

16          MS. NGUYEN:  I agree, Your Honor.

17          THE COURT:  So what if the jury does say, okay,

18  well, the mother bought it, but what is the difference, we

19  have to find whether or not he was the one that used it?

20          MS. NGUYEN:  Well, given that -- based on the

21  cross-examination, we believe that the defendant's argument is

22  going to be that it was not his gun, it was only intended to

23  be used by his mom, his DNA perhaps got on there through some

24  other means, whereas our theory is that it was always meant to

25  be his gun and the mother was a straw purchaser.  So in that

Proceedings                                          1281

1   regard, his connection to the gun is greater and his

2   likelihood of using it for the extorsion attempt is greater if

3   we can establish it was always intended to be purchased and

4   used by him.

5            MR. GUADAGNINO:  How do I cross-examine the fact

6   that the government introduced the purchase of the weapon from

7   Delia's in Philadelphia with the mother if it's in evidence

8   and I have to address that?  I mean, that would -- they can

9   easily establish that in another trial the way Judge Glasser

10  severed the case, but that -- I agree with the Court, that

11  doesn't detract from the fact that there was a gun available

12  to the defendant and the theory is that he used a gun in a

13  Hobbs Act extortion and that there was one available to him.

14  It doesn't help to bring out that he had a prior conviction.

15  What does that have to do with the charge?  The charge is

16  there and there's evidence.

17           THE COURT:  If the jury believes -- if it finds

18  based on the evidence it has heard so far that he used that

19  gun in connection with the crime, it does not matter whose gun

20  it was or how it got there or whether it was legitimate or

21  not, right?  I mean, maybe the defense did that because it

22  makes him look like a little bit less of a bad guy if it was

23  the mother's gun, but -- I mean, I do not mind you arguing to

24  the jury look at the mother, was this her gun?  Okay?  I do

25  not mind you arguing that, but I do not think you want to

Proceedings                                    1282

1  argue that because you do not want to take that burden on

2  yourself.  It does not matter if it was the mother's gun, it

3  seems to me.  The question is, did he use it?  Was the DNA on

4  it his?  And I would leave it to the defense to say, well, if

5  you find the DNA on it was his, maybe he was just holding it

6  one day for his mother.  You know, if you are suggesting that

7  the defendant has forced a reconnection of the severed count,

8  I do not see why because the jury is not going to determine

9  the felon in possession count now.  It does not have to do

10  that in order to reach a verdict on the evidence here.  So I

11  would not worry about it if I were you.

12          MS. NGUYEN:  Can the government -- the government

13  would like to inquire of this witness if he is familiar with

14  the term "straw buyer" and if there might be reasons for a

15  person to purchase a gun even though -- on behalf of another

16  person.

17          THE COURT:  Like I said, I will let you make that

18  argument to the jury.  And I suppose to set up that argument

19  you can ask him if he is familiar with the term "straw buyer."

20  The last thing you suggested, can he start giving opinions on

21  whether this is a straw buyer, no, I am not going to do that.

22          MS. NGUYEN:  Yes, I would just ask if he knows what

23  a straw buyer is.

24          THE COURT:  That's right.  And then you can make

25  that argument.  And if the defense wants to argue it is the

Proceedings                                    1283

1    mother's gun, the jury can decide that.

2            MS. NGUYEN:  And since we're having this colloquy, I

3    would like to also ask of this witness if he is familiar if

4    there are different penalties under New York law for having a

5    loaded firearm versus an unloaded firearm.  I don't think that

6    impinges on the felon in possession count, but I wanted to

7    point it out.

8            MR. GUADAGNINO:  Does that have any bearing on the

9    charges?

10           THE COURT:  Right.  What does it matter?

11           MS. NGUYEN:  Based on the cross-examination, I

12   believe it appears that the argument is going to be that the

13   defendant unloaded the firearm rather than trying to charge

14   the firearm before he was arrested.  And the government's

15   theory is that someone who didn't want to get in more trouble

16   would unload a firearm in their home so that when it was

17   possessed, it wouldn't be loaded.

