1306

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,     :   19-CR-223(BMC)
                              :
                              :
                              :
        -against-            :   United States Courthouse
                              :   Brooklyn, New York
                              :
                              :
                              :
AKMAL NARZIKULOV,            :   Tuesday, July 6, 2021
                              :   9:30 a.m.
        Defendant.           :
                              :
                              :
                              :
- - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR JURY TRIAL
BEFORE THE HONORABLE BRIAN M. COGAN
UNITED STATES DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S :

For the Government:       JACQUELYN M. KASULIS, ESQ.
                          United States Attorney
                          Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201
                          BY: VIRGINIA NGUYEN, ESQ.
                              F. TURNER BUFORD, ESQ.
                              Assistant United States Attorneys

For the Defendant:        LAW OFFICE OF PETER GUADAGNINO
                          Attorney for the Defendant -
                          Akmal Narzikulov
                              30 Wall Street
                              8th Floor
                              New York, New York 10005
                          BY: PETER J. GUADAGNINO, ESQ.
                              ILEANA MONTES, ESQ.

Proceedings                                           1307

Court Reporter:   Anthony D. Frisolone, FAPR, RDR, CRR, CRI
                  Official Court Reporter
                  Telephone: (718) 613-2487
                  Facsimile: (718) 613-2694
                  E-mail:  Anthony_Frisolone@nyed.uscourts.gov

Proceedings recorded by computerized stenography.  Transcript
produced by Computer-aided Transcription.

Proceedings                                         1308

1           (In open court.)

2           (Defendant present in open court.)

3           COURTROOM DEPUTY:  All rise.  The United States

4   District Court for the Eastern District of New York is now in

5   session.  The Honorable Brian M. Cogan is now presiding.

6           (Honorable Brian M. Cogan takes the bench.)

7           COURTROOM DEPUTY:  Calling criminal cause for jury

8   trial in Docket No. 19-CR-223, *United States of America*

9   *against Akmal Narzikulov.*

10          Counsel, please note your appearances for the

11  record.

12          MS. NGUYEN:  For the United States of America,

13  Assistant United States Attorney Virginia Nguyen.

14          Good morning, your Honor.

15          MR. GUADAGNINO: Peter J. Guadagnino for Akmal

16  Narzikulov.

17          Good morning, your Honor.

18          (Defendant enters the courtroom at 9:37 a.m.)

19          THE COURT:  Good morning.

20          MS. NGUYEN:  Good morning.

21          MR. GUADAGNINO:  Good morning.

22          THE COURT:  I have a question.  Is there anybody

23  here that hasn't been vaccinated or doesn't want to say

24  whether they've been vaccinated?  Raise your hand.  The jury

25  isn't vaccinated, but since we all have been we don't have to

Proceedings                                    1309

1   wear masks.

2         First, with regard to the missing witness proposed

3   instruction from the defense, anyone need to be heard further

4   on that?

5         MS. NGUYEN:  No, your Honor.

6         MR. GUADAGNINO:  No, your Honor.  Thank you.

7         THE COURT:  All right.  Having read the parties'

8   submissions, I'm not going to give the instruction because I

9   think the witness is not really missing.  The witness is

10  unavailable.

11        I accept the Government's proffer that Mr. Kaley has

12  conferred with his client and the client would decline to

13  testify, and I also note that I know Mr. Kaley and I have

14  confidence that if that's what he's telling the Government

15  then it is the case.

16        So he is -- this witness is equally unavailable to

17  both sides.  There's nothing the Government has done it

18  procure his nonattendance and, therefore, I think it would

19  distort what was really happening here if we gave that

20  instruction to the jury.

21        I will give the standard instruction about not every

22  witness has to be called and both witnesses have access to the

23  evidence that both sides have access to the evidence that

24  there is.

25        Okay.  Now, with regard to the charging conference.

Proceedings                                    1310

1            MR. GUADAGNINO:  Your Honor, may I?

2            THE COURT:  Yes.

3            MR. GUADAGNINO:  Does that include the defense is

4    precluded from arguing?

5            THE COURT:  It does.

6            MR. GUADAGNINO:  Okay.

7            THE COURT:  It does.  Because it's just not fair.

8    The witness is not missing, so it would be an unfair argument

9    to make.

10           Okay.  Let's go over the charge and I think everyone

11   has a copy.  The first part, as I said, is just mostly, you

12   know, standard that goes up through Page 21 in my copy of it.

13   Anyone have any comments up through Page 21?  I'm going to

14   wait a few seconds.  It's 21 pages.  We'll note that we sent

15   out the charge before the weekend and the only thing that's

16   been changed is we have included the two supplemental charges

17   that the Government asked for over the weekend.

18           MR. GUADAGNINO:  In terms of, your Honor, up until

19   Page 21 there's two sections that appear to be similar.

20   Sectioning F, which is evidence or witnesses not presented by

21   equally available; and then there's H, uncalled witnesses

22   equally available to both sides.

23           THE COURT:  Give me the two pages for that.

24           MR. GUADAGNINO:  The first one is Page 12 and the

25   second one is Page 19, your Honor.

Proceedings                                         1311

1           THE COURT:  Okay.  Give me just a second.

2           MR. GUADAGNINO:  Okay.

3           (A brief pause in the proceedings was held.)

4           THE COURT:  It does seem to me they overlap

5    unnecessarily.  What if I take out H on Page 19?

6           MR. GUADAGNINO:  Yes, your Honor.  That's acceptable

7    to the defense.

8           MS. NGUYEN:  Your Honor, could we include one

9    sentence from Paragraph H which is you should not draw any

10   inferences or reach any conclusions as to what they would have

11   testified to had they been called.  We otherwise agree there

12   is some overlapping.

13          THE COURT:  Okay.  We'll move that sentence and

14   insert it after the first sentence on Page 12, Paragraph F.  I

15   think that'll give us one complete charge instead of two

16   overlapping charges.

17          Okay.  Anything else up to Page 21?

18          MR. GUADAGNINO:  Not from the defense, your Honor.

19          MS. NGUYEN:  Nothing from the Government, Judge.

20          THE COURT:  Okay.  Anything on Page 22?

21          MR. GUADAGNINO:  Not from the defense, your Honor.

22          THE COURT:  You don't need to give me a negative on

23   these.  I'll wait a minute, and if I don't hear from anybody

24   I'll go on to the next page.

25          MR. GUADAGNINO:  Okay.

```
                      Proceedings                    1312
```

1           THE COURT:  Page 23?  Page 24?  Page 25?  Page 26?

2     Page 27?  Page 28?  Page 29?  Page 30?  Page 31?  Page 32?

3     Page 33?  Page 34?  Page 35?  Page 36?  Page 37?  Page 38?

4     Page 39?  Page 40?  Page 41?

5           MS. NGUYEN:  Yes, your Honor.

6           THE COURT:  Okay.

7           MS. NGUYEN:  In the fourth line of Page 41, to

8     says -- it refers to assets from a business.

9           THE COURT:  Right.

10          MS. NGUYEN:  Can we have assets from a business or a

11    person.

12          THE COURT:  I think that's accurate.

13    Mr. Guadagnino.

14          MR. GUADAGNINO:  No objection, your Honor.

15          THE COURT:  Okay.  Anything else on 41?

16          MS. NGUYEN:  In the next sentence, it says, if the

17    defendant's actions affected a business's ability to continue

18    to operate.

19          THE COURT:  Yes.  How do you want to change that?

20    Do you want to take it out.

21          MS. NGUYEN:  Our proposal would be to delete that

22    whole sentence.

23          THE COURT:  Right.  I'm also inclined to change the

24    word "business" from the preceding sentence instead of

25    inserting or a person just take out business.  I don't think

Proceedings                                    1313

1   that's this case, right.

2           MS. NGUYEN:  That's fine with the Government as

3   well.

4           MR. GUADAGNINO:  That's fine with the defense.

5           THE COURT:  All right.  So we'll take out "business"

6   in the preceding sentence, put in, "From a person," and then

7   we'll take out the next sentence.

8           Anything else on 41?  42?  43?  44?

9           MS. NGUYEN:  Your Honor?

10           THE COURT:  Yes.

11           MS. NGUYEN:  Page 44 has the same instruction about

12   the business and the person.

13           THE COURT:  Okay.  We will change business to person

14   and take out the next sentence.

15           Anything else on 44?  45?  46?  47?  48?  49?  50?

16   51?  And then anything on 52 through 53?

17           MR. GUADAGNINO:  Your Honor?

18           THE COURT:  Yes.

19           MR. GUADAGNINO:  Are we on the verdict sheet?

20           THE COURT:  We're not there but we're almost there.

21           MR. GUADAGNINO:  Okay.

22           THE COURT:  Although, I don't seem to have a verdict

23   sheet.

24           MS. NGUYEN:  Your Honor, if it's the same that was

25   distributed on Friday we have an extra copy.

```
                        Proceedings                        1314
```

1          THE COURT:  Okay.  Hand it to one of my interns,

2     please.

3          Okay.  Go ahead, Mr. Guadagnino.

4          MR. GUADAGNINO:  Your Honor, simply, it's just a

5     matter of form.  We had submitted the defense had submitted a

6     request for the verdict sheet to have the words, "not guilty"

7     come before the words guilty based on the presumption of

8     innocence and the burden of proof, people read from left to

9     right.

10         It's kind of like a psychological thing where you

11    know that the jury is supposed to follow the law and the

12    Court's instruction to have a cloak of innocence, presumption

13    of innocence, if they and unless and until the Government gets

14    to that burden maybe from left to right, not guilty/guilty,

15    that's our thinking.

16         THE COURT:  What's the Government's position on it?

17         MS. NGUYEN:  The Government defers to the Court.  We

18    don't see a difference in either version.

19         THE COURT:  I've been asked this before, and

20    generally, I don't do it only because for 800 years of

21    Anglo-American history, jurors have been asked guilty or not

22    guilty.

23         If nobody objects I don't mind changing it.

24         MR. GUADAGNINO:  Thank you, your Honor.

25         THE COURT:  We'll change that.  Okay.  Anything else

Proceedings                                          1315

1    we need to do with regard to the change.

2         MR. GUADAGNINO:  No, your Honor, not from the

3    defense.

4         THE COURT:  I'm sorry.

5         MR. GUADAGNINO:  It has nothing to do the charge,

6    but we have a stipulation as to the unavailability of that --

7    I'm sorry, Mr. Giyasov is in the United States, present in the

8    United States.  And that goes to the issue of the inference

9    that he's not in the country so we do have a stipulation,

10   right.

11        MS. NGUYEN:  Yes.

12        THE COURT:  So is it a joint stipulation so I should

13   read it to the jury?

14        MR. GUADAGNINO:  That's fine, your Honor.

15        MS. NGUYEN:  I think that would be the best at this

16   stage.

17        THE COURT:  Hand it to my clerk and I will read it

18   before closing arguments and then you can go into closings.

19        MR. GUADAGNINO:  Thank you, your Honor.

20        THE COURT:  I think we've established we're going to

21   have government, defense, government rebuttal for closings.

22        MR. GUADAGNINO:  Yes, your Honor.

23        MS. NGUYEN:  Yes.

24        THE COURT:  All right.  Very good.  See you in a few

25   minutes.

Proceedings                                      1316

1           (Defendant exits from courtroom at 9:56 a.m.)

2           (A recess in the proceedings was taken.)

3           (Defendant enters the courtroom at 10:50 a.m.)

4           COURTROOM DEPUTY:  All rise.

5           THE COURT:  Both sides ready for closing argument?

6           MR. GUADAGNINO:  Yes, Your Honor.

7           MS. NGUYEN:  Yes, Your Honor.

8           THE COURT:  Bring in the jury, please.

9           (Defendant enters the courtroom at 10:53 a.m.)

10          THE COURT:  All right, everyone.  Be seated, ladies

11  and gentlemen.  Hope you had a good 4th of July.

12          Before we begin with closing arguments, the parties

13  have agreed on what we call a stipulation.  That's a statement

14  of fact that both sides agree as true and that you should

15  know.  It's part of the evidence in this case.  And as I'll

16  tell you later, when you have a stipulation you should accept

17  this fact as true.

18          What the parties have stipulated to is that Firdavs

19  Giyasov, you remember who he is, Firdavs Giyasov is presently

20  in the United States.  And that's the Court's stipulation,

21  Government Exhibit 701, that's part of the evidence.

22          Okay.  We will now proceed with closing arguments.

23  The Government will go first.

24          MS. NGUYEN:  The defendant TAZED and abducted

25  Firdavs Giyasov in broad daylight.  He dragged Firdavs's body

1   first by the hair and then by the chin to a getaway car just

2   so he could get back a couple of thousands of dollars that

3   Firdavs had stolen.  He did not care who saw him, and he did

4   not care about the consequences.

5           When the defendant learned after the fact that Jasur

6   Kamolov had tried to get in between him and his money.  When

7   he learned that Jasur had warned Firdavs the night before that

8   the defendant was looking for him, he threatened Jasur with a

9   gun.  Threatened to kill Jasur until Jasur agreed to pay him

10  some money, too.

11          He was willing to do all of this just to protect his

12  business helping others cheat to get licenses from the DMV and

13  the TLC.  Then, on top of all of that, after he was arrested

14  for kidnapping, the defendant made plans to pay off not just

15  one witness but two witnesses in a corrupt attempt to keep

16  those witnesses from testifying against him.

17          Ladies and gentlemen, Akmal Narzikulov believes he

18  is before the law and it is time to held him accountable.

19          For some time, he had been running a scam to help

20  people cheat on their licensing test.  It was a successful

21  scam.  He got paid hundreds, sometimes thousands of dollars

22  from individual clients who were willing to cheat their way to

23  a license.  He got paid well because he figured out the

24  perfect way to cheat.  The test offered by the DMV are

25  different for every person, the questions change each time;

1   that's the same way for the TLC tests that PSI offers.

2   They're designed so that no two test takers see the exact same

3   test and the defendant had a solution to that.  He used

4   smartphones and he connected them to hidden wires that go

5   around the person's neck under their shirt.  Those wires were

6   synced to hidden wireless earpieces.  Using Velcro affixed to

7   the back of those phones, they would stick onto T-shirts and

8   those T-shirts each had a tiny little peephole cut out so that

9   the test questions could be seen through the camera of the of

10  the phone.  Then a voice would come through the earpiece to

11  give the test takers the correct answers.  Pictures of that

12  equipment are shown here in Government's Exhibit 302-A at

13  Page 53 and Government Exhibit 263.

14          We know all about how the cheating scam worked from

15  the testimony of Jasur and Firuz we know how it worked from

16  the cheaters who were caught by the TLC test proctors working

17  at PSI.  And we know from examining the equipment that those

18  cheaters brought with them.  We know the equipment wasn't

19  cheap.  We know this because the defendant exchanged

20  screenshots in his chats with his co-conspirators using a

21  Samsung cell phone that was found in his apartment.  That cell

22  phone is Government Exhibit 309, and these images were

23  extracted from that cell phone.  These pictures come from

24  exhibits 309.10 and 309.8.  Each one of those sets of wires

25  and earpieces could sell for $400.  Ten earpieces sell for

Summation - Ms. Nguyen                1319

1    250.  We know from the evidence that was found in the

2    defendant's apartment that he had dozens of these neck wires

3    and dozens of these earpieces all over the place.  And you can

4    examine those pieces of equipment for yourself, they are in

5    evidence in Exhibits 319, 320, and 321.

6          But the cost of the equipment wasn't a big deal; the

7    defendant could certainly afford it.  He was paid a lot of

8    money for his services.  According to Jasur, the defendant

9    would charge between $800 to $1,200 just for the CDL written

10   test.  Jasur himself paid $7,000 to get past the CDL road

11   test.  And look at the pictures in the defendant's phone

12   showing his bookkeeping entries.  This is a picture from

13   Government Exhibit 309.9 from a data extraction from a Samsung

14   cell phone in the defendant's apartment.

15         You can see the defendant services he offered.  This

16   page shows entries for two TLC tests and two CDL licenses.

17   You can see the prices he listed for these services.  In some

18   cases, you can tell the difference between the total price and

19   the deposit he collected from the client.

20         Here's another example from the defendant's cell

21   phone in 309.9.  Again, the types of services are written down

22   the right side of the page.  We see here he's offering three

23   CDL licenses, two Class D licenses, and one TLC license with

24   the prices listed right there next to the individual clients'

25   phone numbers.  If you want to examine some of the defendant's

1    ledgers, they are in evidence, too, at Government Exhibit 305.

2    In those note notebooks, you'll see references to CDLs and

3    contact information, phone numbers, for various clients.

4              For his involvement in the cheating scam, the

5    defendant is guilty of conspiracy to unlawfully produce

6    identification documents.  To be guilty of that crime, the

7    Government has to prove certain elements and the Court will

8    explain each of those elements to you.

9              But let me briefly review how the evidence has

10   established the defendant's guilt.

11             First, there's no dispute that CDLs and TLC licenses

12   are forms of identification and there's no dispute that the

13   defendant did not have authority to produce CDLs or TLC

14   licenses.

15             Second, the evidence has proven that the defendant

16   fraudulently caused those licenses to be produced by helping

17   applicants cheat.

18             Now, he doesn't have to be the one physically

19   producing or physically creating the licenses.  Just by having

20   his co-conspirators help to cheat, the defendant was

21   fraudulently causing these identification documents to be

22   produced.

23             And finally, we know that the CDLs and the TLC

24   licenses were sent to the applicants by United States mail,

25   the postal service, and we know this from the testimony of the

1    employees of the DMV and the TLC.

2            By participating in this conspiracy, the defendant

3    made thousands of dollars.  You can see how he bundled his

4    earnings into bunches of hundred dollar bills and bunches of

5    $50 bills.  That's here on Page 42 of Exhibit 302-A.

6            He made so much money he couldn't be bothered to

7    count it all, to bundle it.  Money was found strewn all over

8    the apartment.  That's shown here on Page 38 of Exhibit 302-A.

9            Clearly, his illegal he business was thriving.  He

10   had so many clients lined up, he needed to expand the

11   operation and enlist some help.  Murod, whose full name is

12   Murodjon Sultanov, was one of the people who participated in

13   the conspiracy with the defendant.  The defendant made

14   arrangements for Murod to drive Jasur all the way to

15   Pennsylvania so that Jasur could sign the certificate saying

16   that he passed the CDL road test when, in fact, no such road

17   test had ever taken place.  Murod helped people cheat on TLC

18   tests at PSI.  People like Jasur's brother and Shukhrat

19   Toshtemirov.  Do you remember Shukhrat Toshtemirov, he is the

20   man who went to the PSI testing facility in Brooklyn on

21   April 1st and he was the one who got caught by Saleema Jones

22   and her co-worker.

23            When Ms. Jones and her co-worker looked at the phone

24   that Mr. Toshtemirov pulled out from under his T-shirt, they

25   saw a bunch of calls to Owl White Boss.  That's shown here in

1    it Government Exhibit 266.  We know from all of the records

2    Murod is Owl White Boss.  Shukhrat Toshtemirov is also one of

3    the dozens of people who had driver's licenses photocopied or

4    photographed in the defendant's phone.  All of the data that

5    was extracted from a Samsung phone found in the defendant's

6    apartment.  This is from exhibit 309.11 data from the cell

7    phone.  And there's a picture of Shukhrat Toshtimirov's New

8    York State driver license.

9           We also know that Murod and the defendant were in

10   business together because the defendant had Murod's bank

11   account information right here in this green notebook that was

12   found in the defendant's apartment.  It had the account

13   number, the routing number, Murod's name, and the Owl White

14   Gmail address.

15          And we also know that Murod and the defendant tested

16   one another about what equipment to buy for cheaters.  And

17   let's not forget the business records that we saw from PSI.

18   Government Exhibit 277 shows that in a period of just over a

19   year, Owl White Boss used his Chase credit card to pay PSI for

20   about 50 different TLC tests.  All of those different tests,

21   and those different applicants, are listed right here in

22   Exhibit 277.

23          But Murod wasn't the only member of the conspiracy.

24   There was the defendant's brother in Uzbekistan.  He

25   negotiated prices with clients over the phone and he provided

1    answers to test takers over the earpieces.  Jasur told us that

2    in his testimony at Pages 796 to 800 of the trial transcript.

3            There was also Firuz.  Firuz was probably the first

4    person the defendant hired to work for him.  After Firuz quit,

5    the defendant had other people to help him with his scam.  He

6    hired Sukhrob, Sherzod, Jasur, and finally, Firdavs.

7            But Firdavs was different from all of the others who

8    worked before him.  Firdavs was disrespectful.  He stole money

9    from the defendant.  And not just that, but he threatened to

10   report the defendant to the police about the cheating scheme

11   in the defendant tried to get his money back.  That's what

12   Firuz testified to at Page 362 of the trial transcript.

13   Firdavs stole a couple of thousands of dollars from the

14   defendant and then he took off.  He hopped on a Greyhound bus

15   on December 21st and rode all the way across the country to

16   sunny Los Angeles, California.  That's shown here in Exhibit

17   296.

18           In February, just a couple months later, Firdavs

19   deposited the cash that he hadn't spent and decided to fly

20   back to New York and it wasn't even a full two months.  We can

21   tell from the Bank of America account statement for Firdavs

22   Giyasov for the period of January '19 to February 15, 2019.

23   The full statement can be found in Government Exhibit 214 at

24   pages 11 to 14 if you want to look again.  But you can tell

25   from this page that in early February while he was still in

1  southern California, Firdavs deposit $1,500 in cash into his

2  bank account.  And then, just a few days later, shown there at

3  the bottom, by February 8th he was at the airport heading back

4  to New York.

5          The defendant could not just stand by and let

6  Firdavs get away with this.  Just imagine if word got out

7  there that there's no penalty for anyone who steals from Akmal

8  Narzikulov.  If Firdavs could get away with it, what would

9  stop Sherzod or anyone else who worked for the defendant from

10 stealing from him.  The defendant needed to take action.  He

11 rounded up his men, Sukhrob and Sherzod, and made sure that

12 Firdavs would pay for what he had done.  Pay both literally

13 and figuratively.  Exhibit 23 shows us exactly how the

14 defendant made Firdavs pay.

15         (Video file played in open court.)

16         (Video file concludes.)

17         MS. NGUYEN:  As you watch this video, notice when

18 Firdavs is coming back into the building.  Firdavs began

19 sprinting away from the defendant and Sukhrob before either of

20 them had even laid a finger on him.  And that's because

21 Firdavs knew what they had planned for him.  Jasur had warned

22 him the night before.  Firdavs knew he was in danger.  He got

23 past the first door, but then he got trapped in the vestibule

24 because he didn't have the key fob to get past that second

25 door into the building.

1           And here, you can tell he's starting to cry out for

2    help because there's that woman on the right side of the

3    lobby, she comes around the corner because she heard

4    something.  She couldn't see it because there was a wall

5    between her and the vestibule, but she turned the corner and

6    took a look and she ignored it.

7           You can see the amount of force that the defendant

8    and Sukhrob had to use to subdue Firdavs.  Firdavs was holding

9    on to that door handle with all of his strength.  You can see

10   why they thought they needed to use the TASER to sap the

11   remaining strength identity of Firdavs.

12           (Video file played in open court.)

13           (Video file concludes.)

14   MS. NGUYEN:  Once Sherzod came back with the TASER,

15   watch what happens on the left side through the glass door of

16   the vestibule.  You can pinpoint a moment when Firdavs's legs

17   go limp.  That was his body's reaction to being TAZED.

18           That kidnapping wasn't a spur-of-the-moment

19   decision, the defendant had been plotting his move against

20   Firdavs since the night before when he learned that Firdavs

21   was back in town.  That night, when they spent hours sitting

22   in Jasur's Sienna waiting for Firdavs to show up at his

23   building so that the defendant could catch Firdavs and force

24   him to pay.  To kick off his plan, the defendant had Sukhrob

25   fetch Jasur from Jasur's house late at night.  From there,

1   Sukhrob and Jasur drove to the defendant's place in the white

2   Toyota Camry.  Then the defendant got into the car with them

3   and they drove back to Jasur's house so that they could switch

4   cars.  The defendant wanted to use Jasur's Toyota Sienna

5   instead of his white Toyota Camry.  And that's because the

6   defendant had already worked out a plan that required using

7   someone else's car.  He wanted to Firdavs off guard, but

8   Firdavs had worked for the defendant and Firdavs would be able

9   to recognize any of the defendant's cars.  If the defendant

10  used one of his own cars to lay in wait, he would lose the

11  element of surprise and that's why he needed to switch cars.

12  That's why he needed Jasur's Toyota Sienna.  Jasur agreed to

13  switch cars and the three men went off to see Firdavs's

14  friend.

15          Now, this person was hardly a friend.  As Jasur

16  said, the so-called friend sold out Firdavs quite quickly.

17  The friend called Firdavs, put him on speakerphone, and the

18  defendant learned that Firdavs would soon be coming home.

19          So the defendant and Sukhrob had Jasur drive them

20  over to Firdavs's apartment building.  From there, Jasur had

21  managed secretly to text Firdavs and tell him not to come

22  home.  He was able to relax once he knew Firdavs had gotten

23  the message and would be safe.  So even when he saw the bat

24  and the TASER that Sukhrob and the defendant had brought into

25  the car with him that night he didn't worry too much.  He knew

1   Firdavs wasn't coming home.  As they waited, the defendant

2   called for reinforcements.  He called Firuz.  He told Firuz to

3   come meet them.  He told Firuz the plan was to catch Firdavs

4   and make Firdavs pay now, all four men were sitting, waiting

5   in Jasur's car, waiting for Firdavs to show up.  Only one of

6   those men, Jasur, knew that Firdavs was not actually going to

7   show up.

8          Still, Jasur tried to convince the defendant that

9   this was a bad idea.  At Page 831 of the transcript, Jasur

10  testified, "I told Akmal don't do it, it's not worth it.  I

11  told him this kid will go to the cops and rat about you."

12  Akmal said, "I don't give a fuck."  Firuz testified to the

13  same thing at Page 356 of the trial transcript.  Firuz said

14  that Jasur told the defendant to leave Firdavs alone because

15  he might file a report and he could put people in jail.  Even

16  Sukhrob told defendant not to do it.

17         After hours of waiting, until around 6:00 in the

18  morning Jasur was finally able to convince them it was time to

19  go home and they went their separate ways.  Just a few hours

20  later, the defendant called Firuz again to convince Firuz to

21  come back them to lay in wait for Firdavs as Firdavs went to

22  won't Firuz refused this time but he did agree to let the

23  defendant use his car.