18           MR. GUADAGNINO:  I believe -- if I can address that?

19           I think that what I'm trying to establish is the

20   government has witnesses that are trying to testify as to

21   hearing a charging noise and is that a credible statement

22   based on the state of the gun when it was found in the crime.

23           THE COURT:  That is what I thought you were going

24   for.  He said a clicking, you know, it did not sound as much

25   as a racking.  But I think he is just going for credibility of

Proceedings                                    1284

1   the prior witness who testified "I heard a noise that caused

2   us to come in immediately because we thought it was a gun

3   being cocked," essentially.

4           MR. GUADAGNINO:  Yes.

5           THE COURT:  If he does that, then I do not think you

6   have a problem.

7           I mean, look, if it goes beyond any of the things we

8   have just discussed in the defendant's closing, not only do

9   you get a rebuttal, but I will reopen the record and take

10  additional testimony if I need to.  But I think you are

11  worried about a place the defendant is not going to go.

12          MS. NGUYEN:  Very well.

13          THE COURT:  Okay.  This has kind of messed up our

14  plans about today.  We will come back at 2, but I am not sure

15  we will be able to do our charging conference today.

16          MR. GUADAGNINO:  That's fine, Your Honor.

17          THE COURT:  All right.  Maybe we will come back a

18  little early on Monday, like 9:15 or so.

19          MR. GUADAGNINO:  Tuesday.

20          THE COURT:  Tuesday, and start the charging

21  conference then.  And have the jury come in at, say, 10:30 for

22  closing arguments and final charge.  I think that is probably

23  the way to do it.

24          MR. GUADAGNINO:  I think the government -- I don't

25  believe -- are you planning on resting on the record today?

Proceedings                                    1285

1            THE COURT:  You are, right?

2            MS. NGUYEN:  We do.

3            Although we did have a conversation with counsel

4     about a potential motion he might be making.

5            MR. GUADAGNINO:  That's why I'm bringing that up

6     right now.

7            Okay.  So the government had informed me prior to us

8     picking a jury, the voir dire, that they did not intend to

9     call Firdavs Giyasov, who in my view is a material witness

10    based on the fact that he was kidnapped.  And the defendant's

11    charged with conspiracy to kidnap, kidnapping, et cetera, and

12    extorsion, the Hobbs Act extorsion.  So it's my view that I

13    would like to ask the Court if they do not call him for a

14    missing witness charge because -- I understand the law and

15    that the government is saying that he's available to both

16    parties, however, I have made efforts through an investigator

17    to try to contact this person.

18           I know he's represented now by counsel, by John

19    Kaley.  I did reach out to Mr. Kaley on Monday, and he will

20    not allow me to speak to his client, he won't allow my

21    investigator to speak to his client.  There's a lot of

22    evidence that the government has spoken to this witness

23    through FBI 302s throughout the entire course of the pendency

24    of this matter, up until trial.  I know that he was given a

25    subpoena to come back from Uzbekistan; he flew into the

```
                        Proceedings                    1286
```

 1   United States.  When I spoke to Mr. Kaley about why his

 2   client's not testifying, his answer to me was that I guess he

 3   came too late, the week before jury selection, and he wasn't

 4   able to be prepped.  But I also understand that the government

 5   has trepidations of calling him based on inconsistencies

 6   having to do with information he gave on the 302 or in the 302

 7   about not taking a bribe, he left on his own accord, so they'd

 8   be in a weird position to put him on the stand.  He would give

 9   -- perjury, he would perjure himself.  And I understand the

10   government's concern that they don't want to call someone who

11   is going to commit perjury.

12            I don't know how to reconcile all of that, but --

13            THE COURT:  First of all, is he under a cooperation

14   agreement?

15            MS. NGUYEN:  No, Your Honor.

16            THE COURT:  Okay.  So, you know, I will be glad to

17   hear from Mr. Kaley, but if Mr. Kaley says he would invoke the

18   Fifth, which I think he would, right, then what are you going

19   to do about that?