24         Again, the switching of the cars was a key part of

25  the plan because if the defendant used one of his cars,

1   Firdavs would recognize it right away.  So when the defendant

2   showed up to Firuz's building that morning in his Ford Escape,

3   Firuz agreed to switch cars with the defendant and he handed

4   over the keys to his gray Toyota Camry.  And we saw in the

5   video what happened next.  Even without audio you can tell

6   just what happened and who did what.  Here, you have Firdavs

7   trying to run towards safety.  Then there's the defendant and

8   Sukhrob forcibly dragging Firdavs outside.  But Firdavs didn't

9   come quietly that's why Sukhrob asked Sherzod to go get the

10  TASER that they had left behind in the car.  Sherzod returned

11  with the TASER, leaving Firuz's gray Toyota Camry double

12  parked on the street for a quick getaway.  And you can see the

13  corner of Firuz's gray Toyota Camry right here double parked

14  on the street.  Finally, the defendant and Sukhrob slowly

15  dragged Firdavs's body over to the car where you can see

16  Sherzod still waiting.

17          What followed after that was a torturous few hours

18  for Firdavs.  The defendant and his co-conspirators took

19  Firdavs from one place to another all over Brooklyn in their

20  attempt to extort money from him.  We know that after the

21  kidnapping, Sherzod drove Firuz's car back to Firuz while

22  Firdavs was trapped in the back seat surrounded by Akmal and

23  Sukhrob unable to escape.  When they got to Firuz's building,

24  Firuz switched places with Sherzod.  Sherzod left and Firuz

25  drove everyone to see a notary at the UZ Wireless store on

1    Kings Highway and West 10th Street.  Firuz testified that he

2    didn't know exactly what papers were being notarized or what

3    was going on.

4              (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          MS. NGUYEN:   The defendant was forcing Firdavs

2     Giyasov, to sign a debt acknowledgment letter for $5,000, and

3     this letter is part of Exhibit 304.   We know from this letter

4     that Suhkrob also helped.   And what's so interesting about

5     this letter, what's so telling, is that the debt, the supposed

6     $5,000 debt, it's not made out to the defendant, it's made out

7     to his mother.   Because that's what the defendant does, he

8     hides his own actions behind his mother's name.   He used his

9     mother's name to register his two cars.   He used his mother's

10    name to buy a gun.   And now he was using his mother's name to

11    claim his extortion money.   If this had been a legitimate

12    loan, the debt acknowledgment letter would have been made out

13    to the defendant, but this letter was not a legitimate

14    agreement between a lender and a borrower.   This letter is

15    evidence of the extortion of Firdavs Giyasov.

16          Now, after they got the notarized letter at

17    UZ Wireless, they took Firdavs to the Bank of America branch

18    located on Kings Highway.   They went there to open a small

19    business account so that Firdavs could deposit a $2100 check

20    made out to his business, Fred Sell Service, Inc.   And we know

21    that they got to the bank at about 11:00 a.m., and you can see

22    that the whole process of opening an account at the bank took

23    about an hour and 15 minutes.   You can compare the time stamps

24    on pages 2 and page 15 of Exhibit 217.

25          After that hour and 15 minutes when Firdavs finished

1   opening the business account all under the watchful eyes of

2   the defendant, he was giving a temporary debit card and some

3   temporary checks.  That's when the defendant and his

4   accomplices forced Firdavs to sign one of those temporary

5   checks for $1,000.  Firuz fill out the rest of the check and

6   wrote it out to himself.  That check is shown in

7   Government Exhibit 216.

8           After the Bank of America, Firuz drove everyone to a

9   check cashing place.  Government Exhibit 236 is from the

10  Pay-O-Matic check cashing place on Kings Highway.  And you see

11  Firuz in his orange coat with the blue sleeves and the furry

12  hood.  From watching the video, you can tell Firuz wasn't able

13  to cash the check.  You can see the teller examine the check

14  and consult with his coworker on the right.  And again, even

15  without the audio, you can tell what's happening.  You can see

16  the teller try to explain to Firuz that because this was a

17  temporary check without a payer name and address on the top,

18  they wouldn't be able to help him.  The teller even tries to

19  show him an example of a valid check, one with an address and

20  a payer name.  So Firuz walks out of the Pay-O-Matic without

21  any money.  That's just what he told us during his testimony

22  at page 375.

23          After the Pay-O-Matic, it was now 1:00 p.m.  The

24  defendant and his men had been holding Firdavs hostage for

25  over five hours, since 7:40 that morning.  When the defendant

Summations - Nguyen                    1332

1   finally agreed to release Firdavs, he still kept Firdavs' most

2   valuable property, his wallet and his cell phone.  The

3   defendant knew that Firdavs would agree to pay the defendant

4   money in order to get that property back.  This was all part

5   of the extortion.

6           After they released Firdavs, Firdavs went home and

7   changed his clothes.  Then he went to the 61st Precinct to

8   report what had happened.  And we know this from the fact that

9   the clothes he was wearing when he went to the Bank of America

10  that morning are different from the clothes that he was

11  wearing when the police took photographs of him at the 61st

12  Precinct.  Just compare page 10 of Government Exhibit 217 at

13  the bank with Government Exhibit 107, taken at the 61st

14  Precinct.  By the time Firdavs was at the precinct, he had

15  changed into a light gray sweatshirt with the words "Breaking

16  News" across the front.

17          After the police station, Firdavs contacted the one

18  person he knew he could trust, Jasur, the friend who had

19  warned him the night before not to come home.  And because

20  Firdavs didn't have his cell phone anymore, he could only

21  contact Jasur using his computer at home.  Firdavs used

22  Facebook Messenger to reach out to Jasur.  And you can see

23  that from Exhibit 515-A, this shows that Firdavs was using a

24  personal computer, a PC, to communicate with Jasur beginning

25  at about 8:30 p.m. on March 28th.

Summations - Nguyen                    1333

1           Now, this Facebook Messenger chat was extracted from

2    Jasur's cell phone.  That's in evidence as Government Exhibit

3    604, FBI Item 1-B-54.  Exhibit 515-A shows the extraction of

4    their Facebook Messenger chat in Tajic, with the specific

5    times and the specific communications between Jasur and

6    Firdavs.  The English translation of this chat is in Exhibit

7    515-B.  By looking at those two exhibits together, we can

8    piece together the specific timeline of events on the night of

9    the kidnapping.

10          At 8:30 p.m., Firdavs reached out to Jasur, they

11   chatted back and forth.  At around 8:34 p.m., Jasur said to

12   Firdavs that he was going to come over.  Jasur told Firdavs it

13   would take him about ten minutes to get there.  Then, at

14   around 8:42 Jasur tried to call Firdavs, probably to tell

15   Firdavs to come outside, but they never connected.  We know

16   from Jasur's testimony at page 835 that the reason they never

17   connected was because when Jasur drove past Firdavs's building

18   that night, he saw the defendant's white Toyota Camry and

19   Jasur didn't want to have the defendant know that Jasur was in

20   touch with Firdavs, so Jasur kept on driving past.

21          Meanwhile, by 8:45 p.m., Firdavs was already

22   planning to go meet Jasur, so he was already heading outside

23   his building to find Jasur, but instead of finding Jasur,

24   Firdavs ran into Firuz.  And you can see that in

25   Government Exhibit 25.  You can see Firuz and his orange

1   jacket.  Firuz explained during his testimony at page 379 that

2   the defendant had sent Firuz to find Firdavs, and Firuz ran

3   into Firdavs as Firuz was trying to get into the building.

4   Firuz testified that the defendant wanted to talk to Firdavs.

5   He couldn't recall the details, but we know from

6   Government Exhibit 27 that the meeting between Firdavs, Firuz

7   and the defendant was short, because in Government Exhibit 27,

8   less than ten minutes after Firuz and Firdavs ran into each

9   other at the service entrance, you can see Firdavs coming back

10  into the building alone at 8:55 p.m. wearing that same

11  "Breaking News" sweatshirt.

12          Meanwhile, as Jasur was driving home after his

13  failed attempt to meet Firdavs, he got a call from the

14  defendant.  The defendant wanted to meet.  Jasur agreed and

15  they met at a nearby Walgreens parking lot.  Jasur got into

16  the white Camry and he saw both the defendant and Suhkrob.

17  The defendant presented Jasur with proof that Jasur had

18  double-crossed him.  The defendant had Firdavs's phone in his

19  hand and he had seen the text message that Jasur had sent

20  Firdavs the night before telling Firdavs not to come home.

21          Jasur described what happened next during his

22  testimony at page 839.  "Then Akmal showed me the phone, the

23  SMS that I had sent, and he was screaming at me.  He cursed me

24  out, asked me why.  And I told him, 'I did it for your own

25  good.  You should actually thank me.'  And then he looked at

Summations - Nguyen                    1335

1    Suhkrob and said 'Take that out.'  Suhkrob got out of the car

2    and from the trunk got some kind of bag and said 'Sit back.'

3    Then he gave it to Akmal.  Akmal opened it and took a gun from

4    outside.  The bullets all fell to the floor of the car.  Then

5    he gathered the bullets, I don't know where he put them, said,

6    'Now you guys going to pay double and I'm going to fucking

7    kill you.'  He said, 'Now you're going to pay for it.'  And

8    then I agreed.  I said, 'Okay.  Sure.  Sure.'  Then after

9    that, he calmed down.  And I told him, 'Me and Fedya together

10   will pay you your money back.'"  Then he agreed.

11        Firuz's memory was less clear, but he also

12   remembered the bullets falling to the floor of the car and he

13   remembered the defendant threatening to shoot Jasur with the

14   gun.  They both described the defendant as angry.

15        Firdavs, at page -- I'm sorry, Firuz, at page 384 of

16   the trial transcript, and Jasur at page 963.  Both witnesses

17   described the gun as a black semiautomatic pistol, about 6 to

18   8 inches long.  And their description of the gun they saw that

19   night in the defendant's white Camry fits the description of

20   the gun in evidence as Government Exhibit 330, the gun that

21   had the defendant's DNA on it.  Seeing this gun in a dark car

22   at night, it would look like a black gun.  Both Firuz and

23   Jasur also testified that after everything calmed down, Jasur

24   took the opportunity to examine the gun for himself.  He had

25   never seen a gun before, much less held one in his hands.

1          Jasur said that the whole incident at Walgreens
2    lasted only 15 to 20 minutes, max.  That's about how much time
3    he estimated he had spent sitting inside that white Camry that
4    night, and his estimate was quite accurate.  We know that from
5    looking at Government Exhibits 515-A and 515-B and analyzing
6    those because by 9:27 p.m., Jasur was again trying to reach
7    Firdavs over Facebook Messenger.  And in the window of time
8    between when Firdavs walked back into his building at 8:55
9    p.m., after he ran into Firuz unexpectedly, and this missed
10   Facebook Messenger call from Jasur at 9:27, the defendant had
11   brandished the gun and threatened to take Jasur's life just to
12   get more money.  Firdavs got Jasur's Facebook message and
13   agreed to meet him.
14         Exhibit 28 is also in evidence, and that was a video
15   clip from Firdavs' building that you watched on the very first
16   day of the trial.  That clip showed Firdavs coming out of his
17   building at around 9:29 p.m. and he waited for Jasur for
18   nearly ten minutes by the front of his building and then he
19   finally gave up and went back upstairs.  And when he got back
20   upstairs, Firdavs went back to his computer and sent another
21   Facebook message at 9:41 to find out where Jasur was.  That
22   gap between 9:27 p.m. and 9:41 p.m. was the time that Firdavs
23   had spent looking for Firuz -- I'm sorry, looking for Jasur
24   and waiting for Jasur to arrive at the apartment building from
25   the Walgreens.  Within a minute or so, Jasur was back at

Summations - Nguyen                    1337

1  Firdavs' building, sending another message to Firdavs to come

2  outside.

3           Exhibit 29 shows the two friends trying to find one

4  another as they go in and out of the different doors of the

5  building.  As you watch this video, you'll notice that neither

6  Jasur nor Firdavs has the key fob needed to get into the

7  building.  The only way they can ever get inside the building

8  is whenever someone lets them in.  And this is Firdavs looking

9  to prop the door open because he doesn't have that key fob.

10  And you can see how they greet one another, friends relieved

11  to finally connect, to tell each other what had happened, one

12  having been kidnapped earlier in the day and the other one

13  having just had his life threatened with a gun, both at the

14  hands of the defendant and his coconspirators.  They talked

15  for a bit.  And after a while you see Jasur got on his cell

16  phone.  That was his conversation with the defendant, planning

17  to meet the defendant so that they could get Firdavs's phone

18  back.  And after that call, the two of them go off to go meet

19  with the defendant to get Firdavs' cell phone.

20           In Government Exhibit 30, we see Firdavs returning

21  to the building, only now it's 10:19 p.m., and Firdavs has his

22  cell phone in his hand.  We learned from both Firuz and Jasur

23  that the defendant had finally agreed to give Firdavs his

24  phone back; after all, Firdavs and Jasur had, by this point,

25  promised to pay $5,000 to the defendant.  And the defendant

Summations - Nguyen                    1338

1   made sure that Firdavs deleted all the data in his phone so

2   that he would no longer have any evidence of the cheating

3   scheme that they had participated in together.  That's what

4   Firuz testified to at page 381 of the trial transcript.  The

5   defendant made sure that Firdavs deleted all of the data

6   before returning the phone to Firdavs.

7          Now, even though the defendant made sure to delete

8   the data from Firdavs's phone, he didn't think to delete the

9   data on his own phones, the phones that were in his apartment.

10  Because we can see Government Exhibit 608-R, this was the

11  summary chart, and the bottom portion of this chart, these

12  rows in orange represent three different cell phones that were

13  recovered from the defendant's apartment.  FBI's CART team was

14  able to obtain data from each of these cell phones, and all of

15  those phone numbers circled in red are phone numbers that the

16  defendant used at one time or another, including this

17  particular cell phone number ending in -0909.

18         If we look at the data extracted from these cell

19  phones, we can learn a lot about what happened on March 28,

20  2019.  Government Exhibit 309.1 shows the Viber calls between

21  Firuz and one of the defendant's phones, Government Exhibit

22  309 or FBI Item 1-B-36.  The Viber calls that are shown in

23  Exhibit 309.1 between Firuz and the defendant's phone

24  correspond to everything you know about what happened on March

25  28th.  First, there is a call from the defendant to Firuz at

1   12:47 a.m.  That call corresponds to what Firuz told us at

2   pages 349 to 350 of the trial transcript.  Firuz told us that

3   it was at night when the defendant called him and told Firuz

4   to meet him at a specific address on East 12th Street.  After

5   Firuz got that call, he went to Firdavs' building and joined

6   Jasur, Sukhrob and the defendant inside Jasur's Sienna.  Now,

7   this call log in Exhibit 309.1 shows that the duration of that

8   Viber call was zero seconds, but we can confirm that Firuz and

9   the defendant actually ended up speaking to one another at

10  that time by looking at Government Exhibit 255.2.

11          255.2 is the T-Mobile records for the phone number

12  of Firuz Juraev, the phone number he used before he lost his

13  phone and before he got arrested.  These records show that

14  among the calls associated with Firuz's phone number, there

15  was a call that lasted 977 seconds between Firuz's phone

16  number and that specific phone number ending in -0909.  Now,

17  the record shows that the call happened at 4:47 a.m. on March

18  28th, but since we know from the record these are in UTC time,

19  you have to subtract four hours to convert it to Eastern

20  Standard Time.  And remember that that phone number ending in

21  -0909 is the same phone number listed in Government Exhibit

22  608-R that was assigned to the SIM card in one of the

23  defendant's phones found in the defendant's apartment.  That

24  was the phone called Government Exhibit 310, FBI Item 1-B-38.

25  In other words, this 977-second call was made at 12:47 a.m.

1  from Firuz to the defendant and it was the call during which

2  the defendant told Firuz to come meet him at Firdavs'

3  building.

4          So we can go back now to Exhibit 309.1 and you'll

5  see a series of Viber calls between Firuz and one of the

6  defendant's phones between 6:46 a.m. and 6:49 a.m.  These

7  calls correspond to what Firuz testified to at pages 355 to

8  360 of the trial transcript.  That's when the defendant asked

9  Firuz to come back with him to Firdavs' building in the

10  morning, between 6 and 7 in the morning.

11          Next, there was a series of calls between 9:40 and

12  9:50 a.m.  That's about two hours after the kidnapping.  And

13  the timing of these calls correspond to what Firuz told us

14  about the defendant calling Firuz a few hours after he

15  borrowed Firuz's car and he came back to Firuz's apartment and

16  told Firuz to come back -- come downstairs.  Firuz told us

17  this during his testimony at pages 363 to 366 of the trial

18  transcript.  Firuz got that call from the defendant, telling

19  him to come outside.  And when Firuz got outside, that's when

20  he saw Firdavs trapped in the back seat of his own gray Toyota

21  Camry, sandwiched in between the defendant and Suhkrob.

22          Next, there's a series of calls between Firuz and

23  the defendant between 3:55 p.m. and 4:14 p.m.  These calls

24  tell us that the defendant and Firuz were no longer together.

25  They had already released Firdavs and Firuz had already

Summations - Nguyen                          1341

1    separated from the defendant and Suhkrob.  He described that

2    at page 376 of the transcript.

3              Finally, there is a 17-second call at 8:03 p.m., and

4    that call corresponds to what Firuz testified to at page 377

5    of the trial transcript.  That's when the defendant told Firuz

6    that he wanted Firuz to get Firdavs so that the defendant

7    could talk to Firdavs.  The timing of this call fits the

8    timeline of events, since we know from the video we just

9    watched, Government Exhibit 25, that at 8:45 p.m. Firuz and

10   Firdavs accidentally ran into each other at the front service

11   entrance of the building.

12             These data extractions from these cell phones, these

13   phone records, they're not terribly interesting, but they lay

14   out the black-and-white timeline of events, and that timeline

15   of events coincides with everything that the witness told you

16   about what happened on March 28th, 2019, and that's just one

17   of the reasons why you know you can rely on the witness's

18   testimony about what happened in this case.

19             Now, we can fast-forward to a week later, April 7,

20   2019.  By that time, Firdavs had managed to put together

21   $1,000 that he could use to pay the defendant.  This would

22   make up for the bounced check that Firuz had tried to cash and

23   deposit into his own Chase bank account the day after the

24   kidnapping.  Firdavs called up Jasur, and the two men reached

25   out to the defendant to let him know that they were ready to

1    make an installment.  The defendant readily accepted and he

2    told them to come meet him at his building on Avenue O.  When

3    they got there, instead of seeing the defendant, it was the

4    defendant's mom who walked out of the building, and the

5    defendant's mom collected and counted the money.  Jasur and

6    Firdavs made sure to call the defendant to confirm that the

7    payment had been made so that there would be no future

8    problems.  Once again, the defendant made his mom do his dirty

9    work.

10            For the defendant's conduct beginning on March 28th,

11    he is guilty of several other crimes.  First is kidnapping and

12    conspiracy to commit kidnapping.  The video proves that the

13    defendant carried Firdavs away against his will and that the

14    defendant did that knowingly and willfully.  The evidence also

15    shows that the defendant abducted Firdavs so that Firdavs

16    would pay him the money.  That's clear from the testimony of

17    the witnesses who knew the defendant and from the debt

18    acknowledgment letter that the defendant coerced Firdavs into

19    signing.  The defendant also used a facility or

20    instrumentality of interstate commerce to commit the

21    kidnapping.  The Judge will instruct you on what that

22    specifically means, but I expect the instruction to include

23    that using a telephone in furtherance of an offense is

24    sufficient to satisfy this element.  Here, there is evidence

25    establishing that the defendant called Firuz and texted Firuz

1   in furtherance of the kidnapping to discuss what property they

2   should keep and take from Firdavs and to have Firuz help

3   transport Firdavs while the defendant and Sukhrob made sure

4   Firdavs didn't escape.  The defendant is guilty of conspiracy

5   to kidnap because he knowingly and willfully entered into an

6   agreement with another person to commit the kidnapping and

7   because a member of the conspiracy committed an overt act in

8   furtherance of the conspiracy.  The video alone proves that

9   the defendant conspired with both Sukhrob and Sherzod.  All

10  three men agreed to participate in the kidnapping and all

11  three men took actual steps, overt acts, to accomplish that

12  goal.  They brought a Taser.  They chased Firdavs.  They used

13  the Taser.  They dragged Firdavs against his will into Firuz's

14  car.  The defendant forced Firdavs to open a small business

15  account.  All of those steps are overt acts in furtherance of

16  the conspiracy.

17          In addition to the kidnapping charges, the defendant

18  is also guilty of extorsion and extorsion conspiracy.  The

19  defendant is guilty of those crimes because he wrongfully got

20  money from Firdavs.  It doesn't matter if Firdavs owed money

21  to the defendant; Firdavs only gave that $1,000 to the

22  defendant through his mom because he had been Tased, kidnapped

23  and threatened by the defendant and his abductors.  The

24  defendant's actions also had an effect on interstate commerce.

25  Again, the Judge will give you the full definition, but it's

Summations - Nguyen                          1344

1   sufficient if you believe that Firdavs would have spent the

2   money that the defendant extorted from him on goods that

3   traveled in interstate or foreign commerce.  You may have been

4   wondering why it mattered that Firdavs shops at H&M or CVS or

5   that he liked to eat at McDonald's, but those transactions are

6   proof that Firdavs would have spent his money and made

7   purchases affecting interstate commerce if he had gotten to

8   keep that money instead of paying the defendant.  And you also

9   saw that he spent money in California.  He had driver's

10  licenses from California and New Jersey.  Firdavs is someone

11  whose purchases affected interstate commerce.

12          With regard to Jasur, the defendant committed a

13  whole separate crime against him.  The defendant is guilty of

14  threatening physical violence to Jasur in order to obtain

15  money from Firdavs.  That's Count Six of the indictment.

16  Based on the testimony of both Jasur and Firuz, we know that

17  the defendant threatened physical harm to Jasur.  In fact,

18  both testified that the defendant threatened to shoot Jasur

19  and that the reason the defendant threatened to shoot Jasur

20  was because he wanted Firdavs to pay him money.  By

21  threatening Jasur, the defendant furthered his plan to get

22  money from Firdavs.

23          Next, the defendant is guilty of the crime of using

24  a firearm during a crime of violence because when he

25  threatened physical harm to Jasur, he did so with a firearm.

1   He held it, he waved it around, all while yelling and

2   threatening Jasur.  If you believe that the defendant

3   brandished the firearm for the purpose of committing the crime

4   charged in Count Six, the one we just talked about, then it

5   doesn't matter if you believe that the defendant also handed

6   the gun to Jasur later on because the defendant already

7   finished committing the crime when he used the gun to threaten

8   Jasur.

9            Now, despite all of the defendant's efforts to

10  extort $5,000 from Firdavs and Jasur, he never received more

11  than $1,000 on that one night that he sent his mom to go

12  collect his money.  Jasur and Firdavs never had to make any

13  other payment to the defendant because on April 18th, the FBI

14  arrested him.  Thankfully, no one was hurt, but there was no

15  doubt a bone chilling moment when FBI Special Agents Michael

16  Buscemi and Kristen Schill heard the sound of a gun being

17  racked from inside the defendant's apartment.  The FBI had to

18  call for reinforcements from the NYPD's Emergency Services

19  Unit, ESU, a unit made from law enforcement officers who are

20  trained and equipped to handle a situation where a suspect is

21  believed to be armed and barricaded inside an apartment into

22  which they can't even see.  With ESU's help, they were able to

23  breach the door.  The defendant was unarmed.  After a small

24  scuffle, the defendant was placed in handcuffs and taken out

25  of the apartment.

1        And then the FBI waited.  They waited for a search

2   warrant signed by a judge to search the apartment for the gun

3   that they knew had to be inside there somewhere.  They waited

4   for a warrant to authorize them to search for evidence of the

5   cheating scheme and the kidnapping and the extortion.  And the

6   FBI found everything they were looking for.

7        They found ammunition, including a bag with loose

8   bullets just like the loose bullets Jasur and Firuz remembered

9   seeing inside the defendant's white Camry at the Walgreens

10  parking lot.  That's page 35 of Government Exhibit 302-A.

11  They found a small black semiautomatic pistol.  It has an

12  abstract blueish design and it's about the same size as the

13  gun that both Firuz and Jasur described, the gun that's shown

14  on page 3 of Government Exhibit 302-B, and the actual physical

15  gun in evidence as Government Exhibit 330.

16       They found countless earpieces, neck wires, cell

17  phones, all equipment that the defendant, Firuz, Sherzod,

18  Sukhrob and Jasur had used to help people cheat.  They found

19  CDL study guides, they found DMV license applications, TLC

20  practice tests.  They found temporary permits issued in the

21  names of other people.  They found ledgers written in Tajic.

22  They found more than $293,000 in cash stashed throughout the

23  apartment in closets and in the back bedroom where the

24  defendant's stuff was.  They found dozens of identification

25  cards issued in other people's names, permanent resident cards

Summations - Nguyen                    1347

1  sometimes called green cards.  They found passports, Uzbek

2  driver's license's, driver's licenses from New York and other

3  states around the country.

4           They also found evidence of the kidnapping and

5  extorsion.  They found Firdavs's wallet, the wallet shown

6  right here in Government Exhibit 333.  It still had the

7  temporary debit card issued by Bank of America on the same

8  morning as the kidnapping when the defendant forced Firdavs to

9  open that small business checking account.  The wallet that

10  they found still had the green card that the defendant told

11  Firuz he had taken.

12           Do you remember the Viber chat between the defendant

13  and Firuz?  That's the text chat that they had.  That chat is

14  contained in Exhibit 514-A in Tajic.  The translation of an

15  excerpt of that chat is in Exhibit 514-B and you can see part

16  of it here.  In that chat, you can see Firuz sends a message

17  to the defendant at 9:09 a.m., two hours after the kidnapping,

18  approximately.  And he says, "Take his cell phone and do not

19  give it back."  The defendant responds, "Of course.  We will

20  not give his green card."  And Firuz responds with a thumbs-up

21  Emoji.

22           What else did the FBI find inside the defendant's

23  apartment?  They found a very distinctive plaid jacket hanging

24  in one of the defendant's closets, the very same jacket that

25  the defendant wore on the morning he committed the kidnapping

1   with Sukhrob and Sherzod, the same jacket he wore walking into

2   the Bank of America to extort money from Firdavs.

3           Now, you would think most people, after being

4   arrested by the FBI and after learning that all of their

5   criminal proceeds and the evidence of their crimes had been

6   seized from their apartment, would stop committing crime, but

7   not the defendant.  Even from the confines of the federal

8   detention center in Brooklyn, he was still orchestrating

9   criminal activity with coconspirators, only now he was no

10  longer focused on cheating and making money, he was focused on

11  keeping people, who knew what he had done, from ever

12  testifying against him.