20            MR. GUADAGNINO:  I can't do anything about it.  It's

21   his right to invoke the Fifth.

22            THE COURT:  I am going to ask the government to call

23   Mr. Kaley and see if that witness is willing to testify.  If

24   he is, we will hear him on Tuesday, if the defense wants to

25   call him.

1             Are you sure you want to call him?

2             MR. GUADAGNINO:  No, I don't want --

3             THE COURT:  You want the missing witness --

4             MR. GUADAGNINO:  I'll be honest, I want a missing

5    witness charge.

6             THE COURT:  Okay.

7             MR. GUADAGNINO:  And if I can't get that, at the

8    minimum I'd like to argue it on summation without the charge.

9             THE COURT:  I get it.

10            MR. GUADAGNINO:  If that's possible.

11            THE COURT:  Now, arguing it on summation is

12   something different than getting the charge.  I mean, you

13   know, your argument is one thing, my adopting it is something

14   else.

15            I would like briefing over the weekend on whether a

16   missing witness charge is appropriate.

17            But I take it that you do not want me to put the

18   government through the trouble of calling him in here?

19            MR. GUADAGNINO:  No, not at all, Your Honor.  I'll

20   take the argument on summation over the missing witness charge

21   any given day.

22            THE COURT:  Okay.  So let's do this.  Give me a

23   brief over the weekend on the missing witness charge.  Look at

24   it from two perspectives.  Number one -- unless the government

25   does not mind the defense arguing that -- if the government

Proceedings                                        1288

1    does mind, brief whether the defense should be allowed to

2    argue that in closing.  And then, secondarily, or maybe this

3    comes first, should I be giving them a missing witness

4    instruction.

5              MR. GUADAGNINO:  Can I say one more thing?

6              THE COURT:  Sure.

7              MR. GUADAGNINO:  The other issue is there's an

8    impression that Mr. Firdavs Giyasov is in the wind in another

9    country, thus giving credence to this he-got-paid-off

10   argument.  So the government knows that he's here.  He's in

11   the United States.  We know that he's in the United States.  I

12   think we should have a stipulation that he's here so that that

13   impression doesn't continue because I find myself in a

14   situation where reality doesn't comport with, you know, what

15   is out there right now in the jury's mind.

16             THE COURT:  What do you think about that, about a

17   stipulation?  He's here.  He's equally available to both

18   sides.

19             MR. GUADAGNINO:  I'll go with that and just the

20   argument on summation.

21             MS. NGUYEN:  Could we just have a little opportunity

22   to think that over?  We do agree here that the fact is he's in

23   the United States.

24             THE COURT:  Yes.  Yes, I know that is the fact.

25             And I appreciate counsel's sensitivity to thinking

Andronikh M. Barna, Official Court Reporter, RPR, CRR

Proceedings                                    1289

1    the jury might be straying off into an area of, oh, he's in

2    the wind and, who knows, he's in the wind because of this

3    defendant, and that is really not what is going on from a

4    real-world perspective.  So see what you can work out to

5    disabuse the jury of any rabbit hole it might go down in that

6    way.

7              MS. NGUYEN:  And, Your Honor, the one other thing I

8    ask is, in light of this potential missing witness charge -- I

9    don't anticipate that we ever want to call Mr. Giyasov, but we

10   would like to understand a little bit, since he is available,

11   what -- if we were to get a missing witness charge, if that

12   might affect our view on calling him, so we would like to

13   discuss that with Mr. Kaley as well.

14             MR. GUADAGNINO:  I'll be more than happy to withdraw

15   the application for missing witness charge if I can argue this

16   on summation.

17             THE COURT:  I do appreciate your honesty.

18             MR. GUADAGNINO:  And we can do a stipulation and

19   that's it.

20             THE COURT:  You see where he is coming from?

21             MS. NGUYEN:  Yes.

22             THE COURT:  So, yes that is fine.

23             I suspect that if you speak to Mr. Kaley and he

24   tells you his client is willing to come to court and to

25   testify and you take the position fine, we are going to call

Proceedings                                      1290

1   him before we rest or I am going to reopen the case if you

2   rest today, then Counsel will likely withdraw his missing

3   witness charge request.