13          First he started with Firdavs, the victim of the

14  kidnapping.  He incorrectly believed, as his former cellmate

15  Andrew Barrett told you, that without a victim, there would be

16  no crime.  He falsely thought he would be able to prevent

17  people from testifying against him.  He would be able to beat

18  the charges, he thought, by bribing Firdavs and getting

19  Firdavs out of the United States.  Somehow, with the help of

20  his brother in Uzbekistan, the defendant managed to convince

21  Firdavs to go, leave the country, fly to Uzbekistan by

22  promising to pay him money.

23

24          (Continued on the following page.)

25

1   (Continuing.)

2          MS. NGUYEN:  We don't know all the details of that

3   payment or the plan, but there is no doubt that there was a

4   plan, an agreement between at least two people, to pay off

5   Firdavs.  This was proven from the testimony of both Andrew

6   Barrett and the Defendant's first lawyer, Mitchell Golub.

7          The Defendant wanted to let Mr. Golub know that the

8   victim would not be appearing to testify at the trial that was

9   scheduled to start in December of 2019.  The Defendant had a

10  third party call Mr. Golub and tell him that financial

11  arrangements had been made and that the victim would not be

12  testifying.

13         Mr. Golub testified at Pages 746 and 758 about how

14  he reacted to receiving that phone call:  He did the only

15  thing he could do.  He advised the caller that what the caller

16  described was witness tampering and obstruction of justice.

17  And then he told the judge about what had happened.

18         Now, there's no doubt that the Defendant was behind

19  it all, behind the plan to pay off Firdavs, because he talked

20  about it in his jail calls with his brother.

21         Let's look at Exhibit 511B.  This is part of a

22  translation of a telephone call between the Defendant and his

23  brother in Uzbekistan.

24         The Defendant says:  Could you call your friend

25  Zufar right now?  It is a task that can be done over the

 1  phone.  In short, you have to contact mine.  My boss needs to

 2  be contacted.  Like, a back-to-back call needs to be made, if

 3  possible.  If he doesn't pick up, then try every 30 minutes,

 4  one hour.  Maybe try to call him from a different number,

 5  maybe he will pick up.

 6          Later in that same telephone call in Exhibit 511B,

 7  at Page 24, the Defendant says again:  Starting from 8, do it.

 8  8 to 8:30; latest, 9.  Call at 8 too.  If he does not pick up,

 9  then call again two times.  Hey, you know his second one,

10  right?  566-2242.  It begins with 212.  566-2242, his mobile.

11          The Defendant gave his brother his lawyer's phone

12  number.  That's how you know it was the Defendant's plan.  And

13  the Verizon phone records that are in evidence as

14  Government Exhibit 258, that exhibit shows all of the phone

15  calls that Mitchell Golub received to his phone number.  And

16  there was one specific phone number calling Mr. Golub again

17  and again and again, just like the Defendant had instructed.

18          There was the long distance phone call from that

19  phone number with the Uzbekistan country code too.  All of

20  those calls were attempts on behalf of the Defendant to reach

21  Mr. Golub and let him know that the victim had been paid off

22  and wasn't coming to the trial.

23          In another recorded jail call between the Defendant

24  and his brother, you can hear them discuss Mr. Golub's

25  reaction to the phone call, the phone call he finally received

1    explaining the arrangement involving the victim.

2            The English translation of that call is in Exhibit

3    512B and an excerpt of it is on Pages 3 to 4.  You can read

4    for yourself what they had to say about Mr. Golub's reaction.

5    You can tell they speak in vague, coded terms because they

6    know their phone calls are recorded.  But this phone call

7    corroborates everything that Mitchell Golub told you, right?

8            Mitchell Golub told you he was upset and frustrated

9    by receiving the call.  And in the call, they're talking about

10   how this is bad, this ruined his mood.  He was like, "Why are

11   you saying this?  You shouldn't have told me these things."

12   That was then the brother reporting to the Defendant what

13   Mitchell Golub had said.

14           The recorded jail calls, the testimony of Andrew

15   Barrett, the testimony of Mitchell Golub, the Verizon phone

16   records, together, all of that evidence shows that it was the

17   Defendant who was the one who masterminded the plan to bribe

18   Firdavs.  And for a short time, it looked like the Defendant's

19   plan may have worked.

20           Firdavs was off in Uzbekistan.  We know that from

21   Government Exhibit 241 because on September 5, Firdavs bought

22   a ticket to fly out three days later, on September 8.  And we

23   know that Firdaz left on September 8 because the records tell

24   us and because Jasur and their friends saw Firdavs off at the

25   JFK Airport on his way to Tashkent.

Summation - Nguyen                                1352

1       But the FBI hadn't given up.  They were persistent.

2    They were still investigating.  Now they were knocking on

3    Jasur's door.  And Jasur knew just as much as Firdavs knew.

4    Once again, the Defendant needed to make another witness

5    unavailable.  This time, he needed to get to Jasur.

6            That's when the Defendant enlisted Firuz, Murod, and

7    his brother to convince Jasur to leave the country, just like

8    Firdavs had.  They convinced Jasur to ignore another lawyer's

9    good advice.  Albert Dayan, he is the one who told Murod and

10   Jasur, in Russian and in English, in no uncertain terms, that

11   their plan to have Jasur leave the country was a bad idea,

12   their plan was nothing more than a crime called "obstruction

13   of justice."

14           Jasur himself was a bit reluctant about the plan at

15   first.  But when Gayrat, the Defendant's brother, named the

16   right price, Jasur was ready to say good-bye to America.  He

17   was going to be paid $10,000 every six weeks for as long as it

18   took until the Defendant's case was over.  We know that this

19   was the arrangement based on Jasur's testimony at Page 861 of

20   the transcript.

21           Jasur accepted the deal and he collected his first,

22   what turned out to be his only, $10,000 payment.  Flush with

23   cash, he went on a shopping spree, just like Firdavs had done.

24   He bought some clothes and he bought a plane ticket.

25           We know from his testimony and from

Summation - Nguyen                              1353

1  Government Exhibit 242 that on October 11, Jasur Kamolov

2  bought the earliest available ticket to Tashkent, Uzbekistan,

3  and prepared for his flight to depart two days later, on

4  October 13.  But this time, the FBI was one step ahead, and

5  they arrested Jasur at the airport on October 13, before he

6  could leave the jurisdiction of the United States.

7          All of the planning and the plotting to bribe and

8  persuade Firdavs and Jasur to leave the country so that they

9  would not be available to testify at the Defendant's trial,

10  that's evidence that the Defendant committed the crime of

11  conspiracy to commit witness tampering.  The judge will give

12  you the full instruction as to that charge as well.

13         As you listen to those instructions, just remember

14  that the Defendant agreed with another person to bribe a

15  witness, to corruptly persuade that witness to withhold

16  testimony at his criminal trial.  The evidence establishes

17  that the Defendant actually entered into an agreement with a

18  bunch of people -- with Murod, with Firuz, with his brother --

19  but you only have to find that he conspired with at least one

20  other person.

21         Despite the Defendant's extensive and expensive

22  efforts to tamper with witnesses, there were witnesses who

23  appeared at this trial and testified openly about their

24  involvement in crimes that they committed with the Defendant.

25  The Defendant had been given his right, with his lawyer, to

Summation - Nguyen                          1354

1    confront each of those witnesses, as he did during this trial.

2            And now, the time has come for the Defendant to be

3    held accountable for his criminal conduct:  Hold him

4    accountable for scamming the DMV and the TLC into issuing

5    licenses for people who didn't earn them; hold him accountable

6    for kidnapping and extorting Firdavs Giyasov; hold him

7    accountable for threatening Jasur Kamolov at gunpoint just to

8    collect a few thousand dollars; and hold him accountable for

9    his efforts to pervert the criminal justice system by bribing

10   witnesses who had relevant evidence about the crimes that he

11   had committed.

12           The evidence presented over the last two weeks has

13   established the Defendant's guilt as to each and every one of

14   the charged crimes beyond a reasonable doubt.  That's why I

15   ask you, on behalf of the United States, to find the Defendant

16   guilty of each of the crimes charged in the indictment.

17           Thank you.

18           THE COURT:  All right, ladies and gentlemen.  Before

19   we hear from the defense -- we've been sitting a while --

20   let's take a morning break.  We'll take just under 15 minutes.

21   Please remember not to talk about the case amongst yourselves

22   at all.

23           See you back in here at 12:20.  Thank you.

24           (Jury exits; in open court.)

25           THE COURT:  Okay.  My current thinking is we'll come

Summation - Guadagnino                1355

1    back at 12:20, do defense and rebuttal, then break for lunch,

2    then charge after lunch.

3             MR. GUADAGNINO:  Sounds good, Judge.

4             THE COURT:  See you in a few minutes.

5             MS. NGUYEN:  Thank you.

6             MR. GUADAGNINO:  Thank you.

7             (Recess taken.)

8             THE COURT:  All right.  Let's have the jury, please.

9             (Jury enters.)

10            THE COURT:  Everyone be seated.

11            Defendant's closing, Mr. Guadagnino.

12            MR. GUADAGNINO:  Good afternoon, ladies and

13   gentlemen.

14            You've been sitting here in this courtroom for over

15   two weeks, and I want to remind you of something very

16   important that Judge Cogan told you when you were selected as

17   jurors in this case:  When you walk out that door, we all

18   stand in this courtroom in honor of the majesty of the

19   important decision that you, as jurors, have sworn to

20   undertake; the importance of your decision and how it can

21   affect someone.  And in this case, you're decision will have a

22   bearing on this human being, Akmal Narzikulov.

23            Now, probably the second most important duty you

24   will ever be called upon to serve as United States citizens,

25   other than probably getting shot at on a battlefield at a time

Summation - Guadagnino                    1356

1   of war in service to your country, would be exactly what

2   you're doing today:   To sit in the judgment of another fellow

3   human being.

4          Ladies and gentlemen, the way this works is that the

5   Government has an opportunity to address you first, which they

6   did; then I am addressing you now; and when I sit down, the

7   Government will have an opportunity to address you one more

8   time in terms of a rebuttal.

9          I want to remind you of your sworn duty as jurors to

10  be fair and impartial.  I cannot address every single point

11  that the Government makes in this case.  But as sworn jurors,

12  who have taken an oath to listen to the evidence very

13  carefully, to cull through all the information that you have

14  received in this case, to be fair and impartial, you have a

15  duty that if the Government, when I sit down, says something

16  to counter anything that I bring up in my summation, to search

17  the evidence that is before you and to reconcile anything the

18  Government says with respect to some type of semblance of the

19  Defendant having culpability, you think about evidence in the

20  case that is contrary to the Government's argument.  As sworn

21  jurors, you have that duty.

22         If you find that there is evidence or lack of

23  evidence that the Government presented that is consistent with

24  the Defendant's innocence, you have a duty to follow that

25  evidence and you have a duty to have it benefit the Defendant,

1    which brings me to the next point.

2            The judge will give you the charges in this case.

3    At the end, when I sit down and when the Government is

4    finished, the judge will charge you on how you decide this

5    case, the law that you are to follow, the procedure in which

6    you are to follow the charges that are before you.  But I want

7    you to pay attention to three very important charges:

8            Remember the presumption of innocence.  That is a

9    very important charge.  Recall that the Defendant has no

10   obligation to put on any evidence.  The Government has the

11   obligation to prove every single element of all the charges

12   against the Defendant beyond a reasonable doubt.  And the

13   Defendant, as he sits before you, is presumed innocent until

14   and if the Government moves that burden to show that he is, in

15   fact, guilty of all the charges and elements before you.

16           Recall as well that the Government again has the

17   burden of proof to satisfy you beyond a reasonable doubt that

18   the Defendant is, in fact, guilty of all of the charges that

19   they are bringing before you.  And recall that he's being

20   charged in an indictment and an indictment is not evidence of

21   anything.  It is a vehicle that the Government uses to present

22   charges to a defendant, but it has no bearing whatsoever and

23   is not of any evidentiary quality.

24           But the most important charges that I want you to

25   consider is reasonable doubt.  The judge will charge you on

Case 1:19-cr-00223-BMC   Document 263   Filed 07/09/21   Page 53 of 178 PageID #: 2567

1   what is reasonable doubt.  Listen carefully to that charge

2   because that is the test that you will apply to see if the

3   Government has met their burden of proof, if they have somehow

4   taken off the cloak of the presumption of innocence for Akmal,

5   if they have proven their case beyond a reasonable doubt.

6            The judge will tell you that a "reasonable doubt" is

7   a doubt that would cause a reasonable person to hesitate to

8   act in a manner of importance in their own personal life.

9   Let's bring that home:  What is a reasonable doubt?  What

10  would cause you to hesitate if you have a doubt about a

11  certain fact that would have some kind of import in your

12  personal life.

13           If you have an elderly parent that you need to take

14  care of or find someone to take care of that person when

15  you're not home, or if you have children and you need to find

16  yourself a babysitter to take care of those kids, you want to

17  make sure that you have no doubt as to the quality, as to the

18  sincerity, as to the safety, the information that you want to

19  know about the people that you are going to leave your loved

20  ones with.  Or if, God forbid, one day you cannot take care of

21  your own affairs, who is going to take care of you?  You would

22  hope that those people in charge of your welfare would decide

23  who that person would be.

24           And all the information, the quality of that

25  information about those people who are going to take this

1    charge, you have to look at that carefully before you make a

2    decision about who is going to watch you, your children, or

3    your financial affairs.  And that is how you want to

4    scrutinize this evidence.  That is the test that you want to

5    employ because that's how important it is to Akmal.

6              Ladies and gentlemen, I'm going to go through some

7    of the testimony in this case.  And you are going to see by

8    illustration how you have every reason to doubt that the

9    Government has proven their case beyond a reasonable doubt.

10             First of all, ladies and gentlemen, all of this

11   information, the story that you're getting about all the

12   physical evidence that is before you, is coming from two

13   sources.  Who are those sources?  Firuz Juraev and Jasur

14   Kamolov.

15             You were here.  You listened to their testimony.

16   You paid attention.  Let's get to it.

17             Firuz Juraev, he testified he, himself, cheated on

18   his test.  He went to Ohio, he used fake addresses in Ohio,

19   not with Akmal's help.  One lie after the other.

20             He lied about how he met Akmal.  He lied about

21   seeing Akmal only at birthdays and special occasions.  He lied

22   about not knowing Firuz Juraev.  He lied and told the FBI he

23   didn't know anything about a kidnapping, according to him.  He

24   lied to the FBI about not knowing Firdavs.  He lied about not

25   knowing where the $1,000 payable to him came from.  He lied

1    about not knowing Murodjon Sultanov.

2           Murodjon Sultanov, we'll get to him in a little bit.

3           He lied about how much money he owes Akmal.  He said

4    to you he borrowed 5,000 and then another 5,000 and later on

5    he borrowed 5,000 and then 2,000.  He said maybe the second

6    time he only borrowed somewhere between five and six hundred

7    dollars.

8           He lied to the FBI and he learned that Firdavs had

9    been beaten up by looking in Google.  This is Firuz Juraev.

10   Firdavs, the guy who got kidnapped, the one that all this fuss

11   is about, him getting kidnapped, Firuz tells you that he

12   learned about him getting beaten up in Google.  He lied that

13   Sukhrob said Firdavs was beaten.  And he never told this to

14   the FBI.

15          He lied about the Walgreens incident.  He told you

16   he was driving home from work and he saw Akmal's car.  He

17   stopped to say hello and he got out of his car to go into

18   Akmal's car.  Never told the FBI that Jasur took the gun from

19   Akmal and that Jasur put that gun in his own hand and said,

20   "Hey, what's this?  Where did you get it?"

21          Let's talk about that for one second.

22          About 25 years ago, a famous judge in New York by

23   the name of Judge Judy wrote a book.  And the title of the

24   book is Don't Pee on My Leg and Tell Me It's Raining.

25          Did you ever hear of such nonsense?

1        Someone is upset at you because you're not paying

2   them money.  They present you with a gun with bullets.

3   They're upset and they say, "I'm going to kill you.  I'm going

4   to fucking kill you."  And then the person who that anger is

5   directed toward is able to take that gun and put it in their

6   hand like that, like nothing happened.

7        Did you ever hear of that?

8        If it doesn't make sense, it's because it's

9   ridiculous.  Just because you were chosen as jurors doesn't

10  mean you left your common sense outside those doors.  You have

11  common sense, each and every one of you.  It's in your bones,

12  it's how you were raised.  And you don't leave it outside the

13  door.  Use it here.

14       That never happened and it doesn't make sense,

15  ladies and gentlemen.

16       They said Jasur -- Firuz said that he owes Akmal

17  about 4,000 and 2,000 that Akmal's father gave him.  Akmal's

18  father gives him $2,000 for Akmal to spend in the commissary.

19  Now, that $2,000, Firuz testifies that he owed Akmal.

20       Well, if Akmal's dad gave Firuz $2,000 to pay off

21  Jasur Kamolov, why would Firuz still owe that money to Akmal?

22  It doesn't make sense.

23       And by the way, a lot of these facts don't make

24  sense.  And they're kind of difficult to get your hand around

25  or head around because there's a lot going on here between

1   Firuz Juraev and Jasur Kamolov, two people that very well know

2   each other, two people that have interacted, and you're

3   getting all of your information from these two people.

4          And this is the kind of evidence you're supposed to

5   decide this man's fate upon.  Think about that.  Think about

6   how scary that is.  That is the task at hand.

7          Firuz tells you that he had an address in Ohio when

8   he cheated on tests in Ohio.  He told the FBI that Akmal gave

9   him $1,000 because Akmal owed him money, he helped Uber and

10  Lyft people cheat on the Taxi & Limousine Commission test, and

11  that Akmal was looking for guns in Firuz's phone.  He said

12  that Akmal asked him to do it for him because he didn't have a

13  phone of his own.

14         Really?  Akmal didn't have a phone of his own?

15         He said Akmal didn't have -- listen to this:  Akmal

16  didn't have eBay or Amazon, so the only way Akmal could get

17  eBay or Amazon is through Firuz.

18         Really?  You got to be kidding me.  You got to think

19  about this and you got to think about this good and hard and

20  apply your common sense as to whether or not this makes any

21  sense to you.

22         You saw what we were talking about, that picture of

23  the different gun holsters.  You had Agent Galicia testify she

24  saw pictures of all the different gun holsters.  And this gun

25  that's in evidence, that gun has nothing to do with any of

1   those pictures that Firuz Juraev said he was looking for on

2   his phone.  Nothing whatsoever.

3           But, see, the idea is and the theme of this whole

4   thing is, "Let's see how much evidence that we have that we

5   can throw out there, and we use Firuz and we use Jasur to

6   connect the dots.  Those are the ones that are going to

7   connect the dots for us."  And, basically, they're going to be

8   telling you whatever they want you to hear and whatever they

9   want you to think.  And, again, that is a reason to doubt that

10  the evidence is credible and decent to make your decision

11  against Akmal.

12          This kidnapping that Firuz testified to.  He said

13  Akmal sent him a text regarding Firdavs owing Akmal money, but

14  he never showed that text to the Government.  He never showed

15  that to the Government.

16          He says he went to Firdavs' building late at night

17  just because Akmal told him to, but he did not know the reason

18  behind that.

19          Wait a minute.  Akmal tells Firdavs, allegedly, to

20  go to a building -- withdrawn.  Firuz goes to a building,

21  okay, based on Akmal telling him, "Go to this building to see

22  Firdavs."

23          Now, you saw -- I believe you saw the video of Firuz

24  trying to look for Firdavs in the building.  And this is

25  supposedly the night of the kidnapping.  You know from the

1   testimony that Firuz tried to extort money from Firdavs

2   because Firuz signed his name on the check for $1,000, okay,

3   he wrote his name in, he wrote in $1,000, and he tried to cash

4   that check.

5          That same night, Firdavs goes to the 63rd Precinct

6   to report to the police that he was kidnapped and Firuz, whose

7   one of these extortionists against the guy who's reporting the

8   kidnapping, shows up at his house to say hello.

9          Really?  Is that how life works?  Do you believe

10  that for one second?  Does that sound credible to you?

11         Does that sound like it makes sense, a guy who just

12  tried to extort a thousand bucks from you shows up at your

13  house that night after you report the kidnapping to the

14  police?

15         Where's the police?  If this guys shows up at the

16  63rd Precinct, Firdavs saying, "I got kidnapped," how come the

17  cops aren't there?

18         And then later on, you got Jasur Kamolov showing up.

19  The Government just showed you the video.  He shows up to say

20  hello to his friend.  And they're talking about the kidnapping

21  and they're getting together and saying, "Oh, my God, I just

22  had a gun put to me in the car.  How are you doing?  Are you

23  okay?  Is everything all right?  Hey, let's call Akmal, the

24  guy that kidnapped me today and see if we can get your phone

25  back."

Summation - Guadagnino                    1365

1        Really?  Why go to the police at the 63rd Precinct

2   and report that you were kidnapped and now you're playing

3   Detective Columbo on your own trying to get your phone back?

4        Does that make sense to you?  Use your common sense.

5   Think about it.  It doesn't make sense.  Because what you got

6   here is you got these three guys getting together, and we're

7   going to get to that in a minute as to why.

8        He testifies, Firuz, he doesn't remember how he got

9   to that building.  He testified that he did not meet them the

10  next morning because he had to go to work and his heart would

11  not let him.

12       The next morning, Akmal went to pick up Firuz's car.

13  Firuz allowed his car to be used even though Akmal had his own

14  car.  Firuz knew what the car was for and his heart was okay

15  with that.  He texted, Akmal, don't give him his phone; he was

16  okay with that.

17       When they came back to his house, Sherzod left and

18  Firuz got behind the wheel.  He drove everyone -- Firuz drives

19  everybody to the Bank of America.  He did not know what the

20  others were talking about in the backseat.

21       Firuz wrote his name on the check and he tried to

22  cash the check.  He deposited it into his account, took a

23  thousand dollars from it, and gave it to Sukhrob because Akmal

24  told him to do it.

25       Everything you're hearing is adding on at the end of

1  the sentence "Akmal told me to do it," "Akmal told me to do

2  it."  It's all Akmal.  "I did this, but Akmal told me to do

3  it", right?

4          That's the decent credible evidence that you have to

5  use to decide Akmal's fate beyond a reasonable doubt.

6          Firuz was down a thousand dollars from his own

7  money.  Firuz testified that he told Akmal the check had

8  bounced.  Akmal told him to talk to Jasur.  Firuz lied to the

9  FBI about never talking to Jasur about the check.

10          Now we're going to talk about the pharmacy incident,

11  the Walgreens incident.  Firuz does not remember why he was

12  called to the Walgreens pharmacy.  He does not remember the

13  time.

14          Firuz said Akmal yelled at Jasur for helping Firdavs

15  sending the text and Akmal pulled out a gun and the gun was

16  black.  Everybody's theme is the gun was black because they

17  recovered a gun and that gun is the one that's supposed to be

18  the gun that was used to put into Jasur, right, the black gun.

19          But you have a picture of the gun and you also have

20  the gun in evidence.  And if you look at that gun, it's very

21  unique.  Now, the Government argues that at night, that gun

22  would look black.  But if you look at that gun and you see the

23  design on the bottom part of that gun, it looks like a blue

24  snakeskin.  It's a very distinctive gun.  It's not black, it's

25  like a two-tone gun; blue snakeskin on the bottom and like a

1  black slide.

2          The gun is in evidence.  The photograph of the gun

3  is in evidence.  And you can take a look for yourself and you

4  can see.  Because at the end of the day, when you go in to

5  deliberate in the jury room, you will have access to all the

6  evidence, and you can study it and look at it and make up your

7  own mind.

8          And Jasur, according to Firuz, said Jasur, who was

9  being threatened with the gun, Jasur took the gun from Akmal,

10  and Jasur said, "Oh, look, what is this?  Where did you get

11  this from?"

12          There was testimony about bullets found in front of

13  Firuz, scattered in front around the middle area of the car.

14  Everybody -- listen to this:  Everyone left very calmly from

15  this I'm-going-to-shoot-you incident.  That's what Firuz tells

16  you.  He doesn't remember if he left first or if Jasur left

17  first.

18          He acknowledged that he owes money to Akmal, about

19  four or five thousand dollars, yet Akmal never kidnapped

20  Firuz.  Why is it that if Firuz owed money to Akmal and he

21  never paid Akmal, Akmal never kidnapped Firuz?

22          He only kidnapped certain people, but not everybody

23  who owes him money.  Akmal calls Firuz "Usto Bobo," which, as

24  you learned, in Tajic means "grand master."  What is that all

25  about, grand master?

Summation - Guadagnino                    1368

1    Another day after the alleged kidnapping, Firuz took

2  Akmal to Firdavs' apartment.  Firdavs came out.  Firuz and

3  Firdavs shook hands like nothing happened.  Firuz is the guy

4  that extorted or took money from Firdavs, the $1,000.

5    Now, here's a guy who is trying to pull the wool

6  over your eyes because he's trying to help himself.  This is

7  Firuz Juraev.  Firuz Juraev pays Jasur Kamolov $2,500 to leave

8  the United States.  Jasur Kamolov says, "No, I want $100,000."

9  So, Jasur is trying to get rich, trying to make something off

10  of this scheme.

11    And Firuz tells you when Jasur and Murodjon Sultanov

12  go to see the lawyer Albert Dayan, Firuz says he didn't want

13  to go to the attorney, he didn't want to get involved.  But he

14  did get involved because he went and gave Jasur the money.  He

15  said, "Here's 2,500 bucks.  Get out."  That's him being

16  involved.

17    Firuz pleads guilty to extortion conspiracy.  He

18  faces up to 20 years in jail, and he's testifying to you in

19  court about this incident under those conditions.  He's

20  looking at $250,000 in fines, he's looking at getting

21  deported, losing his freedom and his family.

22    He pled guilty to witness tampering.  He paid the

23  $2,500 to Jasur; he can look at 20 years for that.  $250,000

24  in fines.  Together with those two charges, he's looking at

25  about 40 years.  And he comes into court and he tells you what

LAM        OCR        RPR

Summation - Guadagnino                    1369

1   he tells you.

2         You have every reason to doubt the truthfulness of

3   what this man is telling you because he is on the hot seat.

4   And he's trying to claw his way out of this problem that he

5   put himself in by trying to dip that man in acid with all of

6   his lies that you know this man is capable of, Firuz Juraev.