4            MS. NGUYEN:  Right.

5            THE COURT:  You do not have to commit to that, but I

6   think it is --

7            MR. GUADAGNINO:  No, that's exactly what I'll do.

8   I'll tell you right now, I don't need it.

9            MS. NGUYEN:  The only reason I raise that is if we

10  were to rest on the record, we didn't want to be precluded

11  from that possibility.

12           THE COURT:  No, I understand.  You certainly have

13  that.

14           And I will also tell you it might well influence me

15  about the missing witness charge if I get a proffer from the

16  government that you have spoken to Mr. Kaley and he will not

17  testify under the circumstances because then you do not get a

18  missing witness charge because you would not get anything from

19  the witness if he were here.

20           MR. GUADAGNINO:  Right.  Exactly.

21           THE COURT:  So I think you should call Mr. Kaley and

22  find out what the story is.

23           MS. NGUYEN:  Thank you, Judge.

24           THE COURT:  Okay.  See you --

25           MS. NGUYEN:  Oh, sorry, with regards to Mr. Rivera's

Proceedings                                    1291

1    continued testimony, I would like permission to speak with him

2    about my questions so he doesn't inadvertently mention people

3    previously who are previously convicted.

4              MR. GUADAGNINO:  No objection, Judge.

5              THE COURT:  Okay, we can do that.

6              MS. NGUYEN:  Thank you.

7              THE COURT:  All right.  Thank you, all.  See you at

8    2:00.

9              MR. GUADAGNINO:  Thank you, Your Honor.

10             MR. BUFORD:  Thank you, Your Honor.

11             (Luncheon recess was taken.)

12

13             (Continuing on the following page.)

14

15

16

17

18

19

20

21

22

23

24

25

Proceedings                                 1292

1            **AFTERNOON SESSION**

2                (In open court - jury not present.)

3                (Defendant entered the courtroom.)

4          THE COURTROOM DEPUTY:  All rise.

5          (Judge BRIAN M. COGAN entered the courtroom.)

6          THE COURT:  All right, let's have the jury, please,

7     and the witness.

8          (Witness entered and resumed the stand.)

9          (Jury enters.)

10         THE COURT:  All right, everyone be seated.

11         Anymore redirect?

12         MS. NGUYEN:  Yes, Your Honor, thank you.

13

14         (Continued on the following page.)

15

16

17

18

19

20

21

22

23

24

25

SAM      OCR      RMR      CRR      RPR

1   **DAVID RIVERA**,

2        called as a witness by the Government, having been

3        previously duly sworn/affirmed by the Courtroom Deputy,

4        was examined and testified further as follows:

5   REDIRECT EXAMINATION

6   BY MS. NGUYEN:

7   Q    Are you familiar with the term straw buyer in the context

8   of gun purchases?

9   A    Yes.

10  Q    Can you tell us what that means?

11  A    So, a straw buyer, basically, means that one person or in

12  this case, a straw gun purchase, one person purchases a

13  firearm on behalf of another person who, for some reason, is

14  unable to make the purchase themselves.

15  Q    And the paper work would include the name of the person

16  agreeing to make the purchase, is that right?

17  A    That's correct.

18  Q    And if someone were to find a firearm and look it up by,

19  let's say, serial number, would they -- they would have the

20  information given on the paper work for that -- for that

21  purpose, is that right?

22  A    That's correct.

23           MS. NGUYEN:  I have no further questions for this

24  witness.

25           All right, anything else?

 1              MR. GUADAGNINO:  No, Your Honor.  Thank you.

 2              THE COURT:  All right, you may step down.  Thank

 3   you.

 4              THE WITNESS:  Thank you.

 5              (Witness steps down and exits the courtroom.)