7         He has the cooperation agreement.  Everything he

8   said in terms of what he did wrong.  He includes Akmal in

9   there.  You heard that, based on his testimony, a judge could

10  do this:  The judge could give Jasur -- could give Firuz no

11  jail.  He's looking at 40 years; he could walk out with no

12  jail.  You know what he's doing.

13        And he was involved.  And he told you how he was

14  involved,in the scheme to commit the identification fraud, the

15  TLC licenses, and all the other things, the commercial

16  driver's license.  And he didn't have to plead guilty to that.

17  He got a pass on that, get-out-of-jail-free card.

18        That's Firuz Juraev.

19        Now we're going to get to Jasur Kamolov.  Akmal's

20  name was not mentioned in the tape with the lawyer.  When

21  Jasur Kamolov went to meet Albert Dayan, you didn't hear on

22  the tape Akmal's name being mentioned.

23        Jasur wanted a hundred thousand to leave.  He

24  listened to Murodjon, Murodjon Sultanov, and attempted to

25  leave.  He admitted lying to the FBI about his involvement in

1   the cheating.

2          Firdavs also helped people cheat.  So, Firdavs

3   helped people cheat, Jasur helped people cheat, and Firuz

4   Juraev.  Those three, the ones that meet on the 28th, that are

5   saying Akmal did this, Akmal did this, all three of them are

6   in cahoots.

7          Murodjon got Jasur involved in the cheating because

8   Murodjon drove Jasur to Pennsylvania for Jasur to cheat on the

9   test.  Murodjon knew the person in Pennsylvania and he had a

10  contact there to help Jasur out.  Jasur didn't have to take

11  the test.

12         Jasur told the FBI the second time he borrowed money

13  from Akmal, he borrowed a thousand dollars.  Then in court, he

14  said Akmal never gave him a thousand dollars.  He said the

15  interpreter got it wrong.

16         When you're confronted with a lie, it's easy to say,

17  "The interpreter screwed up.  I told the truth, but the

18  interpreter lied."  The interpreters are sworn to make a

19  truthful interpretation.  This is this guy's way of trying to

20  slime out of his lies.

21         He lied to the FBI about how he met Firdavs.  He

22  admitted to that lie in court.  He lied to the FBI about going

23  to the wedding.  The night before the kidnap, Jasur testified

24  that Firuz -- listen to this:  The night before the alleged

25  kidnap, Jasur testified that Firuz was in the car, but during

1   an interview with the FBI Jasur said waiting for Firdavs were

2   only Akmal, Sukhrob, and Jasur.  So, only Jasur, Akmal, and

3   Sukhrob were in the car.  But here, he tells you that you

4   Firuz was also in the car.

5           So if he lies in court or he lies to the FBI when

6   he's not allowed to do that, so how do you believe someone

7   like that?  And how do you use that man's testimony under

8   these circumstances to make such an important decision beyond

9   a reasonable doubt in judgment of Akmal?

10          Jasur said Akmal and Sukhrob went to see Jasur, that

11  only two people were in the car with him.  He never mentioned

12  Firuz was in the car.  He reiterated Firuz was in the car.

13          Now, this incident in front of the Walgreens, Firuz

14  Juraev testifies under oath that he was there in the car when

15  Akmal put the gun out on Jasur, that he saw all of this.

16  That's what Firuz told you.  Jasur tells you Firuz was never

17  there.  Firuz was never there.

18          These two guys, they can't even get their stories

19  straight because they want to sell you a bill of goods.  They

20  want to sell you this because they want to save themselves

21  from the crimes that they've committed and they want to throw

22  this man under the bus as a patsy for everything that they're

23  doing because he's an easy target.

24          Jasur never told the FBI that he took Akmal's gun.

25  You don't think that's an important -- you disarm the man

Summation - Guadagnino                    1372

1   that's going to shoot you and kill you because you didn't pay

2   him money, you're able to take his gun away, and you fail to

3   mention it to the FBI, "By the way, I'm sorry I forgot to

4   mention, I disarmed that guy."

5          When it makes news, if somebody disarms someone in a

6   bank, they're going to commit a bank robbery, if somebody's

7   going to shoot this person and you were able to disarm him and

8   turn the gun around on them, "No, I forgot that.  It wasn't

9   important."  That's because it never happened.  It's all a

10  lie.

11         Jasur tells the FBI that when he went to see Firdavs

12  that night, and you saw the video, Jasur is going to show up

13  there that night that Firdavs allegedly got kidnapped and

14  they're going to meet up and that they're shaking hands and

15  seeing if each other is okay and they're in the lobby and

16  they're supposed to see that each other was okay, Jasur told

17  the FBI that he went to see Firdavs that night and Firdavs was

18  badly beaten.  That's the testimony, okay?

19         What is Jasur's definition of badly beaten?  He has

20  a cracked tooth, he's weakly speaking, and weakly walking.

21         Now, you have eyes and you saw the video.  Does

22  Firdavs Giyasov look like he's walking around the hallway

23  trying to meet up with Jasur, that he's weakly walking?

24         And if he was weakly speaking, why have a

25  conversation with Jasur to begin with?

Summation - Guadagnino                1373

1          And by the way, did you see any evidence about a

2    chipped tooth?  At the precinct, they took a picture of this

3    guy wearing the shirt.  Breaking news.  Where is the picture

4    of the cracked tooth?

5          What kind of marks does this man who just got

6    kidnapped that was badly beaten on that same day, where's

7    marks?

8          Common sense.  Use your common sense.  Do not put

9    that to bed, you need that in this case.

10         On November 26, 2019, Jasur testified that he came

11   clean with the FBI and he told them everything that he lied

12   about so he could take a plea in January of 2020.  So, a month

13   and a half before, he wants to have a Kumbaya moment.  He

14   wants to be clean.  "I tell you everything I lied about so

15   that when I go to court on January 2020, everything is good,

16   I'm a clean open book."

17         So, he admitted to them, he admitted to the FBI, to

18   the Government, to the U.S. Attorney's Office, that he

19   admitted to lying about not helping people cheat, he admitted

20   to lying about leaving the country to get married.  All of

21   these lies he tells them while he's sworn to tell the truth,

22   but he's admitting now that he lied even though he was sworn

23   to tell the truth.

24         Jasur lied about not receiving money to leave the

25   United States.  He lied about that.  Jasur lied about not

Summation - Guadagnino                    1374

1  treating when he got his commercial driver's license.  He lied

2  about how Firdavs came into contact with Akmal.

3         And Jasur entered into the cooperation agreement

4  with the Government.  He's trying to get a lower sentence.

5  He's trying to get the 5K letter.  We talked to him about the

6  fact that in his agreement he can get an S visa.

7         Now, this guy's a legal permanent resident.  He

8  pleads guilty, he can get deported, leave the United States.

9  He has family in this country.  They send him back to

10  Uzbekistan, he'll never be able to set foot in this country

11  again, never be able to come back, and he didn't remember that

12  in his agreement the Government can apply on his behalf for an

13  S visa that would save him from being deported.

14         He was in front of Judge Glasser when he took his

15  plea and swore to tell the truth, the whole truth, and nothing

16  but the truth, and that he read the agreement with his lawyer,

17  he understood everything in the agreement.  And here in open

18  court, under oath, he tells you, "I don't remember that.  I

19  didn't go over that.  We didn't go over the whole thing."

20         Common sense.  That's common sense.  That is another

21  reason why this guy is up here lying to you:  He doesn't want

22  to get kicked out of this country.  He wants his candy, he

23  wants his lollipop, and he'll tell you anything he's got to

24  tell you to get himself out of the problem that he put himself

25  in.  And it's very easy to throw put Akmal under the bus to

1   get him what he wants.

2           On November 14, 2019, Jasur told the FBI that Akmal

3   smashed the driver's side of his car, that Akmal had

4   threatened him before because Jasur owed him money.  Jasur did

5   not tell the FBI the smash was a lie when he came clean in

6   November, before he went to his January plea.  He doesn't say

7   a word about that being a lie until one and a half years

8   later, a couple weeks before this case goes to trial.  He lets

9   that impression stand for a whole year and a half.

10          And when I ask him about that lie and about him not

11  coming clean, again, what does he do?  Blame the interpreter.

12  It's the interpreter's fault.  The same interpreter he had

13  over and over again.  He speaks Russian, he speaks Turkish, he

14  speaks Tajic, he speaks Uzbek.  The Russian interpreter got it

15  wrong.

16

17              (Continued on the following page.)

18

19

20

21

22

23

24

25

Summation - Mr. Guadagnino                           1376

1          MR. GUADAGNINO:  Andrew Barrett, ladies and

2     gentlemen, Andrew Barrett came to testify.  Mr. Barrett is a

3     degenerate, steal money person from the

4     United States Government.  He cannot help himself, he admitted

5     That.  He is a who stole millions of dollars from Medicaid and

6     Medicare.

7               While he was out on bail, while he was supposed to

8     behave himself, he entered into a fake contract to pretend

9     like he was selling one of his pharmacies to someone else.

10    While he was out on bail for stealing $6 million from the

11    United States Government so he could try another angle to

12    continue stealing money.  And Judge Kiyo Matsumoto discovered

13    his scheme and took away his bail and put him back into jail.

14    While he was in jail, two weeks before that, that's when he

15    got put in.  Two weeks later, he pleads guilty.

16              So what happens?  Judge Matsumoto sentences

17    Mr. Barrett to 43 months in jail.  Mr. Barrett goes up to jail

18    he goes up to Orange County, up to federal prison in Orange

19    County, and they cut him a break.  They release him early, not

20    like a release where he goes out into society, but to a

21    halfway house.  The halfway house is in the Bronx, it's still

22    part of the United States Bureau of Prisons but you have more

23    liberties, you're able to come and go for 16 hours a day and

24    they gave him that special treatment.  But what does he do

25    while he gets this special treatment?

1          While he gets that special treatment, about a month

2     or two later, his wife, who owns two pharmacies in

3     Long Island, goes and drives there to pick him up so that he

4     can go to the two pharmacies that she owns in the morning and

5     he can use a pharmacist's identification that works for them

6     to get on the computer and continue stealing from the

7     United States Government, Medicaid and Medicare.

8          The guy didn't even get released from jail and he

9     continues to do for himself what he wants and steal.

10    Mr. Schemer, Mr. Scammer, Mr. It's All Me, The Heck With

11    Everyone Else.  He cannot help himself.

12         What happens next?  He gets arrested and charged

13    with new healthcare fraud.  And he tells you, and this is

14    something that's incredible.  While he's at the Metropolitan

15    Detention Center in Brooklyn, he chooses to become cellmates

16    with Akmal.  I chose him, like you got a choice in the matter.

17    The jail they're going to let you choose who you want to be

18    associated with.  Does that make sense?  And that he was in

19    the jail cell with Akmal June, July, August, September,

20    October, November, about five, six months.

21         During that timeframe, he tells you that Akmal is

22    having confession with him every day.  He's going to

23    confession with Mr. Barrett.  Akmal tells him everything:  I

24    kidnapped this person; I was doing cheating at the Taxi and

25    Limousine Commission; I tried to see if there was a way that I

Summation - Mr. Guadagnino                    1378

1   could pay somebody off so that they don't come to testify at

2   my trial.

3          Well, you heard from Mr. Fields.  Mr. Fields was a

4   representative from the Metropolitan Detention Center that

5   when people are in their cells, one of the things that every

6   inmate has is your legal paperwork.  You got charges against

7   you, you got all the papers your lawyer gives you.  And

8   sometimes you leave the cell and it's very easy for another

9   person to see what it is that you're charged with.

10         Now, he says, oh, Akmal showed me the video and he

11  showed me -- that's him, look, I recognize that guy as being

12  Akmal in the video and he showed it to everybody else in the

13  jail that we were with; yet, Mr. Barrett is the only one who

14  is taking advantage of that good stuff, right.  Mr. Barrett

15  comes in here and he's the one that's testifying and you know

16  why?  Because, unfortunately for Mr. Barrett, when he went to

17  court, when he got indicted, he had to go to court and the

18  judge that he had to get was the same Judge who knew his

19  schemes, Judge Kiyo Matsumoto.  That's when he found out in

20  October of 2019, oh, my God, Judge Matsumoto she sent me to

21  jail for 43 months, she's the one that took away my bail

22  because I kept cheating the federal government.  Now, I am in

23  bigger trouble because I got the same judge that I did all

24  those things and now I got to figure out how to get myself out

25  of this trap.

1           So lo and behold, seven days after that, is when he

2    reaches out to the Government to say, I got some information,

3    I got the goods on a guy that's bunking with me.  I want to

4    tell you everything about what he told me, and you're going to

5    love it because you're going to use it against him.  And I'm

6    going to come to court and I'm going to be your witness and

7    I'm going to testify to testify he told me he did.

8           That's what Barrett does.  He's a schemer and he

9    can't help himself.  And this time he really screwed up

10   because he got his ex-wife involved in the scheme.  Because he

11   couldn't help himself and he had her drive him from that

12   halfway house to the pharmacies, she became an accomplice to

13   his stealing and now she's in trouble as well.  And he has

14   three girls with her.  He has one daughter who came and always

15   helped him out with bail she's a doctor.  She must be very

16   embarrassed to have him as her father bit you can't choose

17   your parents.

18          In any event, he has to figure out a way to save

19   himself and his family.  Throw Akmal under the bus, it's

20   really easy.  And something very easy is, Mr. Golub, Akmal's

21   prior attorney came in and he testified.  When he told you

22   that he got a phone call but he couldn't tell you whether the

23   person calling him on the phone had an accent or not.  And

24   that was something that he probably would have remembered.

25   And it's funny how Barrett testified here in open court that

Summation - Mr. Guadagnino                    1380

1   when he testified to Akmal he said, oh, Akmal, oh, you got

2   this great plan to get rid of the witnesses, right?  And

3   that's something you should really tell your lawyer.

4        Well, Mr. Barrett brought that to light, didn't he?

5   Mr. Barrett has minutes from the jail.  And Mr. Barrett can

6   make phone calls and he has contacts and he has people that

7   can make phone calls.  What did Mr. Barrett do?  Isn't it how

8   Mr. Barrett can come in here and take that information and

9   twist it to his own benefit.  That's the kind of evidence that

10  you have to use to decide beyond a reasonable doubt.  Credible

11  evidence as to whether or not Akmal did the things that

12  they're saying that he did.

13       And you heard Mr. Fields who was a representative

14  from the Metropolitan Detention Center who was the

15  investigator who testified this guy, if he was buying minutes,

16  he never got in trouble for it.  He never got sanctioned.  He

17  never got any tickets, any kind of demerits, any kind of

18  penalties for doing that.  Has no record of that.  He's the

19  same guy that told you that Barrett and Akmal were together

20  for six months, but he had no record of this guy getting in

21  trouble for having bought minutes from anyone.

22       Look, the whole story behind what happened here is

23  being provided to you by these three people that you have to

24  completely and totally and morally disregard.  Totally.

25       Other than the testimony from the three people that

1   you have to totally disregard because they're complete liars,

2   the Government failed to prove that Akmal helped Jasur or

3   Firuz with any CDL licenses from all the identifications that

4   were recovered in the apartment.  None of those people

5   testified.  The identifications could have been for money lent

6   by the money or the dad or by any person not necessarily

7   related to Akmal.

8           Other people had access to the apartment.  You know,

9   the mother had money there she was lending money.  You saw in

10  the evidence that there was money that was wrapped in paper

11  towels, that had low interest rates object them.  The

12  identifications were collateral for the money that was lent.

13  And it is a fact, this is Brooklyn, New York, a lot of

14  immigrant communities when people come other over and they're

15  not established and they don't have credit and they don't have

16  any maybe legal means by which they can borrow money for

17  things that they need, people in the community lend each other

18  money.  You go to a Su-su or you go somewhere where you can go

19  get a loan and that's pretty much what is happening here.

20          A lot of the identifications that were found in that

21  apartment were of women.  And typically, and not that women

22  can do anything as well as men, but typically, you don't see

23  many women driving Taxi and Limousine Commission cars, and you

24  don't see a lot of women becoming truck drivers.  It's just

25  not something that women really are into.  The journals that

1    they introduced into evidence, you saw handwriting, you didn't

2    see anyone come in here and analyze the handwriting against

3    his handwriting and say that was his handwriting.  There were

4    no T-shirts with holes found in the apartment.  You have this

5    book that belonged to Murodjon Sultanov that was found in the

6    apartment.  Kevin Jolly, the director of PSI, came in to tell

7    you about the cheating that was going on.  There was no

8    evidence of Narzikulov's payments to the Taxi and Limousine

9    Commission.

10         But, and I say this, there were multiple payments

11   for many clients, approximately, 50 from November 2018 to

12   December 2019 made by Murodjon Sultanov and he used his credit

13   card.  Sultanov finishing in 2828.  Murodjon Sultanov made

14   those payments.  Then you had Saleema Jones come in, she was

15   another test administrator.  There were two videos of people

16   that were cheating that were shown and none of those cheaters

17   were connected to Akmal Narzikulov.  There was no evidence of

18   that whatsoever.

19         Another proctor came in, John Alameda.  He caught

20   Rustam Pulotov cheating and he heard a buzzing noisy emitted

21   from the candidate.  No proof whatsoever that Akmal Narzikulov

22   sent that man in there or got paid for him cheating.

23         So you had also Special Agent Galicia who came in to

24   testify that she came in and assisted with the surveillance of

25   Giyasov and Jasur when they were going to pay a thousand

1  dollars to Akmal.  You remember about seven or eight days

2  after the kidnapping maybe nine days, Special Agent Galicia

3  was in a car, she was taking photographs.  Jasur Kamolov and

4  Firdavs Giyasov were in this car in the front seat and

5  allegedly there was going to be a payment made to Akmal

6  Narzikulov in the amount of $1,000, it was already

7  prearranged.

8          When the time came for the payment, no picture of

9  Akmal Narzikulov picking up the money.  Kamolov testified that

10 the mother came down to pick up the money, but we don't have a

11 picture of the money because the car was in the way I think

12 that's the testimony.  It's unbelievable, isn't it?  These

13 guys open their mouths and tell a story and you're supposed to

14 believe every single thing they say hook, line, and sinker so

15 that they can save themselves.  Tell you a story for their

16 benefit.  They come into court and they're supposed to be

17 truthful and they're supposed to be honest to you and they're

18 supposed to tell you the truth and you're not getting that.

19 You're just getting a bunch of lies.

20         There was no bank accounts found in the apartment

21 that belonged to Akmal.  She testified about the application

22 for the firearm and the sale receipt found under Akmal's

23 mother's name.  The gun that was found in the apartment was

24 legally bought by the mother in Philadelphia.  The Government

25 wants to you believe that the mother was a straw buyer; that

1    she bought the gun for her son because his fingerprints, no,

2    his DNA was on the gun.  His DNA was on the gun, but there

3    were two other people's DNA on the gun, and you never heard

4    whose DNA that was.  You never heard any evidence whose DNA --

5    you don't know if Murod Sultanov's DNA was on that gun.  You

6    don't know if Jasur Kamolov's DNA was on there.  Firdavs

7    Giyasov's.  Firuz Juraev, you don't have that evidence, they

8    only tested one person, him.

9            And this is the gun that they want you to believe

10   was used against Jasur Kamolov tin the Walgreen's parking lot.

11   We already went through that, it was not a black gun.  It was

12   a very distinctive gun in the gun take a look at it when you

13   get into the jury room.  The governments is going to say it

14   was dark in the car, everything looks black.  Really?  Take a

15   look at this gun.  There was no TASER found in the apartment.

16   Allegedly, he kidnapped someone and TASED him.  You saw one of

17   these special agents from Miami came up who used to work in

18   New York and say he took photographs of Firdavs Giyasov's neck

19   and that you can see distinctive TASER marks.

20           Now, this is a photograph taken of him after he

21   allegedly was beaten up and kidnapped when he went to the

22   63rd Precinct in Brooklyn that night after he got kidnapped,

23   they took these photographs.  You see no chipped tooth, you

24   see in beating marks or anything.  Unfortunately, he has some

25   acne, but you can't tell the difference between the acne and

Summation - Mr. Guadagnino                    1385

1    the little marks and they're trying to that those are TASER

2    marks and that they're distinctive TASER marks.

3            There was no TASER found in that apartment on

4    April 18, 2019, no baseball bat was found, no applications

5    were found that match any of the identifications that were

6    found in the apartment.  Nothing showing that that's Akmal's

7    apartment.  And no evidence at all to ascertain whether or not

8    the phones or any of the wires actually worked.

9            So the Government says to you, look, we showed you

10   pictures of a very important piece of evidence.  If you look

11   at the man who was doing the kidnapping in the video, he was

12   wearing a very distinctive plaid jacket.  There's a picture of

13   a piece of a plaid jacket hanging in the closet and that

14   jacket matches the jacket that was in the video of the man who

15   was doing the kidnapping.  The gun was tested for DNA.  The

16   gun was brought into the courtroom.  Akmal gets arrested

17   April 18, 2019, the kidnapping happened March 28, 2019,

18   20 days before Akmal's arrest.  The Government had the video.

19   The Government saw the video.  If you're looking for a plaid

20   jacket, and you arrest a man and you think that this plaid

21   jacket is important, collect it.  Bring it into court.  Show

22   the jury.  Voucher it.  Put it in a bag.  And if you got the

23   ability to DNA test a gun, you can DNA test a jacket.  If this

24   man were wearing that jacket and his skin or his hair got on

25   to the jacket, voilà, that would be wouldn't it that maybe

Summation - Mr. Guadagnino                    1386

1    it's his jacket or maybe that it is the jacket.

2            Ladies and gentlemen, a piece of a plaid jacket in a

3    picture, and you're supposed to rely on that as decent

4    credible evidence by which you're supposed to make your

5    decision about this man's fate beyond a reasonable doubt.

6            Another person came into this court to testify that

7    I want you to pay particular attention to.  You remember the

8    lady at the Bank of America, Ms. Maria Pogrebnyak.  You

9    remember who he was she was the lady at the at the Bank of

10   America that opened up the business account for Firdavs

11   Giyasov.  She has absolutely nothing to do, she has no

12   relationship to Firdavs.  No relationship to Jasur Kamolov.

13   No relationship to Firuz Juraev.

14           What does she tell you?  Giyasov did not look beat

15   up, no marks on his face; no marks on his neck.  He was not

16   shaking; he was not nervous.  Everyone was at the bank for an

17   hour and 15 minutes.  She did not see anything out of the

18   ordinary.

19           She did not -- she had a check that was given some

20   business checks to them.  And then after they opened up the

21   accounts they left.  Here is a very important point that I

22   want you to consider about how you're being lied to and you

23   tell me if this makes sense.  Firdavs Giyasov gets kidnapped

24   in the morning of March 28, 2019, on this theory that Akmal is

25   supposed to get paid money because Firdavs owes Akmal money.

Summation - Mr. Guadagnino                    1387

1  The idea is, take Firdavs to the Bank of America, have him

2  open up a bank account there, a business bank account, so he

3  can deposit a check into that business bank account so that

4  later on the money can be withdrawn from that business bank

5  account, okay?  I got a question for you maybe you can help me

6  answer this question because it is killing me and I don't know

7  the answer to it.  If Firdavs Giyasov got kidnapped while he

8  was going to work that morning, he had no idea about anything

9  that was going on.  He was surprised, he was TASED, he was put

10 into a car, he taken to the Bank of America.

11         You don't have any other evidence that during this

12 kidnapping when he was taken away in a moment maybe a half

13 hour or an hour maybe two hours later he went back to his

14 apartment and got something.  You don't have any evidence to

15 that effect.  He left his apartment allegedly people took him

16 in the car.  He was kidnapped and then the next thing you know

17 he's at the Bank of America.

18         Here's my question to you.  Maria Pogrebnyak said

19 that in order for her to open up a business account under this

20 man's business, she would have to see his business documents.

21 There were two ways that she could see his business documents.

22 Number one she could look it up on Lexis-Nexis and she

23 testified under oath she did not do that.  Maria, how did you

24 open up his business account?  How did you get his documents?

25 He gave them to me, he had those documents on him.  Can you

Summation - Mr. Guadagnino                1388

1  believe the coincidence that the man who gets kidnapped that

2  same day just so happens to be walking around with

3  incorporation business documents in his backpack to be able to

4  coincidentally go to a bank and up a business account.  Who

5  works around with their business documents, their

6  incorporation documents, their legal documents.  That doesn't

7  make sense?  It makes absolutely no sense?

8          A lot of the testimony is derived to make Akmal look

9  bad like he did something wrong.  For example, at the time

10  when the FBI showed up to the apartment, the agent said that

11  they got a search warrant because when they knocked on the

12  door, they heard a sound of racking a firearm.  Somebody like

13  they were loading or doing something to unload a gun, to just

14  sounded like it was very horrific.

15          Detective Jaworski from the New York City Police

16  Department testified when he recovered this gun it was

17  unloaded, it was in a box.  It was up on a shelf.  The

18  magazines were out of it; there were no bullets inside.  There

19  were notice bullets in inner way in a bag but not in the gun.

20          Now, I want to get to a piece of evidence that I

21  think is very important, ladies and gentlemen, and I think

22  that is really the most important piece of evidence in the

23  whole case.  I have a five-minute recording --

24          THE COURT:  Hang on one second.  Ladies and

25  gentlemen, I need you to stay focused, everyone, okay.

Summation - Mr. Guadagnino                    1389

1   Everyone raise your hand, please.  Okay.  Thank you please

2   continue.

3          MR. GUADAGNINO:  You have a five-minute recording in

4   evidence of a meeting between Murodjon Sultanov, Jasur

5   Kamolov, and attorney Albert Dayan.  This is October 2019.

6   Akmal's in jail at the time.  The meeting happens out on the

7   streets of Queens.  Thank God Albert Dayan was smart enough to

8   record that meeting because in that meeting, you hear him

9   scolding Murodjon Sultanov telling him, Murodjon on

10  obstruction of justice, Murodjon, you're wrong.  Don't be

11  insinuating that.  Don't bring that up.  Murodjon was trying

12  to get rid of Jasur Kamolov.  Murodjon was trying to get rid

13  of Firdavs Giyasov.  Firdavs Giyasov left the United States

14  but he is back in the United States today as we speak but he

15  left the United States in September.

16         Now, Murodjon Sultanov wanted to get rid of Jasur

17  Kamolov.  And in that that meeting Albert Dayan continuously

18  scold Murodjon Sultanov.  And this is a meeting where Murodjon

19  figured out a little later that the lawyer is recording him.