 6              THE COURT:  Any further evidence from the

 7   Government?

 8              MS. NGUYEN:  No, Your Honor, the Government rests.

 9              THE COURT:  Ladies and gentlemen, I hope you got

10   comfortable sitting here because we need to excuse you again

11   for just a few minutes, and then we'll have you back and we'll

12   let you know where we're going to go with the case from here

13   since the Government has rested.

14              We'll have you back, I'd say, in 5, 10 minutes at

15   most.

16              So, please bear with us.  And, please, don't talk

17   about the case.

18              (Jury exits.)

19              THE COURT:  All right be seated.  I guess I'll hear

20   from the defense.

21              MR. GUADAGNINO:  Your Honor, at this time, under

22   Federal Rule of Criminal Procedure, Rule 29, subsection A, the

23   defense makes a motion for a judgment of acquittal based upon

24   the Government's failure to establish a prima facia case with

25   respect to the counts before the Court.

1              THE COURT:  All right.

2              Any response from the Government?

3              MR. BUFORD:  Your Honor, we believe the evidence

4    presented so far is certainly sufficient to go to the jury on

5    all of the eight counts in the trial.

6              I am happy to go through them count by count if the

7    Court would like.

8              THE COURT:  No, I don't think that's necessary.

9              I agree.  I think the evidence makes out a prima

10   facia case.  The jury could reasonably find, if it resolves

11   factual disputes in the Government's favor, that there is

12   guilt beyond a reasonable doubt as to each of the eight counts

13   that we are trying here.

14             I will also note that with respect to certain

15   co-conspirator statements that I admitted, I think I have

16   already found, but just for the sake of good order I will make

17   it clear, that the Government has, indeed, offered enough

18   evidence to show the existence of the conspiracy if the jury

19   chooses to so find; and that the statements were admitted were

20   mate in furtherance of and during the conspiracy.

21             Okay, so, next, does the defendant intend to call

22   any witnesses in his case?

23             MR. GUADAGNINO:  Your Honor, may I have 30 seconds?

24             THE COURT:  Sure.

25             MR. GUADAGNINO:  Thank you.

1              (Pause.)

2              MR. GUADAGNINO:  Your Honor, the defense is not

3    going to call any witnesses.  And I'd ask the Court to inquire

4    of the defendant with respect to his decision not to testify,

5    that it would be a knowing, voluntary waiver of his right to

6    testify at trial.

7              THE COURT:  Okay, I will do that.

8              Let me ask you first, have you conferred with the

9    defendant about his right to testify?

10             MR. GUADAGNINO:  I have, Your Honor, and I've

11   counseled him that he has every right to testify at the trial

12   and that that right is his right, no matter what my advice is

13   to him the right is his and he has to make a decision that is

14   informed.

15             THE COURT:  All right.

16             Mr. Narzikulov -- we have an interpreter, right?

17             THE INTERPRETER:  Yes.

18             MR. GUADAGNINO:  Do you want him to stand?

19             THE COURT:  No, he can sit, it's fine.

20             Mr. Narzikulov, I just want to make sure you

21   understand that although your attorney has told me that you

22   have elected not to testify at this trial, that is your

23   decision, not his.  All right?

24             He is going to give you his best advice as to

25   whether you should testify or not, but, ultimately, it is your

Rivera - redirect - Nguyen                    1297

1   decision.

2           Do you understand that?

3           THE DEFENDANT:  Yes.

4           THE COURT:  And do you understand that if you decide

5   not to testify, you are not going to be able to complain later

6   that:  Oh, my attorney wouldn't let me testify, because I am

7   telling you it is up to you?

8           Do you understand?

9           THE DEFENDANT:  Yes.

10          THE COURT:  And do you understand that even if your

11  attorney advised you not to testify, if you wanted to testify,

12  he would put you on the stand and he would ask you any

13  questions you thought he should ask you?

14          Do you understand he would do that if you wanted him

15  to?

16          THE DEFENDANT:  Understand.

17          THE COURT:  All right, what is your decision, do you

18  want to testify during your case or not?