20  But not once during that conversation where you're meeting up

21  with an attorney where you're trying to say what you're trying

22  to do, do you hear the name Akmal Narzikulov mentioned not one

23  time.  Nobody says oh, we got to get this person out of here

24  because the FBI is looking for him, they want to talk.

25  Tomorrow they're going to say something about Akmal we got to

Summation - Mr. Guadagnino                    1390

1    protect Akmal.  We got to make sure that Akmal Narzikulov has

2    no witnesses testify.  Not once did you hear that, ladies and

3    gentlemen?  Not one time.  And, again, Murodjon Sultanov,

4    Murodjon Sultanov, you heard Murodjon Sultanov took Jasur

5    Kamolov.  He got him involved in the business.  Murodjon

6    Sultanov pays people, he pays the Taxi and Limousine

7    Commission fees.  He uses his credit card.  Murodjon Sultanov

8    is the person who is behind all of that, not Akmal Narzikulov.

9    Murodjon Sultanov, ladies and gentlemen, that is the person

10   who was orchestrating all of this.  There he is.

11           What kind of scam, what kind of scheme does he have

12   going on with his underlings Firdavs Giyasov, Jasur Kamolov,

13   Firuz Juraev.  He wants Jasur to leave the United States after

14   the FBI goes talking to him in September of 2019.  He's

15   scheming to get him out of country.  This guy doesn't want the

16   truth to come out about himself.  He's trying to avoid what he

17   can't avoid eventually.

18           Now, ladies and gentlemen, again, I implore you to

19   use your common sense.  Use your good judgment.  Listen to the

20   charges that the judge will give you regarding reasonable

21   doubt.  How to evaluate the evidence.  How to make your

22   decision.

23           Mr. Narzikulov is charged with eight different

24   counts.  Conspiracy to unlawfully produce identification

25   documents.  Conspiracy to commit kidnapping.  Kidnapping.

Summation - Mr. Guadagnino                    1391

1   Hobbs Act extortion conspiracy.  Extortion.  Threatening

2   physical violence against Jasur Kamolov.  Using and carrying

3   and possessing a firearm and also conspiracy do tamper with a

4   witness.  All of these charges are being fabricated by in man

5   and his three cohorts.  It is not the defense's obligation to

6   present any kind of evidence or any kind of evidence to

7   New Hampshire gate anything.

8         The Government has the burden of proof.  The

9   Government has the burden of proof and the defendant has the

10  presumption of innocence and I implore you that at the end

11  when you sift through all the evidence and you can have the

12  testimony read back to you.  You can have the

13  cross-examinations read back to you.  After you do your duty

14  as sworn jurors, and you follow the charges and the law that

15  the judge gives you, you will have to do justice, and justice

16  is not only finding someone guilty if the Government proves

17  beyond all reasonable doubt that the person is guilty, justice

18  is also being able to follow the law, use your common sense,

19  use your good judgment and find that the Government did not

20  prove their case and in this case the only verdict after you

21  do your duty as sworn jurors will be to find Akmal not guilty.

22        THE COURT:  Thank you, Mr. Guadagnino.  Let me see

23  counsel very briefly at sidebar.

24        (Continued on the next page.)

25

```
                          Sidebar                    1392
```

1          (Sidebar conference held on the record in the

2    presence of the Court and counsel, out of the hearing of the

3    jury.)

4          THE COURT:  Unless the Government and guarantee me

5    that you're going to finish by 2:00 I'm inclined to break for

6    lunch now because I don't want to starve the jury.

7          MR. BUFORD:  I think it makes sense to break.  I

8    don't think it will be much longer than 20 minutes but I can't

9    guarantee it.

10          THE COURT:  Can you guarantee me half an hour?

11          MR. BUFORD:  I think I could, your Honor, if that's

12    okay.

13          THE COURT:  Let's do half an hour.  We'll be done at

14    2:10.  Okay.

15          (Sidebar discussion concludes.)

16          (Continued on the next page.)

17

18

19

20

21

22

23

24

25

Rebuttal Summation - Mr. Buford          1393

1          (In open court.)

2          THE COURT:  All right hang on with us, ladies and

3    gentlemen, we'll have lunch soon right after the Government's

4    rebuttal.

5          Please proceed.

6          MR. BUFORD:  Thank you.

7          Good afternoon, members of the jury.  I'd like to

8    begin with counsel's observations about some of the witnesses

9    that you heard in this trial who testified pursuant to

10   agreements with the Government Jasur Kamolov, Firuz Juraev,

11   and Andrew Barrett.

12         There is no mystery about the terms of agreement

13   that these witnesses have with the Government are.  Their

14   agreements are actually in evidence.  They're Government's

15   Exhibits 605, 606 and 607.  So you can have them with you in

16   the jury room when you deliberate.

17         And I expect Judge Cogan will instruct you that it

18   is up to you to determine whether these agreement, give those

19   witness incentive to lie or to tell the truth.  I expect if

20   you look at the terms of the agreements, you will see that

21   what those individuals have done is agreed to tell the truth,

22   that those agreements showed they had no interest in the

23   outcome of this case i.e., whether you find the defendant

24   guilty or innocent and no promises have been made about what

25   sentences they will receive in this case.

Rebuttal Summation - Mr. Buford                 1394

1           Now, I want you to remember that no one is under any

2    illusions about who these witnesses are and what they had

3    done.  We told you from the beginning that you would hear

4    witnesses in this case who have admitted as having

5    participated in crimes.  It would have been great if we

6    couldn't have appropriated to you only witnesses with

7    impeccable credentials and advanced degrees in science like

8    Dr. Cassandra Williams from the OCME.  The defendant didn't

9    ask Dr. Williams to participate in his criminal driver's

10   license business.  He asked Firuz Juraev and Jasur Kamolov.

11   And if you want to know how the defendant's criminal business

12   worked, you have to hear about it from people who participated

13   in the crime with the defendant those witnesses.

14          Now, those witnesses admitted to you that they had

15   lied in the past, but the question that's before you in this

16   trial is did they lie to you in this trial.  And all of the

17   evidence backs up their testimony as Ms. Nguyen explained to

18   you in the Government's summation.  Their testimony is

19   consistent with all of the rest of the evidence that you had

20   seen.  It's consistent with the evidence recovered from the

21   defendant's apartment including the phones and the pictures on

22   them.  It's consistent with the records of communications at

23   the time these events were taking place.  The Facebook chat,

24   the toll records, the call logs from the phones, and the chats

25   including the Vibr chat between the defendant and Firuz on the

Rebuttal Summation - Mr. Buford                1395

1  day of the kidnapping in which the defendant says, I'm going

2  to take his green card essentially confessing, we submit, to

3  extorting Firdavs Giyasov.

4         (Continued on the next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Rebuttal - Buford                         1396

1         MR. BUFORD:  It's also backed up by the security

2    video footage you've seen of the kidnapping itself, as well as

3    the video of Firuz trying to cash the check at the Pay-O-Matic

4    and later depositing the check into his Chase account and

5    getting $1,000 out of it.  It's also backed up by the jail

6    calls where you hear the defendant in his own words

7    participating in a conspiracy to tamper with the witnesses.

8         I want to talk a little bit about some of the

9    specific arguments that defense counsel made.  I won't be able

10   to address all of them, but I ask you to rely on Ms. Nguyen's

11   summations for anything that I can't get to you.

12        And I submit to you that most of the questions that

13   defense counsel raised or tried to raise are distractions.

14   They're trying to distract you from the evidence in the case,

15   such as asking if Firdavs had gone to the police, how come no

16   one was arrested that night?  Members of the jury, you know

17   why, because the police and the FBI agents began to conduct an

18   investigation, an investigation that allowed them to do the

19   surveillance operation to see Firdavs and Jasur make a payment

20   consistent with the extorsion scheme to the defendant.  And

21   you know that that investigation resulted in the defendant's

22   arrest less than a month after the kidnapping.

23        Counsel also says there's no specific evidence

24   linking the defendant to the cheating scheme for the driver's

25   license.  First of all, take a giant step back and consider

Rebuttal - Buford                      1397

1   the evidence that was found in the defendant's apartment.  You

2   saw the pictures that were on the phones that were recovered

3   there, dozens of driver's licenses, TLC exam appointment

4   confirmations, New York State driver's license applications,

5   pictures of the wireless earbuds that were used to do the

6   cheating scheme.  And you also saw dozens of pictures of what

7   were unmistakably those ledger entries; CDL, TLC, as well as

8   the phone numbers and the money paid by the clients.  You also

9   saw the yellow zipped packages containing the cheating

10  equipment.  Not just one or two of those packages, a lot of

11  them.  And you also saw the money, the cash, $294,000 in cash,

12  the proceeds of the defendant's illegal business.

13          And as for specific cheating, one of the cheaters at

14  the TLC was Rustam Pulotov.  And the phone that was taken from

15  him in the call log shows a contact with one of the phone

16  numbers associated with a SIM card in the defendant's

17  apartment, a contact as recently as April 2019.  That's

18  Government Exhibit 402.1.  Ms. Nguyen also told you about

19  Shukhrat Toshtemirov.  A picture of his license is on a phone

20  recovered in the defendant's apartment.  The defendant is

21  linked to the individual cheaters in this case.

22          Counsel also tried to suggest, I think, that Firdavs

23  Giyasov wasn't beaten badly enough for this to qualify as a

24  kidnapping, that he seemed to be okay later on in the day.

25  Members of the jury, you have seen the video; that is a

1  violent kidnapping or there's no such thing.  You see the

2  defendant and Sukhrob shove Firdavs Giyasov to the ground,

3  Taser him until he has to let go of the door handle, drag him

4  across the pavement and stuff him in the car.  At a minimum,

5  the evidence shows that Firdavs went against his will.

6  There's a moment in the video Ms. Nguyen showed you at about

7  the minute mark and five seconds which you can see Firdavs

8  Giyasov make eye contact with the woman in the lobby.  And I

9  think we would all hope for a little bit more from our fellow

10 citizens because that woman did not help him, but in that

11 moment there is no doubt about what is happening there.

12 Firdavs Giyasov is terrified.  He is terrified because he's

13 being carried away against his will.

14         Counsel suggests that this couldn't have been an

15 extorsion because when Firdavs was at the Bank of America, he

16 didn't try to scream or run for help or signal to anybody that

17 he was in danger.  But consider the circumstances, members of

18 the jury.  He had just been assaulted and Tased and he is

19 still in the power of his kidnappers.  He is their prisoner.

20 You heard the testimony from Firuz that he sandwiched into the

21 back seat between the defendant and Sukhrob as they drive him

22 around from place to place.  And also, consider this:  You

23 couldn't have asked for a more public place than the lobby of

24 that apartment building, and you saw Firdavs yelling,

25 screaming trying to get anyone's attention, no help came to

1  him.  And we submit to you what Firdavs learned from that is

2  that the defendant and Sukhrob were not going to be deterred

3  from hurting him just because they were in a public place and

4  that the better course for him was to stay quiet, be

5  submissive and try to ride this thing out until he could get

6  away.  And that's exactly what the evidence shows that he did.

7  What did his cries for help get him at the apartment building?

8  A chipped tooth and Taser marks on his neck.  That's why he

9  doesn't try to run out of the Bank of America, because he

10 knows that the defendant and Sukhrob tried to hurt him in the

11 beginning.

12         Counsel tries to suggest that the money in the

13 apartment building could have been part of a lending business

14 that the defendant's mother was running.  There's no evidence

15 of that in the record.  It's pure speculation.  And it's also

16 fatally inconsistent with two key pieces of evidence.  The

17 first is the ledger entries that you've seen which show the

18 nature of the defendant's business.  They're not loans.  They

19 say CDL, TLC, and they have the dollar amounts next to them.

20 It's the proceeds from the illegal driver business.  It's also

21 inconsistent with the fact that the cheating equipment is

22 there in the defendant's apartment.  This is not some

23 unofficial bank, it's a business to help people get driver's

24 license illegally.  Now, there may have been times where the

25 defendant floated a particular license applicant the entry fee

Rebuttal - Buford                    1400

1    or the charge to get the license and then charged that person

2    interest, but the overwhelming evidence shows that the nature

3    of the defendant's business was to get fraudulent driver's

4    licenses for his clients.

5            Counsel wonders why there's no picture of the

6    defendant's mother at the surveillance operation when Jasur

7    and Firdavs went to drop off the thousand-dollar payment.

8    Members of the jury, what is the suggestion here?  There is no

9    dispute that Firdavs and Jasur drove to the defendant's

10   apartment building.  Is it just the defendant's bad luck that

11   they were there to pay off somebody who happened to live in

12   the same building?  The evidence shows they were there to pay

13   off the defendant.  It was a payment for the extorsion that he

14   was holding Firdavs' property for in order to get Firdavs to

15   pay, and that's exactly what happened.

16           On the incident in the Walgreens parking lot

17   involving the gun, Counsel points to certain inconsistencies

18   in the testimony between Firuz and Jasur about what happened

19   there and tries to suggest that they're in cahoots with one

20   another to make the whole thing up.  And there certainly are

21   some inconsistencies, but members of the jury, we submit to

22   you that rather than show that those witnesses are lying,

23   those inconsistencies help their credibility.  If they had

24   gotten together and made up a story, they would be perfectly

25   in sync, letter-perfect in their descriptions of how the event

1  occurred.  Instead, there are slight differences in their

2  testimony, just like there would be if they were relying on

3  their memories.  Your own common sense and life experience

4  tells you that people remember things, even vivid events,

5  differently, different details stand out.  And the fact that

6  there are some inconsistencies shows, we submit, that they are

7  not making it up in cahoots to try to frame the defendant.

8          In addition, their accounts are the same in key

9  respects.  Both remember that the defendant was angry because

10 he had learned Jasur had tried to warn Firdavs that they were

11 lining up to kidnap him.  Both remember specifically that the

12 defendant had learned that because he saw a text message in

13 the defendant's -- in Firdavs's phone after he had taken it.

14 Both say that when Jasur told -- when confronted, Jasur told

15 the defendant that he had tried to warn him for his own good

16 because Firdavs had evidence, he could go to the police.  And

17 both say that when the defendant pulled out the gun, bullets

18 spilled all over the floor of the car.  Now, that last detail

19 is particularly significant, we submit, one, because it's the

20 kind of detail that it's hard to imagine two people

21 independently making up if they were trying to come up with a

22 story, and two, because it's consistent with the bullets that

23 you later saw in the apartment which were in a bag, loose.

24         Their testimony is also consistent with the fact

25 that the defendant's DNA is on the gun that was later found in

1    the apartment.  And not just on the gun generally, on the

2    parts of the gun that you would hold if you were going to

3    point it at somebody.  This is the testimony of Dr. Williams;

4    the textured grip, the sides of the trigger and the trigger

5    guard, the rear sight and the edges of buttons.  It's no

6    surprise, members of the jury, that there is a mixture of DNA

7    on the gun.  We know that the defendant's mother purchased the

8    gun and that Sukhrob was there with her.  We also know that

9    Jasur held the gun.  So it's certainly consistent with the

10   testimony that there's more than one person's DNA on it.  But

11   remember the testimony of Dr. Williams; the person with the

12   most DNA on the gun is the defendant's, and his DNA is

13   conclusively on the gun, according to her expert testimony.

14   Counsel says the gun in the picture that was recovered from

15   the apartment looks different, it doesn't look black and that

16   the Government is trying to make you believe that if you saw

17   it at night in a car it looks black.  Members of the jury, I

18   submit to you that if you see it in a brightly lit courtroom

19   in 225 Cadman Plaza, it looks black.  The gun looks black.

20   And I think the testimony shows that Jasur and Firuz could

21   have concluded the gun was black based on their seeing it in

22   the car.

23        Counsel says the fact that Jasur held the gun after

24   he was threatened shows that this wasn't really a violent

25   extorsion attempt.  But remember, the defendant used the gun

Rebuttal - Buford                          1403

1   to threaten Jasur, to get him to agree to pay Firdavs' debt.

2   Once he had threatened Jasur with the gun, the gun had served

3   its purpose and the defendant now had another person on the

4   hook for the money.  It also serves the defendant's purposes

5   for Jasur to hold the gun because he will know that it's real

6   and he doesn't want to see that gun again.  Allowing Jasur to

7   hold the gun turbocharges the defendant's threat and makes it

8   real and long lasting.  And it worked because you know that

9   Jasur, about a week later, went with Firdavs to pay $1,000 to

10  the defendant, precisely because he was afraid of the

11  defendant as a result of this meeting.

12          You also know that the gun was the defendant's

13  because it was purchased by his mother.  And you saw the

14  paperwork for that gun.  It's in evidence as

15  Government Exhibit 205.  And you can see the defendant's

16  mother's identification card was presented at the time of the

17  gun purchase and her address is listed as Bustleton Avenue in

18  Pennsylvania, an address where she was not living at the time

19  the gun was bought in February of 2019.  This is consistent

20  with the defendant's MO.  He uses his mother as a front, as a

21  cover, as a smokescreen to hide the tools of his illegal

22  business.  Remember the testimony of Special Agent Buscemi and

23  the pictures that he found of the vehicle registrations inside

24  the defendant's apartment.  This is Government Exhibit 302-A

25  at page 43.  It's a vehicle registration for a Ford in the

Rebuttal - Buford                    1404

1    name of the defendant's mother at Bustleton, Pennsylvania and

2    of a Toyota also in the name of the defendant's mother with

3    the same address of Bustleton Avenue in Pennsylvania.

4           There was someone else there the day the gun was

5    purchased, Sukhrob Khamrokulov.  And we know who that is, the

6    defendant's coconspirator, right-hand man.  And look at the

7    notation in the records, "Call this number, (802) 289-0909."

8    You know by now that is one of the numbers assigned to the

9    many phones in the defendant's apartment.  This was the number

10   that the people that the people at the gun shop were supposed

11   to used to contact the purchaser of the gun and it's one of

12   the phones that the defendant used to conduct his illegal

13   business on.  The evidence has shown that the phones inside

14   the defendant's apartment were essentially work phones, phones

15   that he used to conduct his business, and he used this number

16   to purchase this gun.  And don't forget in evidence at

17   Government Exhibit 309.11, from another of those phones, a

18   picture of Delia's Gun Shop, which is where the gun was

19   purchased.

20          Members of the jury, the defendant researched

21   Delia's Gun Shop and he sent Sukhrob to Pennsylvania with his

22   mother to make sure that the gun was in her name, just like

23   the cars.  The defendant tries to use his mother as a front to

24   hide the tools of his trade, the phones, the cars and the gun.

25   That's how you know this really was his gun; it fits the

1   pattern.

2          On the witness tampering count, Counsel says that

3   you cannot believe the testimony of Andrew Barrett.  But

4   remember, Barrett's testimony is totally consistent with all

5   the other evidence in the case.  Barrett told you that the

6   defendant was trying to communicate with his attorney the fact

7   that payments had been made to Firdavs Giyasov that

8   Mr. Giyasov would be unavailable at trial.  And the evidence

9   shows that's exactly what happened.  The call detail records

10  show a phone call from Uzbekistan to Mr. Golub on the same day

11  that the defendant has these jail calls with his brother,

12  talking about the urgent need to communicate with the

13  attorney.  And members of the jury, we submit, what reason

14  would there be to communicate this information to Mr. Golub if

15  it weren't true?  For the defendant, it serves no purpose to

16  urgently communicate to your attorney evidence of a crime that

17  you didn't commit.  The only way this plan makes sense is if

18  the information is true and the defendant is trying to tell

19  his attorney you can take it to the bank that the victim in

20  this case will not be available at trial and we should push

21  ahead for a speedy trial.

22          Mr. Barrett also told you the defendant bought

23  minutes from other inmates and you heard with your own ears

24  that that's true.  You heard the introduction on the jail

25  calls where it says you will hear a call from inmate, and the

1  name that's not the defendant's, and then the defendant's

2  voice unmistakably speaking Tajic to the person on the other

3  line.

4           Counsel also tries to suggest that Murodjon Sultanov

5  is the one who came up with the witness tampering conspiracy.

6  And Murodjon, I would submit to you, seems to be going to a

7  lot of trouble help out the defendant if the defendant is not

8  involved in it.  But you know from the jail calls that the

9  defendant was involved in it.  You know that the defendant

10 tried to recruit Firuz to go to Jasur and find out what it was

11 that Jasur had told the FBI after he had been approached.  And

12 this is the jail call at Government Exhibit 503-B, and it's a

13 call that took place on October 7th at 8:25 in the evening.

14 And remember the testimony of Firuz, that when he says that

15 he's waiting for somebody, he is literally waiting for Jasur

16 to come approach, to meet with him to talk about what Jasur

17 told the FBI.  If you look at the next page,

18 Government Exhibit 503-B at page 3, you remember what the

19 defendant told Firuz about meeting with Jasur.  "Don't sit in

20 his car."  And also, "Make sure you see his phone to make sure

21 he's not recording you."  Consider for a moment, members of

22 the jury, what the defendant is not saying to Firuz in this

23 situation.  He's not saying how is this happening?  Where is

24 this coming from?  I don't understand the charges against me.

25 He's saying make sure you check Jasur's pockets so he's not

1   recording you and don't sit in his car because that might be
2   wired up by the FBI, too.  This shows the defendant's guilty
3   knowledge about what he has done and what he is doing in
4   trying to tamper with these witnesses.  And then two days
5   later, on October 9th, there's another call between the
6   defendant and Firuz.  This one is in evidence as
7   Government Exhibit 508-B, the translation.  And we submit to
8   you the evidence indicates that on this night Firuz met with
9   Jasur, with Murod there -- this is the night that Murod and
10  Jasur went to go see Albert Dyan -- and you see in this call,
11  on page 4, Firuz saying to the defendant that he is there with
12  Ray.  Remember, Ray or Reesh (ph) is the code name for Murod.
13  He actually offers to put Murod on the phone and Murod says
14  no.  And look at the last line, the last row.  The defendant
15  says, "Explain to him about the Qe" -- remember Firuz told you
16  that's the money -- "and Daroz."  That's the code name for
17  Jasur.  The defendant, in realtime, is coordinating the
18  witness tampering with Jasur.  He is aware of what's happening
19  in the moment, on the phone with Firuz, making sure this is
20  happening the way he wants this to happen.  The jail calls
21  prove the defendant is involved in the witness tampering
22  conspiracy.
23          In addition, on all the conspiracy charges, I expect
24  Judge Cogan will instruct you that in order to convict the
25  defendant, the Government does not have to prove that the

1   defendant was in charge of any of these conspiracies, only

2   that he was a member or a participant in it.  But the evidence

3   has shown beyond a reasonable doubt, even though we don't have

4   to prove it, that the defendant was in charge of these

5   conspiracies, that he was running a driver's license fraud,

6   that he did come up with the idea to kidnap the defendant,

7   that he was trying to extort -- excuse me, Firdavs and Jasur,

8   that he was -- he didn't try to kidnap Firdavs.  He was trying

9   to extort Firdavs and Jasur.  If you're trying to figure out

10  who was in charge of the conspiracy, it's the person with

11  $294,000 in their closet.  In every organization, money flows

12  from the bottom to the top, and the evidence has shown beyond

13  a reasonable doubt that the defendant was at the top of this

14  criminal pyramid.

15          Members of the jury, the time has come to hold the

16  defendant accountable for his conduct.  We ask you to return

17  the only verdict consistent with the evidence you have heard,

18  a verdict of guilty on all counts.  Thank you.

19          THE COURT:  All right.  Thank you.

20          Ladies and gentlemen, we will take our lunch now.  I

21  want to take only 45 minutes so I can get going on the

22  instructions to you which themselves take a little while.

23  Please remember not to talk about the case amongst yourselves

24  or with anyone else.  We will come back here at ten minutes to

25  three.  Have a good lunch.

Rebuttal - Buford                                    1409

1              (Jury exits the courtroom.)

2              All right.  Mr. Guadagnino, I'm sorry I had to

3    interrupt your closing, but I observed the same phenomena with

4    Juror No. 9 that we have been having and I really wanted him

5    to pay attention.

6              MR. GUADAGNINO:  All I have to say is thank you,

7    your Honor.

8              THE COURT:  Okay.  See you at ten to three.

9              MS. NGUYEN:  Thank you.

10             (Luncheon recess was taken.)

11

12             (Continuing on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Jury Charge                              1410

1       AFTERNOON SESSION

2              (In open court - jury not present.)

3              THE COURT:  Let's bring in the jury.

4              (Jury enters the courtroom.)

5              THE COURT:    Now that the evidence has been

6    presented, it is my responsibility to instruct you on the law.

7    You are going to get a copy of the instructions that I am

8    reading you now, so do not feel you have to write anything

9    down, but take any notes that you want to.

10             The instructions I am going to give you are going to

11   be in three parts.  First, I am going to instruct you on the

12   general rules that define and govern the duties of jurors in a

13   federal criminal case.  Second, I am going to instruct you as

14   to the legal elements as to each of the crimes that have been

15   charged here.  And then third, I am going to give you some

16   important principles to use during your deliberations.  The

17   third part is short.  The first two parts are fairly long,

18   just so you know what is coming.

19             It has been very obvious to me that you have

20   faithfully discharged your duty to listen carefully and

21   observe each witness who testified during the trial.  Please

22   give me that same attention as I give these instructions to

23   you now.  It is my job to instruct you on the law.  You have

24   to accept my instructions and apply them to the facts as you

25   determine them.  It would violate your sworn duty to base a

1    verdict on any other view of the law other than the one that I

2    am about to give you.  This means you have to follow my

3    instructions regardless of any opinion that you might have as

4    to what the law is or what you think it should be and

5    regardless of whether any attorney has stated a legal

6    principle differently from how I am stating it.  You also have

7    to consider these instructions as a whole during your

8    deliberations, do not single out any one of them as alone

9    stating the law.

10             Now, please understand, I have no opinion at all as

11   to the verdict that you should reach.  If during the trial it

12   seemed to you I made any kind of expression or question or

13   ruling that seemed to indicate that I do have an opinion about

14   the case, I did not mean to do that, because I do not.  So

15   please disregard anything you think you may have picked up.

16   Also, we had a couple of sidebars with counsel.  Those were

17   just for scheduling purposes.  Do not worry about what

18   happened there.