19          THE DEFENDANT:  I do not wish to testify.

20          THE COURT:  All right.  I find that the defendant is

21  making that decision knowingly and voluntarily, having been

22  advised of his rights, both by his lawyer and the Court, to

23  testify if he wanted to.

24          All right, let's have the jury back in.  I will

25  close the record.  I will ask the defense if they intend to

1  proceed, and then we will let the jury go for the weekend.

2             MR. GUADAGNINO:  Thank you, Your Honor.

3             MS. NGUYEN:  Can I do housekeeping?

4             THE COURT:  Sure.

5             MS. NGUYEN:  There's two issues the Government would

6  like to clarify for the record.

7             The first is something that I misstated when I

8  referred to the Verizon records as sub-exhibits 258.1 to

9  258.16.  I meant to include also a 258.17, which was the

10 certification that was read.

11            THE COURT:  Any objection to amending the record?

12            MR. GUADAGNINO:  No objection, Your Honor.

13            MS. NGUYEN:  And the second housekeeping issue is

14 when Mr. Guadagnino was cross-examination Agent Galicia there

15 was a photograph of gun holsters.

16            I believe the record may indicate that that came

17 from Exhibit 401, but it, in fact, came from Exhibit 309.

18            THE COURT:  All right, any problem?

19            MR. GUADAGNINO:  No objection, Your Honor.

20            THE COURT:  Okay, the record is so amended.

21            (Government's Exhibit 258.17 was received in

22 evidence.)

23            MS. NGUYEN:  Thank you.

24            THE COURT:  Okay.

25            (Jury enters.)

1           THE COURT:  All right, everyone be seated.

2           The Government having rested its case, how would the

3    defense like to proceed?

4           MR. GUADAGNINO:  Your Honor, the defense will now

5    rest as well.

6           THE COURT:  All right, both sides having rested.

7           Ladies and gentlemen, that completes the evidence in

8    the case.

9           Now, let me tell you how we are going to proceed.

10          We are going to give you a long holiday weekend, as

11   I suggested.  We are going to send you home now.  We will have

12   you back here Tuesday morning at 10:30 a.m. because I have to

13   do some things with the lawyers first on Tuesday morning.

14          When you come back on Tuesday morning, we will then

15   hear closing arguments.  I will give you my instructions on

16   the law, and then you will start your deliberations.

17          So, because you are going to be away from us for

18   longer than we have been away from each other since last week,

19   let me remind you again:  Please do not discuss this case with

20   anyone at all, not even your family.  Please do not do any

21   research about the case , no Googling, no TikToking, no

22   WhatsApp'ing, nothing at all.  Don't research any of the

23   things that you have heard.  Again, if there's media coverage,

24   hit the remote control, flip the page, click the mouse, do

25   what you need to do to stay away with anything that you do on

1    this.

2           And I also want to mention to you, we are adjourning

3    for the 4th of July holiday, one thing you might want to think

4    about just to impress upon yourselves the seriousness of this

5    task that you are undertaking is that we are one of the few

6    countries in the world that trusts our fellow citizens to sit

7    in matters like this.  In all but a handful of countries,

8    everyone has professional judges determining cases like this.

9    We don't do that here because we think it's part of your

10   participation in the Democratic process that you get this

11   close to our justice system, and we trust your judgment

12   because we know how seriously you take these matters.

13          So, you might want to think about that special trust

14   that exists between the people of this country over the 4th of

15   July weekend.  Enjoy it.  Don't party too much because we need

16   you fresh on Tuesday morning, but have a good weekend.

17          (Jury exits.)

18          THE COURT:  Okay, have a seat just for a minute and

19   let's sum up where we are.

20          We have your e-mail addresses and we will e-mail you

21   a set of the proposed charge and verdict form, if not tonight,

22   certainly over the weekend.

23          And just so you know, my plan at the charging

24   conference is, you know, the instructions are in three parts.

25   You have all the preliminary stuff, and then you've got the

1    substantive charge, and then you've got a little advice for

2    the jury at the end.