19             Now, you are going to be the sole and exclusive

20   judges of the facts in this case.  You could be wearing black

21   robes for the job that you are about to do.  It is going to be

22   your duty to determine the weight of the evidence and the

23   credibility of the witnesses and you resolve any conflicts

24   that there may be in the testimony, you draw whatever

25   reasonable inferences you decide to draw from the facts as you

1    have determined them.  Now, please remember that in carrying

2    out this duty, you took an oath to render judgment fairly and

3    impartially, without prejudice or sympathy and without any

4    fear.  You took an oath to base your verdict solely on the

5    evidence in the case and the applicable law as I am giving it

6    to you now.  Please remember that all parties are here today

7    equally under the law.  The fact that the Government is a

8    party and the prosecution is brought in the name of the

9    United States does not entitle the Government or its witnesses

10   to any different consideration than the defendant.  Now,

11   please do not be swayed by sympathy for any of the parties or

12   what the reaction of the parties or the public might be to

13   your verdict.  You must not be influenced by any feelings you

14   might have about the nature of the crimes charged or by any

15   feelings that you might have about the race, religion,

16   national origin, gender or age of the parties or anyone

17   participating in the trial.  Do not bear any prejudice against

18   any attorney or that attorney's client merely because during

19   the course of the case the attorney made an objection or asked

20   for a sidebar or asked me for a ruling on a point of law.  If

21   you did, during the trial, form any reactions or opinions of

22   any kind about the lawyers in this case, you must disregard

23   those.  The personalities and conduct of the counsel are not

24   what is at issue in this case.  Also, you must not consider

25   the question of the defendant's possible punishment if you

1  find him guilty.  The duty of imposing a sentence rests

2  exclusively with the Court if there is a conviction, and you

3  cannot allow that consideration to enter into your

4  deliberations at any point.

5              Now, the defendant has pled not guilty to the

6  indictment and, as a result, the burden is on government to

7  prove the defendant's guilt beyond a reasonable doubt.  That

8  burden never shifts to the defendant because the law does not

9  impose on a criminal defendant any duty to call or

10 cross-examine witnesses or produce any evidence at all.  As

11 you know, the defendant has been charged with crimes in a

12 document that we call an indictment.  The indictment is not

13 any evidence at all of guilt.  It is just a formal way that

14 the Government tells a person what crimes he is accused of

15 committing.  It does not raise even any suspicion of guilt.

16 The defendant starts the trial here with a clean slate, with

17 no evidence at all against him.  The law presumes that he is

18 innocent of all the charges against him.  That presumption of

19 innocence stays with him and it alone is sufficient to acquit

20 him unless the Government presents evidence here in court that

21 overcomes the presumption and convinces you beyond a

22 reasonable doubt that he is guilty.  That means, again, that

23 the defendant has no obligation to present any evidence,

24 whether by calling witnesses or producing any other kind of

25 evidence.  The defendant has no obligation to prove to you in

1   any way that he is innocent.  It is up to the Government to

2   prove that he is guilty.  Because you must presume the

3   defendant to be innocent, you must find the defendant not

4   guilty unless and until the Government convinces you beyond a

5   reasonable doubt that he is guilty.

6            So by now it has probably occurred to you, what is a

7   reasonable doubt?  Well, the words almost define themselves.

8   It is a doubt based on reason and common sense.  It is a doubt

9   that a reasonable person would have after carefully weighing

10  all the evidence.  It is a doubt that would cause a reasonable

11  person to hesitate to act in a manner of importance in their

12  own personal life.  Proof beyond a reasonable doubt must be of

13  such a convincing character that a reasonable person would not

14  hesitate to rely on it in making an important decision.  A

15  reasonable doubt, therefore, is not an impulse or a whim, it

16  is not speculation or a suspicion, it is not an excuse to

17  avoid the performance of an unpleasant duty and it is not

18  sympathy for any party.  The law does not require the

19  Government to prove guilt beyond all doubt.  Proof beyond a

20  reasonable doubt is sufficient to convict.  If after fair and

21  impartial consideration of all the evidence and the lack of

22  evidence you are satisfied of the defendant's guilt beyond a

23  reasonable doubt, then you should vote to convict.  On the

24  other hand, if after fair and impartial consideration of all

25  the evidence and any lack of evidence you have a reasonable

1    doubt, then it is your duty to acquit the defendant.

2         Now, you will note that the defendant chose not to

3    testify in this case.  Under our Constitution, a defendant has

4    no obligation to testify or present any evidence.  You may,

5    therefore, not attach any significance to the fact that the

6    defendant did not testify.  No adverse inference against the

7    defendant may be drawn by you just because he did not take the

8    witness stand.  You may not consider this against the

9    defendant in any way during your deliberations.  In fact,

10   during your deliberations, nobody should even mention that the

11   defendant did not testify because it is irrelevant to your

12   deliberations.

13        Now, the fact that one party called more witnesses

14   and introduced more evidence than the other does not mean that

15   you should necessarily find the facts in favor of the side

16   offering the most witnesses.  By the same token, you do not

17   have to accept the testimony of any witness who has not been

18   contradicted or impeached if you find that that witness was

19   not credible.

20        Now, let me go over with you the various kinds of

21   evidence that you heard.  It is going to be your recollection

22   of the evidence that counts here.  You should consider the

23   evidence in light of your own common sense and experience and

24   you can draw any reasonable inferences that you think are

25   appropriate from the evidence.  The evidence in this case

1   consisted of the sworn testimony of the witnesses, the

2   exhibits received in evidence, and that stipulation that I

3   read to you this morning.  I will talk to you about each one

4   of those a little bit.

5           A stipulation, as I told you this morning, is an

6   agreement among the parties that a certain fact is true.  You

7   should regard that fact as true.

8           As to exhibits, you may only consider exhibits which

9   I have received into evidence.  You may not consider documents

10  which have been referred to but not received into evidence.

11          Moreover, as I told you at the beginning of the

12  trial, only the witnesses' answers are evidence, a lawyer's

13  questions are not evidence.  You will also have to remember

14  that the lawyers' statements, their openings and closings --

15  and I think they were pretty good about this, but just in case

16  they said anything to me during the trial, that is not

17  evidence for you to consider.

18          In addition, I know you all tried very hard to stay

19  away from any publicity about the case because I asked you to

20  every day, but if by any chance you ran into some and you were

21  not able to stay away from it, then you must set it aside now,

22  you must put it out of your mind.

23          Now, you can consider both direct and circumstantial

24  evidence in deciding whether the Government has met its burden

25  of proof.  Direct evidence is evidence that proves a disputed

1    fact directly; that is, when a witness testifies about what

2    the witness saw, heard or observed.  Circumstantial evidence

3    is evidence that tends to prove a disputed fact by proof of

4    other facts.  The law makes no distinction between direct and

5    circumstantial evidence and you can give either or both

6    whatever weight you conclude is warranted.

7              There is an example we often use in the courthouse

8    to illustrate to jurors the differences between direct and

9    circumstantial evidence.  Suppose when you got here this

10   morning -- and I think this was the case -- the sun was

11   shining and it is a nice day.  But as you sit here, we have

12   got no windows, you do not know what it is doing outside.  I

13   read there was a 10 percent chance of rain this morning; it

14   could be raining.  You have no direct evidence of what is

15   going on outside.  But if somebody were to walk into the

16   courtroom and they are wearing a raincoat and carrying an

17   umbrella and the umbrella and raincoat are dripping wet, it

18   would be reasonable and logical for you to conclude that it is

19   raining outside.  On the other hand, if people came in and did

20   not have wet raincoats and wet umbrellas, you could reasonably

21   conclude that it is not raining.  The raincoat, wet or dry,

22   the presence of the raincoat or the absence of the raincoat,

23   that is what we mean by circumstantial evidence.  You infer on

24   the basis of reason, experience and common sense from an

25   established fact or the lack of an established fact the

1    existence or nonexistence of some other fact.  That is all

2    there is to it.

3            Now, already quite a few times in these instructions

4    you have heard me use the term "inference."  And the attorneys

5    have argued, particularly in their closing statements, that

6    you should or should not make different inferences based on

7    the evidence presented during the trial.  So, what is an

8    inference?  An inference is not a suspicion or a guess.  It is

9    a reasoned, logical decision to conclude that a fact exists on

10   the basis of another fact that you know exists.  It is a

11   deduction or a conclusion that you are permitted but not

12   required to draw from the facts that have been proved by

13   direct or circumstantial evidence.  Remember that it is going

14   to be you and you alone to decide what inferences you want to

15   draw and not draw.  I will remind you, however, that whether

16   based on direct or circumstantial evidence or upon the

17   logical, reasonable inferences that you draw from such

18   evidence, you have to be satisfied that the Government has

19   proved the defendant's guilt beyond a reasonable doubt before

20   you may vote to convict.

21           Now, there were a couple of charts and summaries in

22   this case which I am going to allow you to see and I allowed

23   you to see during the trial without going into the underlying

24   documents just to save some time and not make you go through a

25   pile of papers.  You can consider those charts and summaries

1   as you would any other evidence.

2          Now, I have told you what you may properly consider

3   and infer as you are sifting through the evidence in this

4   case.  Now I am going to tell you what you may not consider.

5   Again, the objections that the lawyers made, those are not

6   evidence.  Testimony and exhibits can only be admitted into

7   evidence if they meet certain criteria or standards, it is the

8   lawyer's obligation to object if they think the evidence does

9   not meet those standards.  Do not be influenced by any party

10  just because their lawyer made an objection.  That does not

11  cut one way or the other.  Similarly, I made a couple of

12  rulings on objections to some of the questions.  Do not think

13  that means that I want one party to win or I think that party

14  has a better case.  That is not the case at all.  These are

15  technical evidentiary rules that have no bearing on your

16  deliberations.

17         Now, the law does not require any party to present

18  all available evidence or subpoena as witnesses everyone who

19  was present at any time or place or who might have knowledge

20  of the matters at issue in this case.  Do not draw any

21  inferences or reach any conclusions as to what witnesses who

22  were not here may have testified to had they been called.  The

23  law also does not require any party to produce as exhibits all

24  papers and all objects mentioned during the trial, but each

25  party had an equal opportunity or a lack of opportunity to

1    subpoena those witnesses and introduce that evidence.  Your

2    concern is to determine, based upon the evidence that has been

3    presented, whether the Government has met its burden to prove

4    that the defendant is guilty beyond a reasonable doubt.  Do

5    not speculate about evidence that was not presented at the

6    trial.  That being said, as I have told you, you always have

7    to remember that the law does not impose on a criminal

8    defendant the burden or duty of calling any witnesses or

9    producing any evidence, and the burden of proof is always on

10   the Government.

11          Now, you also may not draw any inference towards

12   either party from the fact that other people who were involved

13   in the offenses charged in the indictment are not on trial

14   before you.  You may not speculate as to the reason why or

15   allow their absence as parties to influence your deliberations

16   in any way.  Your concern is solely the defendant on trial

17   before you.  The fact that these other individuals are not on

18   trial is not your concern.  You are being asked to decide

19   whether or not the Government has proven beyond a reasonable

20   doubt the guilt of this defendant.  You are not being asked

21   whether any other person has been proven guilty.  Your verdict

22   has to be solely on the evidence or lack of evidence as to

23   this defendant in accordance with these instructions and

24   without regard to whether the guilt of other people has or has

25   not been proven.

Jury Charge                                  1421

1      Now, you have heard testimony about evidence

2 obtained pursuant to the search of the defendant's residence.

3 That evidence was obtained lawfully.  The use of this

4 procedure to gather evidence is perfectly lawful and the

5 Government has the right to use such evidence in this case.

6 Now, during the trial you may have heard arguments regarding

7 law enforcement techniques and practices.  You may consider

8 that argument in determining whether the Government has met

9 its burden of proof.  You are instructed, however, that there

10 is no legal requirement that the Government use any specific

11 techniques or practices.  Similarly, you should not be

12 concerned about whether certain techniques may not have been

13 used.  Simply put, law enforcement techniques are not your

14 concern.

15      Now, it is also your duty as jurors to determine the

16 credibility of the witnesses you heard and measure the

17 importance of their testimony.  You have to decide where the

18 truth lies, and that will require you to judge the testimony

19 you listened to and observed.  You should carefully scrutinize

20 the testimony, the circumstances under which each witness

21 testified, and any other matter in evidence that may help you

22 decide the truth of and weight to assign to any witnesses'

23 testimony.  Your decision whether to believe a witness may

24 depend on how the witness impressed you.  Was the witness

25 candid and frank or did it seem as if the witness was hiding

1   something, being evasive or suspect in some way?  How did the

2   testimony on the witness's direct examination compare with the

3   witness's testimony on cross-examination?  Was the witness's

4   testimony consistent or inconsistent?  Did it appear that the

5   witness knew what the witness was talking about?  Did the

6   witness strike you as somebody who is trying to report their

7   knowledge accurately?  How much you choose to believe a

8   witness may also be influenced by a witness's bias.  Does the

9   witness have a relationship with the Government or the

10  defendant that may affect how the witness testified?  Does the

11  witness have some incentive, loyalty or motive that might

12  cause the witness to shade the truth?  Or does the witness

13  have some bias, prejudice or hostility that may have caused

14  the witness, whether consciously or not, to give you something

15  other than a completely accurate account of the facts?

16  Evidence that a witness may be biased towards one of the

17  parties requires you to view that witness's testimony with

18  caution, to weigh it with great care, and to subject it to

19  close scrutiny.  In other words, what you have to try to do in

20  deciding credibility is to size a person up just as you would

21  in any important matter where you are trying decide if a

22  person is truthful, straightforward and accurate in their

23  recollection.  How much you believe a witness may also be

24  influenced by any interest that the witness may have in the

25  outcome of the case.  That interest may create a motive to

1   testify falsely, to advance that witness's own personal or

2   professional interests.  That is not to suggest that every

3   witness who has an interest in the outcome of the case is

4   going to testify falsely, not at all.  It is for you to decide

5   to what extent, if at all, a witness's interest is affected or

6   colored the witness's testimony.  You should specifically

7   consider evidence of resentment or anger that some witnesses

8   may have towards a defendant.  Evidence that a witness is

9   biased, prejudiced or hostile toward a defendant requires you

10  to view that witness's testimony with caution, to weigh it

11  with care and again to subject it to close and searching

12  scrutiny.  Even if you think a witness was not biased, you

13  should still consider whether the witness had an opportunity

14  to observe the facts that he testified about, as well as the

15  witness's demeanor and ability to communicate effectively.

16  Ask yourselves whether a witness's recollection of the facts

17  stands up in light of the rest of the evidence.  You have to

18  be guided by your common sense, your good judgment and your

19  life experience.

20          Now, in this case, you know, witnesses usually are

21  not allowed to testify as to their opinions.  They have to

22  state facts.  But I did permit a certain witness to express

23  her opinions about matters that are at issue in the case.  A

24  witness can be permitted to testify to an opinion on those

25  matters about which she has special knowledge, skill,

1   experience and training.  That testimony is presented to you

2   on the theory that someone who is experienced and

3   knowledgeable in a particular field can assist you in

4   understanding the evidence or in reaching an independent

5   decision on the facts.  In weighing this opinion testimony,

6   you may consider the witness's qualifications, her opinions,

7   the reasons for testifying, as well as all of the other

8   considerations that I have just talked to you about when

9   considering any witness's testimony.  You can give her opinion

10  whatever weight, if any, you think it deserves in light of all

11  the evidence in the case.  You should not, however, accept

12  opinion testimony merely because I allow the witness to

13  testify concerning her opinions.  That is up to you.  Nor

14  should you substitute it for your own reason, judgment and

15  common sense.  Again, that is because the determination of the

16  facts in this case rests exclusively with you.

17         Now, there has been evidence that the defendant made

18  certain statements in which the Government claims he admitted

19  certain facts charged in the indictment.  In deciding what

20  weight to give the defendant's statements, you should first

21  examine with great care whether each statement was made, in

22  fact, and whether if it was, it was voluntarily and

23  understandingly made.  You can give those statements such

24  weight as you feel they deserve in light of all the evidence.

25         Also, you heard testimony from a number of witnesses

1    employed as law enforcement officers or employees of the

2    Government.  The fact that a witness may be employed by the

3    Government as a law enforcement official or employee does not

4    mean that their testimony is necessarily deserving of more or

5    less consideration or greater or lesser weight than that of

6    any other witness.  At the same time, it is quite legitimate

7    for defense counsel to try to attack the credibility of a law

8    enforcement witness on the ground that their testimony may be

9    colored by a personal or professional interest in the outcome

10   of the case.  It is going to be your decision after reviewing

11   all of the evidence whether to accept the testimony of a law

12   enforcement or government witness and to give that testimony

13   whatever weight, if any, you think that it deserves.

14          Now, you also heard that the Government's lawyers

15   interviewed -- I think it came out that they interviewed a

16   couple of the witnesses when preparing for the trial.  Do not

17   draw any unfavorable inferences from that testimony.  The

18   attorneys were obligated to prepare this case for you as

19   thoroughly as possible, and one way to accomplish that is to

20   properly interview witnesses before the trial and is necessary

21   throughout the course of the trial.

22          Now, you also heard from witnesses who testified

23   that they were involved in one or more of the charged crimes

24   with the defendant.  Experience will tell you that the

25   Government sometimes must rely on the testimony of witnesses

1   who admit to participating in criminal activity.  The law

2   allows the use of cooperating witness testimony.  It is the

3   law in federal courts that such testimony may be enough even

4   standing alone for a conviction if the jury finds that the

5   testimony establishes guilt beyond a reasonable doubt.

6   Because of the interest both unindicted and indicted

7   cooperating witnesses may have in testifying, the testimony

8   should be scrutinized with special care and great caution.

9   The fact that the witness may benefit from the witness's

10  cooperation may be considered by you as bearing on their

11  credibility.  Like the testimony of any other witness,

12  cooperating witness testimony should be given such weight as

13  it deserves in light of the facts and circumstances before

14  you.  You have to take into account the witness's demeanor and

15  candor, the strength and accuracy of the witness's

16  recollection, their background and extent to which their

17  testimony is or is not corroborated by other evidence in the

18  case.

19          You may consider whether a cooperating witness has

20  an interest in the outcome of the case and, if so, whether

21  that interest has affected the testimony you heard.  You

22  should ask yourselves whether the witness would benefit more

23  by lying or by telling truth.  And you should consider who

24  makes that determination.  You should ask yourselves whether

25  the witness would benefit more by testifying in a manner to

1   please the Government and whether such a benefit makes their

2   testimony unreliable or not credible.  You should consider

3   whether any aspect of the witness's testimony was made up in

4   any way because that witness believed or hoped that they would

5   somehow receive favorable treatment by testifying falsely or

6   whether they believe that their interest would be better

7   served by testifying to the truth.  If you believe that the

8   witness was motivated by hopes of personal gain such as

9   avoiding prison or a significant prison sentence, was the

10  motivation one that would cause the witness to lie or was it

11  one that would cause the witness to tell the truth?  Did this

12  motivation color the witness's testimony?  If you think the

13  witness's testimony was false, you should reject it.  However,

14  if after a cautious and careful examination of the cooperating

15  witness's testimony you are satisfied that the witness told

16  you the truth, then you should accept it.

17          Now, it came up a couple of times with these

18  cooperating witnesses, you know, how are they going to be

19  sentenced, and I want to just tell you what the procedure is

20  so you understand the way it works.  When somebody decides to

21  cooperate with the Government, the Government does not

22  determine what sentence they are going to get.  In fact, the

23  Government typically does not even make a recommendation to

24  the sentencing court as to how much time the Government

25  believes they should be sentenced to.  What the Government

1   will do, if it is satisfied with the witness's efforts of

2   cooperation, is it will write to the sentencing judge what you

3   heard referred to as a 5K1 letter.  What that letter does is

4   it sets forth the nature of the crimes that the cooperating

5   witness has committed and all of the cooperation that the

6   witness has undertaken.  Then, the judge who has to do the

7   sentencing takes that letter, together with a lot of other

8   information about the cooperating witness and all that

9   witness's crimes, and it is the judge who exclusively decides

10  what the sentence should be, not the Government.

11

12            (Continuing on the following page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Charge of the Court                    1429

1    (Continuing)

2          THE COURT:  All that a cooperating witness gets from

3    the Government, if the Government is satisfied with their

4    cooperation, is this 5K1 letter.  It's the Government's

5    decision as to whether to submit the letter, but it's the

6    judge's decision alone as to what the sentence should be.

7          Now let me talk to you about statements made by

8    co-conspirators.  I admitted into evidence against the

9    Defendant the acts and statements of others because these acts

10   and statements were committed by persons who the Government

11   contends were also confederates or co-conspirators of the

12   Defendant on trial.  The reason for allowing this evidence to

13   be received against the Defendant has to do with the nature of

14   the crime of conspiracy.  And I'm going to instruct you on

15   that in great detail, but for now just talking about evidence.

16         A "conspiracy" is often referred to as a partnership

17   in crime.  Thus, as in any other types of partnerships, when

18   people enter into a conspiracy to accomplish an unlawful end,

19   each and every member becomes an agent for the other

20   conspirators in carrying out the conspiracy.  Accordingly, the

21   reasonably foreseeable acts, the declarations, the statements,

22   and omissions of any member of the conspiracy and in

23   furtherance of the common purpose of the conspiracy are deemed

24   under the law to be the acts of all of its members.  All of

25   the members are responsible for such acts, declarations,

LAM        OCR        RPR

Charge of the Court                    1430

1   statements, and omissions.

2          Now, in this indictment you're going to deliberate

3   on Counts One, Two, Four, and Eight allege that the Defendant

4   participated in a conspiracy.  If you find beyond a reasonable

5   doubt that a Defendant was a member of the conspiracy charged

6   in those counts, then any acts done or statements made in

7   furtherance of the conspiracy by persons also found by you to

8   be members of that conspiracy may be considered against the

9   Defendant.  This is so even if such acts were done and

10  statements were made in the Defendant's absence and without

11  his knowledge.

12         Now, we had a lot of interpretations in this trial.

13  The Tajic and Russian languages were used for some of the

14  evidence.  As you observed, some witnesses testified in Tajic

15  through an interpreter.  The evidence you are to consider and

16  on which you must base your decision is only the English

17  language interpretation and translations presented in this

18  court.  I have no idea about whether any of you speak Tajic or

19  Russian, but, if you do, put it aside because it's the English

20  that you heard that you have to consider.

21         You have to rely solely on the evidence presented in

22  the English interpretation.  Don't make any assumptions about

23  a witness or a party based solely on the use of an interpreter

24  to assist that witness or party.  If somebody is more

25  comfortable testifying in a foreign language, then we want

1    them testifying in a foreign language but we want you to go by

2    what the interpreter says they're saying.

3            There are also audio recordings of various

4    conversations that were entered into evidence.  The

5    transcripts of foreign language recordings have also been

6    admitted into evidence.  For those transcripts of those

7    foreign language recordings, I instruct you that it's the

8    English translation reflected in the transcript that is the

9    evidence.

10           So, if you heard something and you speak Tajic or

11   Russian and you think it's different from what's in the

12   transcript, you have to go by the transcript.  Again, I don't

13   know that any of you do, but just in case.

14           Whether you agree or disagree with any recording or

15   translations is not something for you to consider.  The

16   recordings were made in a lawful manner and that evidence was

17   properly admitted in this trial.  So, you must, therefore,

18   regardless of any personal opinion about the interpreter or

19   what the interpreter should have said, you have to give this

20   evidence full consideration along with all the other evidence

21   in the case.  Of course, like everything else, it's for you to

22   decide what weight, if any, you want to give to this evidence.

23           Okay.  That concludes part one, which may be the

24   longest part of the instructions.  Give me just a second.

25           (Pause in proceedings.)

1          THE COURT:  For this portion of the instructions
2    ladies and gentlemen, I'm going to project it on your screens
3    and I'm going to project it on the overhead so you can read
4    along.  It's a little complex.  And even though you're going
5    to have the instructions with you, I think it will be easier
6    for you to follow what I'm saying.
7          Please, though, don't get lost in the instruction.
8    Just like I told you with taking notes, listen to me, please.
9    You'll be able to read it later, but I think it might help you
10   understand what I'm saying if you can see it as well as listen
11   to me.
12         Go ahead, Melonie.
13         (Exhibit published to the jury.)
14         THE COURT:  These are the legal elements of the
15   crimes charged in this case.
16         First, as I mentioned, the Defendant is formerly
17   charged in an indictment.  That's simply notice of what the
18   Defendant has been charged with.  I'm going to refer to each
19   count by the number assigned to it in the indictment.  There
20   are eight counts in this indictment, One through Eight.  You
21   have to consider each count of the indictment separately and
22   you have to return a separate verdict for each count in which
23   the Defendant is charged.
24         Let me give you some general words that you're going
25   to see a lot in this indictment for all the counts:  Many of

1    the charges contain the terms "knowingly," "intentionally," or

2    "willfully."  I'll tell you right now what those mean.

3                A person acts "knowingly" when he acts intentionally

4    and voluntarily and not because of any accident, mistake, or

5    carelessness or ignorance.  Whether a defendant acted

6    knowingly may be proven by his conduct and by all the facts

7    and circumstances surrounding the case.

8                A defendant acts "intentionally" when he acts

9    deliberately and purposefully.  A defendant's act must have

10   been the product of his conscious objective rather than the

11   product of a mistake or accident.

12               And then a person acts "willfully" if he's acting

13   knowingly and purposely with an intent to do something that

14   the law forbids; that is to say, with a bad purpose, to

15   disobey or disregard the law.

16               Now let's talk about conspiracy.  That's as a

17   general matter before I go through each conspiracy count in

18   the compliant.  Again, One, Two, Four, and Eight of the

19   indictment charge the Defendant conspired to commit a

20   particular crime.

21               The essence of the charge of conspiracy is an

22   understanding or agreement between or among two or more people

23   that they're going to act together to accomplish a common

24   objective that they know is unlawful.

25               You should understand that a conspiracy is an

1    independent offense.  It's a crime in and of itself regardless

2    of which whether the goal of the conspiracy is accomplished.

3    That is, it's separate and distinct from the actual violation

4    of any specific federal law.  The law refers to those

5    violations as substantive crimes, but what we're talking about

6    here are conspiracy crimes.

7            When I instruct you on each conspiracy charge, I'm

8    also going to instruct you on the element of the substantive

9    underlying crime that is the object of the conspiracy for each

10   count.  However, because conspiracy to commit the substantive

11   crime is an independent offense from the substantive crime

12   itself, you may find the Defendant guilty of the crime of

13   conspiracy to commit the substantive crime even if the

14   substantive crime that was the object of the conspiracy was

15   not actually committed.

16           Now, let me go over the elements of the conspiracy.

17   For most conspiracies, the Government has to prove each of the

18   following elements beyond a reasonable doubt:  First, that two

19   or more people entered into a particular unlawful agreement

20   charged in that conspiracy count; and, second, that the

21   Defendant knowingly and willfully became a member of the

22   conspiracy.  Now let me go over each one of those counts in

23   more detail.