3            Generally, what I do at the charging conference is I

4    just ask if anyone has any changes to the entirety of the

5    first part, because that is mostly boilerplate and we've all

6    seen that before and that takes a second.

7            And then I will go page by page through the

8    substantive charge to see if there's any changes or additions

9    that you think ought to be in there.

10           And then I'll do the same group question with regard

11   to the last part.

12           Additional homework, the Government, at least, if

13   not the defense as well, is going to pin down Mr. Kaley on

14   whether his client would invoke the fifth.  Based on what

15   happens there, I expect some kind of stipulation to be worked

16   out between the parties as to the availability of this

17   witness.  See what you can do.

18           And I think that's all I've got.

19           Anything else that we need to talk about first?

20           MS. NGUYEN:  Not from the Government.

21           MR. GUADAGNINO:  And, Your Honor, based on your

22   analysis of their answer with respect to Mr. Kaley, if the

23   defendant -- I'm sorry -- the witness would take the fifth,

24   Your Honor will rule.

25           And then if we don't get the missing witness charge,

Rivera - redirect - Nguyen                    1302

1   you will let me know if I can argue on summation?

2          THE COURT:  Yes, I am glad you mentioned that.

3          I am going to need a letter from the Government if

4   the Government is opposed to letting him do that.  Okay?

5   Because I kind of think if he wants to do that, it is probably

6   okay, but I will willing to be convinced.

7          MS. NGUYEN:  Yes, Your Honor, we'll

8   present something to you.

9          THE COURT:  Try to have that by Saturday, if you

10  can, sometime on Saturday, so that if the defense wants to

11  respond to it, they have a couple of days to do that as well.

12         MS. NGUYEN:  Yes.

13         THE COURT:  All right, enjoy the holiday, everyone.

14         MR. GUADAGNINO:  Thank you, Judge.

15         THE COURT:  See you next week.

16         MR. BUFORD:  Thank you, Your Honor.

17         MS. NGUYEN:  Thank you, you too.

18         (Judge BRIAN M. COGAN exited the courtroom.)

19         (Defendant exited the courtroom.)

20

21   (Matter adjourned to Tuesday, July 6th, 2021 at 9:30 a.m. )

22

23

24

25

1303

<u>I N D E X</u>

<u>WITNESS</u>                                                    <u>PAGE</u>


MELISSA GALICIA

    CROSS-EXAMINATION   BY MR.

    GUADAGNINO                                        1147

    REDIRECT EXAMINATION BY MS. NGUYEN                1165


HISLATJON SADIZODA

    DIRECT EXAMINATION BY MR. BUFORD                  1170

    CROSS-EXAMINATION  BY MR. GUADAGNINO              1195


DAVID RIVERA

    DIRECT EXAMINATION BY MS. NGUYEN                  1197

    CROSS-EXAMINATION BY MR. GUADAGNINO               1263

    REDIRECT EXAMINATION BY MS. NGUYEN                1293

1304

1                       **E X H I B I T S**

2

3

4    Government's Exhibit 111                       1166

5

6    Government's Exhibit 514B                  1172

7

8    Government's Exhibit 515B                  1179

9

10   Government's Exhibit 510B                  1183

11

12   Government's Exhibits 511A, 511B, 512A and

13   512B                                   1189

14

15   Government's Exhibits 296 through 299       1199

16

17   Government's Exhibit 253, Sub-exhibits 253.1

18   to 253.8                             1210

19

20   Government's Exhibit 259                  1212

21

22   Government Exhibit 255, including

23   Sub-exhibits 255.1 to 255.6             1218

24

25

1305

1    E X H I B I T S (Cont'd)

2

3    Government Exhibit 258, including

4    Sub-exhibits 258.1 to 258.16                    1221

5

6    Government's Exhibits 286 through 290           1234

7

8    Government's Exhibits 201 through 207           1244

9

10   Government's Exhibit 333                        1259

11

12   Government's Exhibit 258.17                     1298

13

14

15

16

17

18

19

20

21

22

23

24

25