24           First, the Government has to prove beyond a

25   reasonable doubt that two or more people entered into the

Charge of the Court                    1435

1  unlawful agreement charged in the particular count that you

2  are considering.  In other words, a person can't commit the

3  crime of conspiracy by himself; rather, the proof has to

4  convince you that at least two people joined together in a

5  common criminal scheme.

6        To establish a conspiracy, the Government isn't

7  required to prove that the conspirators sat around a table and

8  entered into a sound contract or wrote down their agreement

9  stating that they formed a conspiracy.  Nor do they have to

10 set forth in any kind of document or oral agreement all the

11 details of the plans or the means by which the unlawful

12 project would be carried out or the part to be played by each

13 co-conspirator.

14        You may, of course, find the existence of an

15 agreement between two or more persons to engage in criminal

16 conduct that has been established by direct proof.  But since

17 a conspiracy is, by its very nature, characterized by secrecy,

18 direct proof may not be available.  You may, therefore, infer

19 the existence of a conspiracy from the circumstances of the

20 case and the conduct of the parties involved.

21        You may also consider the actions and statements of

22 all those you find to be participants as proof that a common

23 design existed to act together for the unlawful purpose stated

24 in the indictment.  It's sufficient for the Government to show

25 that the conspirators somehow came to a mutual understanding

Charge of the Court                    1436

1  to accomplish an unlawful act by means of a joint plan or

2  common scheme.

3         So, that's the first element.

4         The second element the Government must prove beyond

5  a reasonable doubt is that the Defendant knowingly and

6  intentionally became a member in the charged conspiracy.  Now,

7  I already told you about what knowing and intentional means,

8  and you should apply those definitions here.

9         I do want to emphasize that merely because a person

10 is present at a place where criminal conduct is underway does

11 not make that person a member of the conspiracy to commit that

12 crime.  Mere presence alone isn't sufficient.  That's true

13 even if the person knows that a crime is being committed.

14 Mere knowledge or acquiescence in the unlawful plan without

15 participation is also not sufficient.  Nor does the

16 Defendant's mere association with one or more members of the

17 conspiracy automatically make that defendant a member.

18        A person may know or be friendly with a criminal

19 without being a criminal himself.  Similarly, the fact that a

20 person without any knowledge that a crime is being committed

21 merely happens to act in a way that furthers the purposes or

22 objectives of the conspiracy doesn't make that person a member

23 of the conspiracy.  More is required under the law.

24        What's required is proof beyond a reasonable doubt

25 that the Defendant participated in the plan with knowledge of

Charge of the Court                          1437

1    its objective and with the intent to help accomplish that

2    unlawful end.  The key inquiry is simply whether the

3    Defendant, understanding the conspiracy's unlawful character,

4    intentionally assisted in it with the intention of aiding the

5    accomplishment of its unlawful purpose.

6            Now, for some kinds of conspiracy, there is a third

7    element.  Most conspiracies have only the two that I've just

8    given you.  One of the conspiracy charges in this indictment

9    does have that third element.  I'll instruct you on that third

10   element when I get to that particular conspiracy charge.

11           Now, separate and apart from conspiracy, there is

12   what's called "aiding and abetting liability."  In Counts

13   Three, Five, and Six, the indictment charges the Defendant not

14   only with committing the crimes but also with aiding and

15   abetting the commission of the crimes.  When I instruct you on

16   those counts, as I will in a minute, I'll remind you that the

17   Defendant has been charged with aiding and abetting as well,

18   but I'll tell you what aiding and abetting means before we get

19   there.

20           There's two different kinds of aiding and abetting.

21   Let me go through each of them.

22           The Aiding and Abetting Statute in the United States

23   Code says that, quote, "Whoever commits an offense against the

24   United States or aids or abets or counsels, commands, or

25   induces, or procures its commission is punishable as a

1   principal," close quote.  That is, the principal who committed

2   the crime.

3           Under the statute, it's not necessary for the

4   Government to show that a defendant himself physically

5   committed the crime with which he's charged.  A person who

6   aids or abets another to commit an offense is just as guilty

7   of that offense as if he committed it himself.

8           As you can see, the first requirement for aiding and

9   abetting liability is that you find that another person has

10  committed the crime charged.  Obviously, you can't be

11  convicted of aiding and abetting a criminal act of somebody

12  else if the somebody else didn't commit any crime in the first

13  place.  But if you do find that a crime was committed, then

14  you have to consider whether the Defendant, on trial here,

15  aided or abetted the commission of that crime.

16          To aid or abet somebody else to commit a crime, the

17  Defendant has to:  First, willfully and knowingly associate

18  himself in some way with the crime; and, two, participate in

19  the crime by doing some act to help make the crime succeed.

20          In deciding whether the Government has established

21  that the Defendant willfully and knowingly associated himself

22  in some way with the crime, you have to follow my previous

23  instruction when I told you what knowingly and willfully mean.

24          To establish that the Defendant participated in the

25  commission of the crime by doing some act to help make the

1   crime succeed, the Government has to prove that the Defendant

2   engaged in some affirmative conduct or some what we call

3   "overt act" -- that means a positive action -- for the

4   specific purpose of bringing about that crime.  However, the

5   Government doesn't have to prove that the Defendant

6   participated in each and every element of that crime.

7            Again, the mere presence of a defendant where a

8   crime is being committed, even coupled with knowledge by the

9   defendant that a crime is being committed, or merely

10  associating with others who are committing a crime is not

11  sufficient to establish aiding and abetting.

12           Somebody who has no knowledge that a crime is being

13  committed or is about to be committed but inadvertently does

14  something that aids in the commission of that crime is not an

15  aider and abettor.  An aider and abettor has to know that the

16  crime is being committed and act in a way that is intended to

17  bring about the success of that criminal venture.

18           To determine whether a Defendant aided or abetted

19  the commission of the crime with which he's charged, ask

20  yourselves these questions:

21           Did he participate in the crime charged as something

22  he wished to bring about?

23           Did he knowingly associate himself with the criminal

24  venture?

25           Did he seek by his actions to make the criminal

1    venture succeed?

2          If he did, then the Defendant is an aider and

3    abettor and, therefore, guilty of the offense just as if he

4    had done the thing himself.  If, on the other hand, your

5    answer to any one of these questions is no, then the Defendant

6    is not an aider and abettor and you have to find him not

7    guilty.

8          Now, the second type of aiding and abetting is under

9    Section 2(b) of the statute, and it says, quote, "Whoever

10   willfully causes an act to be done, which, if directly

11   performed by him, would be an offense, a crime, against the

12   United States, is punishable as a principal," close quote.

13         So, what does the term "willfully cause" mean?  It

14   doesn't mean that the Defendant himself must have physically

15   committed the crime or supervised or participated in the

16   actual criminal conduct charged in the indictment.  If he did

17   that, he'd be liable as a principal and we wouldn't be worried

18   about aider and abettor liability.

19         Rather, the meaning of the term "willfully cause"

20   can be found in the answers to the following questions:  Did

21   Defendant intend the crime to occur?

22         Did the Defendant intentionally cause another person

23   to commit the crime charged?

24         If you're persuaded beyond a reasonable doubt that

25   the answer to both of these questions is yes, then the

Charge of the Court                1441

1  Defendant is guilty of the crime charged just as if he,

2  himself, had actually committed it.  If, on the other hand,

3  your answer to any of these questions is no, then you must

4  find him not guilty as an aider and abettor.

5           All right.  Now let me go through each one of the

6  counts that's in the indictment, and I'll tell you what they

7  mean.

8           Count One of the indictment charges the Defendant

9  with conspiracy -- so you know it's a conspiracy count -- to

10 unlawfully produce identification documents.  The indictment

11 reads as follows:

12          In or about and between November 2018 and April 18,

13 2019, approximate dates, within the Eastern District of New

14 York and elsewhere, the Defendant Narzikulov, together with

15 others, did knowingly and intentionally attempt and conspire

16 to produce identification documents; that is, commercial

17 driver's licenses and Taxi & Limousine Commission licenses,

18 knowing that such documents were produced without lawful

19 authority, in a manner in and affecting interstate and foreign

20 commerce, and transported in the mail in the course of their

21 production and transfer.

22          Now, this count charges the Defendant with violating

23 two sections of Title 18 of the U.S. Code.  The first, section

24 1028(a)(1) provides that:  Whoever knowingly and without

25 lawful authority produces an identification document shall be

1   guilty of a crime.

2        The second section, 1028(f) provides that:  Any

3   person who attempts to conspire or conspires to commit any

4   offense under this section shall be guilty of a crime.

5        Now, I've already instructed you on conspiracy and

6   what that is, and you should apply those instructions in

7   considering that charge.

8        The object of the conspiracy charged in this count

9   is to unlawfully produce identification documents.  I'm now

10  going to tell you what the elements of that substantive crime

11  are, producing identification documents.

12       To prove a defendant guilty of this offense, the

13  Government has to establish beyond a reasonable doubt:  First,

14  that the document described in the indictment is an

15  identification document; second, that the Defendant knowingly

16  and intentionally produced or knowingly and intentionally

17  attempted to produce or knowingly and intentionally caused the

18  document in question to be produced; third, that the Defendant

19  produced that document knowingly and without lawful authority;

20  and, fourth, that the Defendant's conduct was in or affecting

21  interstate commerce or that the fake identification document

22  was transported in the United States mail.

23       Let me go over those one at a time.

24       First, what's an "identification document"?  The

25  term identification document means a document made or issued

Charge of the Court                        1443

1  by or under the authority of the United States Government or a

2  state or a local government or even a foreign government that,

3  when completed with information concerning a particular

4  individual, is of a type intended or commonly accepted for the

5  purpose of identifying individuals.  A document is of a type

6  intended or commonly accepted for the purpose of

7  identification of individuals if it's regularly used or

8  accepted to identify the bearer as himself or herself.

9          The second element that the Government has to prove

10  beyond a reasonable doubt is that the Defendant knowingly and

11  intentionally produced or knowingly and intentionally

12  attempted to produce or knowingly and intentionally caused the

13  documents in question to be produced.

14          Again, I told you what knowingly and intentionally

15  means.  To produce a document means to make it, manufacture

16  it, issue it, publish it, alter it, authenticate it, or

17  assemble it.  A document may be caused to be produced through

18  a fraud on the agency that produces the documents.

19          The third element that the Government has to prove

20  beyond a reasonable doubt is that the Defendant lacked lawful

21  authority to produce the document and that he did that

22  knowingly.  I've already told you what knowingly means.

23  "Lawful authority" means someone given the authority to

24  manufacture, prepare, or issue identification documents either

25  by some law or by a contract with the Government.

1          To prove this element, then, the Government has to

2     prove that the Defendant was not authorized to produce the

3     document described in the indictment.

4          And then the fourth element of this Count One is

5     affecting interstate commerce.  Again, it has to be proved

6     beyond a reasonable doubt and it has to be proved that the

7     document was produced in or affecting interstate commerce or

8     that it was mailed through the United States mails.

9          "Interstate commerce" simply means the movement of

10    goods, services, money, and individuals between any two or

11    more states or between one state and the District of Columbia.

12    So, walking across the state line from New York to New Jersey,

13    that's interstate commerce.

14          To satisfy this element, the Government must prove

15    that the Defendant's conduct affected interstate commerce in

16    any way, no matter how minimal.  You don't have to find that

17    Defendant's conduct actually affected interstate commerce if

18    you find that the Defendant's conduct would have affected

19    interstate commerce if the Defendant had successfully and

20    fully completed his actions.

21          Also, it's not necessary that each document

22    separately affect interstate commerce as long as you find that

23    the Defendant's conduct in producing the documents actually or

24    potentially affected interstate commerce in some way.

25          Finally, the Government isn't required to prove that

1    the Defendant knew he was affecting interstate commerce.

2           "Transported in the United States mail" means that

3    the identification document was dropped in the mail for

4    delivery by the Postal Service.  The Government doesn't have

5    to prove that the Defendant knew that the identification

6    document in question were or would have been transported to

7    the United States.

8           Now, Counts Two and Three, let me do those two

9    together, Two and Three.

10          Count Two charges the Defendant with conspiracy to

11   commit kidnapping and Count Three charges the Defendant with

12   what I've told you is called the substantive crime of

13   kidnapping.  Just because the elements follow in a better

14   logical order, I'm going to tell you about Count Three first

15   and then I'll circle back to Count Two.

16          Count Three says that on or about March 28, 2019,

17   within the Eastern District of New York, the Defendant

18   Narzikulov, together with others, did knowingly, intentionally

19   an unlawfully seize, confine, inveigle, decoy, kidnap, abduct,

20   and carry away and hold for ransom and reward and otherwise a

21   person; to wit, Firdavs Giyasov, and use one or more means,

22   facilities, and instrumentalities of interstate and foreign

23   commerce; that is, cell phones and a bank transaction, in

24   committing and in furtherance of the commission of the

25   offense.

Charge of the Court                    1446

1       This count charges the Defendant with the violating
2   Section 1201(a)(1) of the United States Criminal Code.  That
3   section says that:  Whoever unlawfully seizes, confines,
4   inveigles, decoys, kidnaps, abducts, or carries away and holds
5   for ransom or reward or otherwise any person, except in the
6   case of a minor by a parent, when the person is willfully
7   transported in the interstate or foreign commerce, regardless
8   of whether the person was alive at the time, or the offender
9   travels in interstate or foreign commerce or uses the mail or
10  any means, facility, or instrumentality of interstate or
11  foreign commerce in committing or in furtherance of the
12  commission of the offense.
13          In order to prove the Defendant guilty of the crime
14  of kidnapping, the Government has to prove each of the
15  following elements beyond a reasonable doubt.  For
16  convenience, I'm going to refer Firdavs Giyasov as simply
17  "Giyasov."
18          First, that the Defendant seized, confined,
19  inveigled, decoyed, kidnapped, abducted, or carried away
20  Giyasov; second, that the Defendant held Giyasov for ransom
21  reward or any other reason; third, that Giyasov was
22  transported in interstate or foreign commerce, that the
23  Defendant traveled in interstate or foreign commerce, or that
24  the Defendant used the mail or any means, facility, or
25  instrumentality of interstate or foreign commerce in

1    committing or in furtherance of the commission of the offense;

2    and, fourth, that the Defendant acted unlawfully, knowingly,

3    and willfully.  Let me go over those one at a time.

4          First, the Government has to prove beyond a

5    reasonable doubt that the Defendant seized, confined,

6    inveigled, decoyed, kidnapped, abducted, or carried away

7    Giyasov.

8          "Kidnapped" means to take and carry away a person by

9    force or against his will.  "Seize, confine", "abduct," and

10   "carry away" all mean the physical or bodily taking and

11   carrying away of a person or the holding or restriction of

12   someone by force without that person's consent.

13         The second element that the Government has to prove

14   beyond a reasonable doubt is that the Defendant held Giyasov

15   for ransom, reward, or some other reason.  It's sufficient for

16   the Government to prove that the reason that the Defendant

17   held Giyasov was for monetary reward or financial gain;

18   however, the Government doesn't have to prove that's the

19   reason for monetary reward or financial gain if the Government

20   proves that it was for some other purpose that the Defendant

21   consider sufficient to benefit him.

22         The third element that the Government has to prove

23   beyond a reasonable doubt is that Giyasov was transported in

24   interstate or foreign commerce or that the Defendant used the

25   mail in committing or in furtherance of the commission of the

1    offense.  Again, "interstate commerce" simply means traveling

2    across a state line.

3             In order to satisfy this element, the Government

4    need not show that the Defendant actually did the transporting

5    of Giyasov, nor need the Government show that the Defendant

6    knowingly crossed state lines while transporting Giyasov.

7    It's sufficient to satisfy this element if the Government

8    proves that Giyasov was transported or was moved from one

9    state to another and that the Defendant caused the interstate

10   transportation to occur.

11            The Government may satisfy this element by proving

12   beyond a reasonable doubt that the Defendant used the

13   United States mail or any means, facility, or instrumentality

14   of interstate or foreign commerce in committing or in

15   furtherance of this offense.

16

17            (Continued on the following page.)

18

19

20

21

22

23

24

25

1          THE COURT:  The term means facility, or

2   instrumentality of interstate or foreign commerce includes the

3   use of a telephone or the internet in furtherance of the

4   commission of the offense.

5          And then the fourth element of this kidnapping

6   charge is that the Government must prove beyond a reasonable

7   doubt that the defendant acted unlawfully, knowingly, and

8   willfully.  Unlawfully simply means contrary to the law.  I've

9   already told you what knowingly and willfully mean.

10         In order to satisfy this element, the Government has

11  to show that the defendant knew that Giyasov was not

12  accompanying him voluntarily but rather was forced, cored or

13  tricked into coming along.

14         Now, the defendant is also charged with aiding and

15  abetting in this Count Three.  The instruction that is I gave

16  on aiding and abetting therefore apply to this count.

17         Now, Count Two, circling back is conspiracy to

18  commit kidnapping.  I just told you what kidnapping is in

19  Count Three of the substantive count.  Now, I want to tell you

20  about conspiracy to commit kidnapping.

21         In Count Two, the indictment reads:  On or about

22  March 28, 2019, within the Eastern District of New York the

23  defendant Narzikulov, together with others, did knowingly,

24  intentionally, and unlawfully conspire to seize, confine,

25  inveigle, decoy, kidnapping, abducted, and carry away and hold

1  for ransom and reward and otherwise an attorney to wit:

2  Giyasov and to use one or more means, facilities, and

3  instrumentalities of interstate and foreign commerce to wit:

4  Cell phones and a bank transaction in committing and in

5  furtherance of the crime.

6          Give me just a second, please.

7          This count charges the defendant with violating

8  §1201(c) of Title 18 of the U.S. Criminal Code.  That sections

9  provides if two or more people conspire to violate this

10  section and one or more of such persons to my overt acts to

11  affect the object of the conspiracy, each shall be guilty of a

12  crime.

13          Kidnapping is a violation of this section as I've

14  already instructed you on Count Three before I circled back to

15  this Count Two.

16          This is the conspiracy charge that has three

17  elements to it rather than the usual two elements to a

18  conspiracy charge.  To prove the defendant guilty of

19  conspiracy to commit kidnapping, the Government has to prove

20  each of following elements beyond a reasonable doubt.

21          The first two are from the general crime of

22  conspiracy, that is, first that two or more persons entered

23  into the particular unlawful agreement charged in the count.

24          And second, that the defendant knowingly and

25  willfully became a member of the conspiracy.

1          And then the third element for this conspiracy is

2     that one or more members of the conspiracy did any overt act

3     to affect the object of the conspiracy.

4          Now, when I first talked to you about conspiracy.  I

5     told you the law for the first two elements here and you

6     should follow those instructions in this count when you

7     consider those two elements.

8          The object of this conspiracy is kidnapping.

9          Now, this count also has a third element that one or

10    more of the members of the conspiracy had to do some overt act

11    to affect the object of a conspiracy.  Let me tell you what an

12    overt act means.  It is any action intended to help achieve

13    the goals of the conspiracy.  The indictment alleges that the

14    following overt acts were committed in the Eastern District of

15    New York.

16         There's A through F.

17         First, on or about March 28, 2019, the defendant

18    Sukhrob Kamolov forcibly removed Giyasov from an apartment.

19    Then, on or about March 28, 2019, Sukhrob used a device to

20    apply one or more electric shocks to Giyasov in the presence

21    of the defendant.

22         On or about March 28, 2019, the defendant and

23    Sukhrob forcibly dragged Giyasov to a vehicle where Sherzod

24    Mukumov was waiting.

25         On or about March 28, 2019, the defendant and

1   Sukhrob drove Giyasov to a Bank of America branch located in

2   Brooklyn.

3            On or about March 28, 2019, the defendant and

4   Sukhrob drove Giyasov to a Pay-O-Matic check-cashing store

5   located in Brooklyn.

6            And on or about March 28th, the defendant took

7   possession of a Bank of America debit card and other

8   identification documents in the name of Giyasov.

9            Now, the Government isn't required to prove all of

10  those acts, or that any particular overt act was committed at

11  precisely the time alleged in the indictment.  Nor must you

12  find that the defendant personally committed any of these

13  overt acts.

14           Rather, the Government has to prove that at least

15  one overt act was knowingly and willfully committed by at

16  least one co-conspirator in furtherance of some object or

17  purpose of the conspiracy.

18           The act itself need not be, although it can be, but

19  it need not be criminal in nature if considered separately and

20  apart from the conspiracy.  However, it has to be an act that

21  further or lends to the accomplishment of plan or scheme.

22           Finally, you have to find either that the agreement

23  was formed or that one of these overt acts was committed in

24  this judicial district where we all are for this trial, the

25  Eastern District of New York.

1          The Eastern District of New York means Brooklyn,

2     Queens, Staten Island, and all of Long Island, Nassau and

3     Suffolk County.

4          Next, we have Count Five.

5          Again, I'm going to take Counts Four and Five

6     together, but I'm going to tell you Count Five first because

7     that's the substantive count and it's a little easier to

8     present that way.

9          Count Four is the conspiracy count.  Count Five is

10    an extortion count.

11         Count Five says as follows:

12         On or about and between March 28, 2019, and

13    April 18, 2019, approximate dates, within the Eastern District

14    and elsewhere, Narzikulov together with others, did knowingly

15    and intentionally delay and affect commerce and the movement

16    of articles and commodities in commerce by extortion.  And

17    that the defendant obtained property, that is, a check in

18    U.S. currency from Giyasov with his consent which consent was

19    induced through wrongful use of actual and threatened force,

20    violence, and fear.

21         This count charges the defendant with violating

22    Section 1951 of the Criminal Code.  This is what we call this

23    provision of the law is called "The Hobbs Act."  The section

24    provides in relevant part that whoever in any way or degree

25    obstruct, delays, or affects commerce or the movement of an

1  article or commodity in commerce by extortion, commits a
2  crime.
3          What does extortion mean?  Extortion is the
4  obtaining of another person's property or money with his
5  consent but when their consent is induced or brought upon
6  through the use or threatened use of force, violence, or fear.
7          In order to meet its burden of proving that the
8  defendant committed extortion, the Government has to establish
9  beyond a reasonable doubt each of the following elements.
10          First, that the defendant wrongfully obtained the
11  property of another.
12          Second that the defendant obtained this property
13  with the victim's consent, but that his consent was compelled
14  by the wrongful use or threat of force, violence, fear of
15  physical injury or fear of economic harm whether immediate or
16  to occur in the future.
17          Third, that the defendant acted knowingly and
18  intentionally.
19          And fourth, that as a result of the defendant's
20  actions, interstate commerce, or an item moving in interstate
21  commerce was delayed, obstructed, or affected in any way or
22  degree.
23          So let me go through each of those four elements.
24          First, personal property.  That is the defendant
25  wrongfully obtained or took personal property of another or

1    from the presence of another.

2         Property includes money and other tangible and

3    intangible things of value that are capable of being given

4    from one person to another.  It doesn't matter if the victim's

5    initial acquisition of the property was illegal, or if the

6    business in which the victim was engaged in illegal.  This is

7    focused on the movement of the property itself.

8         The second element is the obtaining of property

9    through the wrongful use of force, violence, or fear.

10        Again, this is where property is used with the

11   victim's consent or obtained with the victim's consent, but

12   that consent is improperly gained by using threat of force,

13   violence, fear of physical injury or fear of economic harm now

14   or in the future.

15        This element is satisfied in any one of those

16   methods is used.

17        In considering whether the defendant used or

18   threatened to use force, violence, or fear you should give

19   those words their common and ordinary meaning and understand

20   them as you normally would.  There's no special legal

21   definition to those terms.

22        The use or threat of violence does not have to be

23   directed at the person whose property was taken.  The use or

24   threat of force or violence might be aimed ate third person or

25   causing economic rather than physical injury.  A threat can be

Jury Charge                      1456

1  made verbally or by a physical gesture.

2          Whether a statement or a physical gesture by the

3  defendant actually was a threat depends on the surrounding

4  facts.

5          Now, I just used the term "fear."  The wrongful use

6  of fear includes creating or instilling in the victim fear of

7  physical injury or fear of economic harm.  Fear exists if the

8  victim experienced anxiety, concern, or worry over some

9  expected physical and economic harm that's reasonable under

10  the circumstances.

11          Fear of economic harm to the victim is only wrongful

12  when it's used to obtain property to which the defendant has

13  no lawful right to obtain.  The existence of fear has to be

14  determined by the facts as they existed at the time of the

15  defendant's conduct.

16          Any fear created or exploited in the course of an

17  extortion has to be a reasonable fear.  The fear of economic

18  loss also has to be a reasonable fear.  Reasonable fear means

19  that a reasonable person in the defendant's position would

20  experience similar fear.

21          The essence of crime of extortion is the defendant's

22  knowing and willful attempt to use fear wrongfully.  What the

23  laugh prohibits is knowingly and willfully attempting to

24  create or instill fear wrongfully or knowingly and willfully

25  attempting to use or exploit existing fear wrongfully when

1   that's done with a specific purpose of inducing somebody to

2   part with their property.

3          A defendant need only attempt to wrongfully exploit

4   fear to be guilty of extortion.  He need not attempt nor

5   create it.  However, although the victim's fear of harm or

6   loss need not be instilled by the defendant, there still has

7   to be proof that the defendant away of the victim's fear did

8   or said something in an attempt to wrongfully exploit that

9   fear.

10         In making your decision whether the defendant used

11  or threatens force violence fear or fear of economic harm

12  whether now in the future.  You have to make a decision about

13  the victim state of mind at the time of the defendant's

14  actions.  It's impossible to look into another person's mind

15  to determine what its state was, right?  We can't see through

16  people's heads and see what the wheels are turning around and

17  doing.

18         After careful consideration of all of the evidence,

19  all the surrounding facts and circumstances may enable you to

20  decide whether fear would reasonably have been the alleged

21  victim state of mind.  Looking at the situation, the actions

22  of the people involved including the alleged victim may help

23  you decide what his state of mind was.

24         In other words, you must consider -- you may

25  consider circumstantial evidence in deciding whether the

1  defendant used or threatened physical force, violence, or fear

2  to obtain property.

3        You may have also consider the relationship between

4  the defendant and the victim in deciding whether fear exists.

5  Fear may be present even if confrontations between the victim

6  and the alleged extorter appear friendly.

7        The third element that the Government has to prove

8  beyond a reasonable doubt is that the defendant acted

9  knowingly and intentionally.  Again, I've already told you

10  what that means and you should apply those instructions here.

11        The fourth element that the Government has to prove

12  beyond a reasonable doubt is that interstate commerce or an

13  item moving in it was delayed, obstructed, or affected in some

14  way by the defendant's actions.  Again, I've told what you

15  interstate commerce means, you should apply that definition

16  here.

17        If you decide that the defendant sought to obtain

18  another's property without his consent by the use or threat of

19  force, violence, or fear, then you have to decide whether this

20  act would affect interstate commerce in any way or degree.

21  You have to determine whether there is an actual or potential

22  effect on interstate commerce between any two or more states.

23        If you decide that there was any affect at all on

24  interstate commerce that's enough to satisfy this element.

25        The affect on interstate commerce can be minimal.

1    Doesn't need to be a direct affect and it doesn't need to be

2    immediate.  I instruct you that under the law, depleting

3    assets from a person that would have been used to buy items

4    that moved or traveled in interstate or foreign commerce

5    that's a should have affect on interstate commerce to satisfy

6    this element.

7            Furthermore, the defendant need not have intended or

8    anticipated an affect on interstate or foreign commerce.  The

9    commerce affected need not have been lawful.  Activities

10   affecting unlawful interstate commerce fall within the purview

11   of the statute.

12           If you decide that interstate commerce would

13   potentially or probably be affected if the defendant had

14   successfully and fully completed his actions, then the element

15   is satisfied.  I do not have to find that interstate commerce

16   was actually affected.  However, if the defendant has finished

17   his actions and done all he intended to do, and you determine

18   that there has been no affect on interstate commerce, then you

19   can't find him guilty of the you don't need to decide whether

20   the affect on interstate commerce was harmful or beneficial to

21   a particular business or commerce in general.

22           Okay.  This crime also has an aiding and abetting

23   charge as part of it.  The instructions I give you on aiding

24   and abetting also applies to this count, that is, Count Five.

25           Count Four of the indictment charge the defendant

1   with conspiring to commit extortion this is the conspiracy

2   count for substantive extortion count.

3            Count Four reads, on or about March 28, 2019, and

4   April 18, 2019, approximate dates, within the Eastern District

5   of New York, Narzikulov, together with others did knowingly

6   and intentionally conspire to obstruct, delay, and affect

7   commerce and the movement of articles and commodities in

8   commerce by extortion in that the defendant and other agreed

9   to obtain property that is a check and U.S. currency from

10  Giyasov with his consent, which consent was to be induced

11  through wrongful use of actually is and threatened force,

12  violence, and fear.

13           I've already instructed you on conspiracy and you

14  should apply those instructions in considering this charge.

15  For this count, the object of the charged conspiracy was to

16  commit the crime of extortion.  I've also instructed you on

17  the elements of extortion and the count I just and so you

18  should apply those instructions here as well.

19           Then we go to Count Six.

20           Count Six charges the defendant with committing or

21  threatening physical violence against Kamolov in furtherance

22  of a plan to obstruct, delay, or affect commerce by extortion.

23  It says that on March 28, 2019, within the Eastern District,

24  Narzikulov, together with others did knowingly and

25  intentionally threaten physical violence to Kamolov in

1  furtherance of a plan and purpose to obstruct, delay, and

2  affect commerce and the movement of articles and commodities

3  in commerce by extortion, that is, a plan and purpose to

4  obtain U.S. currency from Giyasov with his consent, which

5  consent was induced through wrongful use of actual and

6  threatened force, violence, and fear.

7          This count charges the defendants with violating

8  Section 1951 of the Criminal Code.  That section states that

9  whoever in any way obstructs, delays, or affects commerce or

10 the movement of an article or commodity in commerce by

11 extortion or attempts or conspires to do so, or commits or

12 threatens physical violence to any person or property in

13 furtherance of a plan to do anything in violation of this

14 section will be deemed to have committed a crime.

15         To prove the defendant guilty of this crime, the

16 Government has to prove each of the following elements beyond

17 a reasonable doubt.

18         First, that the defendant committed or threatened

19 physical violence.

20         Second, that the committed or threatened physical

21 violence, furthered a plan or purpose to engage in extortion.

22         And third, that the extortionate plan, if

23 successful, would have in some way or degree delayed,

24 obstructed, or affected interstate or foreign commerce.

25         Let me go over those one at time, although I think

1   for port you would have these kinds of ideas before.

2          The first element that the Government must prove

3   beyond a reasonable doubt is that the defendant committed or

4   threatened physical violence.

5          Again, physical violence isn't a term of art, it's

6   what its ordinary meaning has and you should interpret those

7   words the way you usually would.

8          The second element that the Government has to prove

9   beyond a reasonable doubt is that the committed or threatened

10  physical violence furthered a plan to engage in extortion.

11  I've already told you about what extortion is and you should

12  follow that instruction here.

13         I remind, however, that Count Six does not allege

14  that extortion was actually committed and the Government

15  doesn't need to prove that the extortion was successful.

16  Rather, Count Six charges the defendant with committing or

17  threatening physical violence against Kamolov in furtherance

18  of a plan to extortion U.S. currency from Giyasov.

19         And then element three is the interstate commerce

20  component which I again have already instructed you on.

21         I don't think I need to go through that again.  Do

22  either of the lawyers think I need to?

23         MR. GUADAGNINO:  No, your Honor.

24         MS. NGUYEN:  No, your Honor.

25         THE COURT:  Okay.

Jury Charge                                    1463

1          Okay.  This count also has an aiding and abetting

2    theory lined to.  This Count Six so the aiding and abetting

3    theory applies to this count.

4          And then Count Seven is using, carrying, and

5    possessing a firearm to commit a crime of violence.  Count

6    Seven charges as follows.

7          On or about March 28, 2019, went Eastern District of

8    New York, Narzikulov together with others did knowingly and

9    intentionally use and carry one or more firearms during and in

10   relation to a crime of violence, that is, the crime charged in

11   Count Six.

12         And it knowingly and intentionally possessed those

13   firearms in furtherance of said crime of violence one or more

14   of which firearms were brandished and I'll explain all that to

15   you.

16         That comes from Section 924(c) of the Criminal Code

17   and that section provides that any person who during, and in

18   relation to, any crime of violence for which the person may be

19   prosecuted in a court of the United States uses or carries a

20   firearm, or who in furtherance of any such crime possessed a

21   firearm shall be guilty of this crime.

22         To prove the defendant guilty of this crime, the

23   Government must prove each of following elements beyond a

24   reasonable doubt.

25         First, that the defendant committed a crime of

1   violence for which he might be prosecuted in a court of the

2   United States.

3           Second, that the defendant knowingly and

4   intentionally used or carried a firearm during, and in

5   relation to, the commission of or knowingly and intentionally

6   possessed a firearm in furtherance of the crime of violence

7   for which he might be prosecuted in any United States court.

8           Now, I'll address each of those elements

9   individually.  It.

10          The first element that the Government has to prove

11  beyond a reasonable doubt is that the defendant committed a

12  crime of violence for which he might be prosecuted in a court

13  of the United States.

14          The defendant is charged in Count Six of the

15  indictment with committing the crime of threatening physical

16  violence in furtherance of a plan to obstructed, declaration

17  or affect interstate commerce by the use of extortion.

18          I instruct you that this is a crime of violence.

19  However, it's for you to determine that the Government has

20  proven beyond a reasonable doubt that the defendant committed

21  the crime charged in Count Six.  If, upon all of the evidence,

22  you find that the Government has failed to prove Count Six

23  beyond a reasonable doubt, then you will proceed no further.

24          In other words, if you don't find the defendant

25  guilty on Count Six, if you acquit him on that count, then you

Jury Charge                                    1465

1   also have to acquit him on Count Seven.  Count Seven is

2   dependent on Count Six.

3          If, on the other hand, you find that the Government

4   has proven Count Six beyond a reasonable doubt then the

5   Government has also proven this first element of Count Seven.

6          The second element that the Government has to prove

7   beyond a reasonable doubt is that the defendant used or

8   knowingly carried a firearm during, and in relation to, or

9   knowingly possessed a firearm in furtherance of the commission

10  of the crime charged in Count Six.

11         A firearm is any weapon that will or is designed to

12  or may be readily converted to expel a projectile by the

13  action of an explosive.

14         To satisfy that element, you must find that the

15  defendant carried, used or possessed the firearm knowingly and

16  intentionally.  I've already instructed you on the terms

17  knowingly and intentionally and you have to follow those

18  instructions are.

19         In this context, it means that the defendant carried

20  the firearm purposefully and voluntarily, not by accident or

21  mistake.  It also means that the defendant knew the weapon was

22  a firearm.  However, the Government is not required to prove

23  that the defendant knew he was breaking the law.  The terms

24  "used," "carried," and "possessed" are differently defined in

25  the law.

1       The Government has to prove that the defendant did

2   at least one of these actions but doesn't have to prove that

3   he did all three.

4       To prove that the defendant used the firearm, the

5   Government must prove an active employment of the firearm by

6   the defendant during and in relation to the commission of the

7   crime in Count Six.  That doesn't mean that the defendant must

8   actually fire or attempt to fire the weapon, although those

9   would obviously constitute use of the weapon, brandishing

10  displaying, or even referring to the weapon so that others

11  present knew that the defendant had the firearm available if

12  needed, those are all use of the firearm the way it's defined

13  in the statute.

14      However, merely possessing or storing a firearm at

15  or near the site of the crime out active employment of it as I

16  just described it to you is not sufficient to constitute use

17  of the firearm.

18      To prove that the defendant carried the firearm, the

19  Government has to prove that the defendant had the weapon

20  within his control in such a way that it furthered the

21  commission of the crime or was an integrate part of the

22  commission of the crime.  The defendant did not necessarily

23  have to hold the firearm physically, that is, have actual

24  possession of it on his person.  If you find that the

25  defendant had dominion and control over the place where the

1   firearm was located, and had the power and intention to

2   exercise control over the firearm in such a way, that is,

3   furthered the commission of the crime of violence you may find

4   that the Government has proven that the defendant carried the

5   weapon.

6            If you find that the defendant used or carried the

7   weapon, you must also then consider whether the firearm was

8   used or carried during, and in relation to, the commission of

9   the crime of violence.  It prove that the firearm was used or

10  carried during, and in relation to, the commission of the

11  crime of violence, the Government has to prove that the

12  firearm was an integral part of the commission of the crime,

13  and that it furthered or facilitated the crime.

14           It's not sufficient if the carrying was inadvertent,

15  coincidental or for some purpose other than furthering or

16  facilitating the crime.

17           Finally, to prove the defendant possessed the

18  firearm in furtherance of the crime, the Government has to

19  prove that the defendant had possession of the firearm and

20  that such possession was in furtherance of the crime.

21           Possession means that the defendant either had

22  physical possession of the firearm on his person, or that he

23  had physical control and dominion over the place where the

24  firearm was located and that he had the power and intention to

25  exercise control over the firearm.

1         To possess a firearm in furtherance of crime means

2    that the firearm helped forward, advance, or promote

3    commission of the crime.  The mere possession of the firearm

4    at the scene of the crime is not sufficient.  The firearm must

5    have played some part in furthering the crime in order for

6    this element to be satisfied.

7         Now, if you find that the Government has proven that

8    the defendant committed the crime charged in this count, or

9    that he had aided and abetted the crime charged in this count,

10   then you will be further asked to determine whether the

11   firearm in question was brandished during the commission of

12   the underlying crime of violence.

13        The term "brandished" means to display all or part

14   of the firearm or otherwise make the presence of the firearm

15   known to the person in order to intimidate that person

16   regardless of whether the firearm is directly visible to that

17   person.

18        And then finally, we have Count Eight, conspiracy to

19   tamper with witnesses.  The indictment says that between April

20   2019 through December 2019, approximate dates, Narzikulov,

21   together with others, did knowingly and intentionally conspire

22   to use intimidation, threaten and corruptly persuade one or

23   more persons with intent to influence, delay, and prevent the

24   testimony of one or more persons in an official proceeding are

25   that is a criminal trial against Narzikulov contrary to the

1  U.S. Code.  That he used and induced one or more persons to

2  withhold testimony from an official proceeding, also a

3  criminal trial against him, and that he use caused and induce

4  one or more persons to evade legal process summoning such

5  persons to appear as witnesses and to produce one or more

6  records, documents, and other things in an official

7  proceeding, again, with relation to his trial.

8         The relevant statute on this subject is

9  Section 1512(b) of the Criminal Code and that says, whoever

10  knowingly uses intimidation, threats, or corruptly persuades

11  another person or attempt to do so, or engages in misleading

12  conduct toward another person in an attempt to influence,

13  delay, or prevent the testimony of any person in an official

14  proceeding, or cause or induce any person to withhold

15  testimony, or withhold a record, document, or other object

16  from an official proceeding; or evade legal process summoning

17  that person to appear as a witness or produce a record,

18  document, or other object in an official proceeding shall be

19  guilty of a crime.

20         Now, I've already told you about the law that

21  applies to conspiracies, and you should apply those

22  instructions here.  For this count, the object of the

23  conspiracy was to tamper with witnesses.  I'll tell you about

24  each element of that.

25         The Government first has to prove beyond a

1   reasonable doubt, and on the date charged, the defendant

2   knowingly used intimidation, threatened, or corruptly

3   persuaded one or more persons.  And, second, that the

4   defendant acted knowingly and with the intent to influence,

5   delay, or prevent the testimony of one or more persons in an

6   official proceeding or to cause one or more persons to

7   withhold testimony in an official proceeding or evade legal

8   process summoning that person to appear in a proceeding, or to

9   produce a second document or other object in an official

10  proceeding.

11          Let me explain those in more detail.

12          The first element that the Government has to prove

13  beyond a reasonable doubt is that the defendant knowingly used

14  intimidation threatened or corruptly persuaded one or more

15  persons.  Intimidation includes frightening somebody,

16  inspiring or affecting that person by fear, or deterring him

17  by threats.  It doesn't matter whether or not the person

18  alleged to be the object of the threat is actually frightened

19  or thinks he is in physical danger.  It's enough that the

20  threat had a reasonable tendency to make the person fearful.

21  A threat is simply expression of an intention to do harm.  A

22  threat maybe communicated by words as well as gestures.

23          To find that the defendant used threats, you need

24  not find that he intended to carry out the threat.  The real

25  issue is whether the words allegedly used were, in fact,

Jury Charge                                                      1471

1    uttered by him and expressed an intention to harm.

2               To corruptly persuade means to act knowingly with a

3    wrong or evil purpose to convince or induce another person to

4    engage in certain conduct.

5               Then the second element that the Government has to

6    prove beyond a reasonable doubt is that the defendant acted

7    knowingly and with the intent to influence, delay, or prevent

8    the testimony of one or more persons in an official

9    proceeding, or to cause or induce one or more persons to

10   withhold testimony in that proceeding or evade legal process

11   summoning that person to appear as a witness or to produce a

12   record, document, or other object in an official proceeding.

13              To act with the intent to influence the testimony of

14   a witness means to act for the purpose of getting that witness

15   to change or color or shade the witness's testimony in some

16   way.  It's not necessary for the Government to prove that the

17   witness testimony was, in fact, changed in any way.  An

18   official proceeding means a proceeding before a court, judge,

19   or federal agency.  The proceeding may be civil or criminal.

20   I'm instructing you that the criminal trial against the

21   defendant here is an official federal proceeding.

22              And that completes the substantive charge.

23              So those are the counts in the indictment, ladies

24   and gentlemen, I have just a couple of words for you and then

25   I'm going to send you in for deliberations.

Jury Charge                                              1472

1          Nobody on the jury during your deliberations should

2    attempt to communicate with me or with any court personnel by

3    any means other than a writing signed by your foreperson.

4    Therefore, the first thing you have to do when you retire is

5    pick a foreperson.  I will tell you don't spend a lot of time

6    doing it.  There's no more money attached to the job.  It's

7    just you serve as a conduit for communications with the

8    Government Court.  The foreperson will sign all notes to the

9    Court and hand them to the marshal who will be standing

10   outside your door for me to read.  Once I have your note, I'll

11   bring you back in the courtroom so that we can speak in person

12   or if there is some exhibit you want to see, I might send it

13   into the jury room.

14         If you send out any notes, under no circumstances

15   should you tell me or anybody else how you stand numerically

16   on the issue of the defendant's guilt even in open court if I

17   bring you back here until a unanimous verdict has been

18   reached.  Don't give us any splits until you reach a unanimous

19   verdict.

20         Now, most of the exhibits, maybe even all of the

21   exhibits, we're going to send back to you in the jury room.

22   But if you're missing something that you want to see, then

23   send out a note requesting that.

24         In addition, we can have portions of the trial

25   testimony read back to you or tape recordings or video

1   recordings played again for you.  However, it can take us more

2   than a few minutes to find the part that you are looking for,

3   so be as specific as you can be when you refer or request some

4   testimony or exhibits.  Tell us exactly what it is you want

5   from what witness, what their name was what it's about and

6   that will help us find it faster and get it to you.

7            The purpose of jury deliberations to discuss and

8   consider the evidence, to listen to the arguments of your

9   fellow jurors, to present your individual views, to consult

10  with one another, and to reach an agreement based on the

11  evidence presented if you can do so without violence to your

12  own individual judgment.  You shouldn't hesitate to change

13  your opinion if, after discussion with your fellow jurors,

14  your opinion seems wrong.

15           If, however, after you have carefully considered all

16  the evidence and the arguments of your fellow jurors, you

17  entertain a conscientious view that differs from the others,

18  you are not to yield your conviction simply because you are

19  outnumbered.  Your final vote must reflect your conscientious

20  judgment as to how the issue should be decided.  Your job is

21  to reach a fair conclusion from the law and the evidence.

22           Each of you has to decide the case for yourself

23  after you considered the evidence with your fellow jurors.  If

24  the Government succeeds in meeting its burden of proof beyond

25  a reasonable doubt, your verdict should be guilty.  If the

1   Government fails to meet its burden, your verdict should be

2   not guilty.

3              Either way, your verdict as to each count has to be

4   unanimous.  All of you must reach the same conclusion as to

5   each count.

6              Now, the way it's going to work, when you've reached

7   a unanimous verdict, your foreperson will go ahead and sign a

8   note saying, "We have reached a unanimous verdict."  That note

9   will be handed to the marshal outside your door.  The marshal

10  will bring it in to me.  There is also a verdict form which

11  you will have.  That should not given to the marshal.  The

12  verdict form is quite simple.  It goes through each count:

13  Count One, Count Two, Count Three all the way up to

14  Count Eight and it asks you as to each count it has the name

15  of the count under it just so you can tie it into the

16  instructions and it says, "How do you find the defendant, not

17  guilty or guilty?"  and you just put a check mark where your

18  foreperson does.  The only exception to that is as I mentioned

19  to you during the instructions on Count Seven if you find the

20  defendant guilty on Count Seven, that's the using and

21  possessing of a firearm, then it says there's a question that

22  you need to answer if you find him guilty and that is if he

23  brandished the firearm, no or yes, and you will check

24  whichever one of those you happen to find.  But that's the

25  only question you get asked aside from not guilty or guilty on

1    each count of the indictment.

2         So what'll happen, once I've gotten your note saying

3    you reached a unanimous verdict, and the marshal brings it to

4    me, your foreperson will be carrying the signed verdict form.

5    I will confirm with you that you have reached a unanimous

6    verdict and then I'll take the verdict form from the

7    foreperson, look it over, and then I will do what we call

8    "publishing the verdict."

9         Remember that the parties and I are relying on you

10   to give full and conscientious deliberation and consideration

11   to the issues and evidence before you.  Your oath sums up your

12   duty and it is this:  Without fear or favor, you will truly

13   try the issues between these parties according to the evidence

14   given to you here in court and under the laws of the

15   United States.

16        All right.  Let me have the Court officer brought

17   forward.

18        After we swear the Court officer, ladies and

19   gentlemen, I'm going to have you retire to start your

20   deliberations.  But I'd like Mr. Coffey, Ms. Mosery, and

21   Mr. Casane, if I'm pronouncing it right, to stay here for a

22   minute.

23        Please administer the oath.

24        COURTROOM DEPUTY:  Please raise your right hand.

25        (Deputy U.S. Marshal sworn by the courtroom deputy.)

Jury Charge                                1476

1          COURT SECURITY OFFICER:  I do.

2          THE COURT:  Before you take them, hang on one

3    minute.

4          Let me see the attorneys at sidebar for just a

5    second.

6          (Continued on the next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Sidebar                                      1477

1           (Sidebar conference held on the record in the

2     presence of the Court and counsel, out of the hearing of the

3     jury.)

4           THE COURT:  This is not a redo of the charge

5     conference, but if there is anything I did that I was

6     inconsistent with the charge now is the time for me to correct

7     it.

8           Is there anything like that?

9           MS. NGUYEN:  No, Judge.

10           MR. GUADAGNINO:  No, Judge.

11           THE COURT:  Thank you of the.

12           (Sidebar discussion concludes.)

13           (Continued on the next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy                                    1478

1          (In open court.)

2          THE COURT:  All right.  The Court officer may take

3    the jury to the place of deliberation.  Thank you.

4          COURT SECURITY OFFICER:  Thank you, your Honor.

5          (Jury exits courtroom at 4:42 p.m.)

6          THE COURT:  Everyone be seated.  Mr. Coffey

7    Ms. Mosery and Mr. Casane, you know, I don't want to you feel

8    bad that you've put in this whole trial and you're alternate

9    jurors.  First of all, it is not at all the clear that you

10   will not be called on in trials.  I've done, I would say,

11   about half the time we do need an alternate or two or three

12   once deliberations start.  And I also want you to know we very

13   much appreciate you being here because we couldn't do the

14   trial without the security of knowing that you're here to back

15   up the jury if that becomes necessary.  As I said, it often

16   does.

17          I think what I'm inclined to do but I'll hear the

18   parties at sidebar if you have a different view is I'm

19   inclined to let you go now home with the same admonitions that

20   we've had through out, that is, you can't talk about the case

21   to anyone or anybody, and you can't look at any media and you

22   can't do my research, nothing like that.  But I would like you

23   back here at 9:30 tomorrow morning we will take you to a

24   different place.  Ms. Clarke will show you where that is and

25   bring a book and we'll have you here as long as necessary to

Colloquy                                    1479

1   see if we need you because there's a, like I say, certainly,

2   reasonable chance that we will need one or more of you, all

3   right.

4            All right with the parties?

5            MR. GUADAGNINO:  Fine, your Honor.

6            MS. NGUYEN:  Yes, your Honor.

7            THE COURT:  All right.  Again, thank you for your

8   efforts and have a very good night.

9            (Alternate jurors retire from the courtroom at

10  4:44 p.m.)

11           Okay.  We are in recess until we hear from the jury.

12  My general practice is I let them go as late as they want to

13  go.  I imagine some time between 5:30 and 6:30.  We'll here

14  that they want to come back tomorrow.  Whenever they want to

15  go, we'll let them.

16           Thank you all for your efforts.

17           MS. NGUYEN:  Thank you.

18           MR. GUADAGNINO:  Thank you.

19           THE COURT:  Stand by.

20           (A recess in the proceedings was taken.)

21           (In open court; 4:57 p.m.)

22           (Court's Exhibit 1 was marked in evidence as of this

23  date.)

24           THE COURT:  Okay.  We have Court Exhibit 1.  "To the

25  judge:  We are ending the day and returning tomorrow.

Colloquy                                  1480

1   Sincerely, the jury."  Whoever that is.  Let's have them.

2   We'll send them home.  It's been a long day.

3            (A brief pause in the proceedings was held.)

4            (Defendant enters the courtroom at 5:05 p.m.)

5            (Jury enters courtroom at 5:05 p.m.)

6            THE COURT:  All right.  Everyone be seated.  Ladies

7   and gentlemen.  We have your note and recognizing it has

8   certainly been a long day it is, of course, fine for you to go

9   home.

10           There is a couple of things I wanted to mention.

11  The note was signed by "The Jury."  I don't know if that means

12  you haven't picked your foreperson, or the foreperson decided

13  to sign it, "The Jury."  It's fine, I don't need to know now.

14  I just want to make sure when you come back tomorrow you do

15  first thing is pick a foreperson.

16           The second thing I want to say is when you come back

17  tomorrow you can go right into 8-A, right into the jury room.

18  However, you may not start your deliberations until all 12 of

19  you are present there, okay.  So if some of you get there,

20  talk about something else until everyone is assembled that's

21  very important because you all have to deliberate together,

22  okay?

23           And then the last thing I want to say is the usual

24  please don't talk about the case especially now when we've

25  gotten this far in the case to anybody.  Do not do any

Colloquy                                      1481

1    research.  Don't bring anything from the outside world by way

2    of knowledge into the jury room and no communicating on

3    Instagram or tweets or anything else about this case.  Put it

4    out of your mind until all 12 of you are back in the room

5    tomorrow and do try to get there by 9:30 so you're not holding

6    up fellow jurors.

7           Thanks for putting in the hard day's work today,

8    hard day's work the last two weeks.  I appreciate it and I'll

9    see you tomorrow.

10          (Jury exits courtroom at 5:07 p.m.)

11          THE COURT.  Okay.  I want to make sure that the

12   parties are compiling the exhibits and will, of course, send

13   in a copy of the instructions and a copy of the verdict form

14   for them.  If there is any dispute about what exhibits should

15   go in, you'll let me know but I doubt there will be.  It's up

16   to the parties to decide if you want to send in a copy of the

17   revised indictment.  It's contained in the instructions, so I

18   don't think they really need to but if you both agree that

19   they should have to.  It's up to you.

20          MS. NGUYEN:  I don't think it's necessary since it's

21   in the instructions.

22          MR. GUADAGNINO:  That's fine, your Honor.

23          THE COURT:  All right.  So we'll do without it.

24   Have a good night, get some rest.  Thanks for your hard work.

25          MS. NGUYEN:  Thank you.

Colloquy                                              1482

1          MR. GUADAGNINO:   Thank you.

2          (WHEREUPON, this matter was adjourned to July 7,

3     2021, at 9:30 a.m.)

4

5                              *   *   *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2692 of 178 PageID #: 2692

Colloquy                                                    1483

INDEX OF EXHIBITS

FOR THE GOVERNMENT:                                      PAGE:


FOR THE DEFENSE:


COURT EXHIBITS:

  Court's Exhibit 1 was marked in evidence as of         1479

    this date.......................................


SUMMATIONS, REBUTTAL, AND JURY CHARGE:

  Summation - Ms. Nguyen...........................       1316

  Summation - Mr. Guadagnino.......................       1355

  Rebuttal Summation - Mr. Buford..................       1393

  Jury Charge......................................       1410

* * * * *

Anthony D. Frisolone, FAPR, RDR, CRR, CRI
Official Court Reporter