

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

FTB
F. #2019R00138

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

December 5, 2022

By E-mail and ECF

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    United States v. Akmal Narzikulov
               Criminal Docket No. 19-223 (S-2) (ILG)

Dear Judge Cogan:

        The government respectfully submits this letter in advance of the sentencing hearing for the defendant Akmal Narzikulov in the above-referenced case, which is currently scheduled for December 12, 2022. On July 7, 2022, a jury returned a verdict of guilty against the defendant on seven counts[1] of the second superseding indictment (the "Superseding Indictment"): conspiracy to unlawfully produce identification documents, in violation of 18 U.S.C. § 1028 (Count One); kidnaping conspiracy, in violation of 18 U.S.C. § 1201(c) (Count Two); kidnaping, in violation of 18 U.S.C. § 1201(a) (Count Three); conspiracy to commit Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (Count Four); Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a) (Count Five); threatening violence in furtherance of a plan to commit Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a)

---

[1] The defendant was also convicted at trial of Count Seven – using a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c). (PSR ¶ 26). On November 21, 2022, the Court granted the government's post-conviction motion to dismiss Count Seven against Narzikulov. In addition, as discussed at the February 11, 2022 conference, the government does not intend to proceed with the prosecution of the defendant on Count Eight of the Superseding Indictment (a felon-in-possession charge alleging a violation of 18 U.S.C. § 922(g)), which was severed from the other counts prior to the start of trial. The government will move orally to dismiss Court Eight, as well as the prior indictments against the defendant, at the sentencing hearing on December 12, 2022.

(Count Six); and conspiracy to commit witness tampering, in violation of 18 U.S.C. § 1512 (Count Nine).

The United States Probation Department ("Probation") issued a Presentence Investigation Report dated September 12, 2022 (the "PSR"). Probation issued an addendum to the PSR dated October 5, 2022 (the "First PSR Addendum") and issued another addendum on December 2, 2022 (the "Second PSR Addendum"). The PSR calculated a total offense level under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") of 43, which corresponds to an advisory recommendation of life in prison, given that the defendant falls within Criminal History Category III. The government submits that the PSR's calculation of the offense level is correct. For the reasons set forth in greater detail below, the government does not object to a sentence below the Guidelines' recommendation of life in prison; but the government does respectfully submit that a substantial term of incarceration is warranted in light of the serious, prolonged, and unrepentant nature of the defendant's criminal conduct.

I.     Factual and Procedural Background

As discussed in the PSR, and proven at trial, the defendant was the organizer and leader of a long-running scheme to facilitate cheating on computerized exams by applicants for New York State commercial driver licenses ("CDLs") and New York City Taxi & Limousine Commission ("TLC") licenses. (PSR ¶¶ 11-18). The defendant and his co-conspirators helped driver-license applicants cheat on the exams in exchange for cash payments, typically charging between $800 to $1,200 per applicant. (PSR ¶ 18). In exchange for these payments, the defendant's team would outfit the applicants with t-shirts that were designed to conceal smart phones. (Id. at ¶ 14). The t-shirts had tiny holes cut in them that permitted the cameras of the smart phones to transmit (via live video stream) the exam questions displayed on the computer screens at testing facilities to other members of the conspiracy, who would review the questions and relay the answers orally to the test takers. (Id.). The applicants heard the answers through small, flesh-colored ear buds that were also provided to them by the scheme participants. (Id.).

The evidence at trial showcases the breadth and temporal scope of the scheme. During the search that was executed at the defendant's residence in the spring of 2019, federal agents recovered multiple ledgers containing handwritten records of hundreds of transactions referencing CDLs or TLC licenses. (Id. at ¶ 23). The agents also recovered approximately $293,000 in cash. (Id.). In addition, the government seized multiple electronic devices that contained dozens of pictures of driver licenses for third parties – pictures that were featured at trial. (GX 309.10). The search also yielded multiple identification documents and driver licenses of third parties, as well as the electronic equipment used in executing the cheating scheme. (PSR ¶ 23). The evidence shows that the scheme ran for years, and involved hundreds of drive license applicants.

In addition, the evidence showed that the defendant recruited and employed at various times at least five other co-conspirators to assist him in this illegal enterprise. One of

the co-conspirators, Sukhrob Khamrokulov, began working for the defendant in 2017 and had basically no other income during the time he was involved in the defendant's scheme. (ECF No. 992, at 8-9). Two of the defendant's co-conspirators, whom he employed at various points, testified at trial about the nature and mechanics of the defendant's operation. There can be no question that the defendant was the leader of the organization he created and that he received the vast majority of the illegal proceeds it generated.

The evidence also showed the lengths to which the defendant was prepared to go to protect his enterprise. The defendant, as a convicted felon, could not legally purchase a firearm, so he arranged for a gun to be purchased in his mother's name. The paperwork showing the purchase of the gun by the defendant's mother in February 2019 – as facilitated by Sukhrob Khamrokulov – was admitted at trial. (GX 201–207). As discussed in greater detail below, the defendant used the gun to terrorize a co-conspirator that he believed was stepping out of line, threatening the co-conspirator at gunpoint.

Another of the defendant's employees, John Doe, worked for him for only a brief time, after which John Doe moved away from New York. (PSR ¶¶ 11-12). The defendant came to believe that John Doe owed him money, and when John Doe moved back to New York, the defendant organized a crew to kidnap John Doe to force him to return the money the defendant believed he owed, plus a significant penalty for having deprived the defendant of his money. (PSR ¶ 19). On March 28, 2019, the defendant and two of his henchmen chased John Doe down the street in front of John Doe's apartment building, after John Doe saw them approaching. (Id.). The defendant and Sukhrob Khamrokulov forcibly pushed John Doe against a wall and then attempted to manhandle John Doe into a waiting car; but John Doe resisted and clung to the handle of the front door of his building. (Id.). The defendant and Khamrokulov then used a taser on John Doe, shocking him until he lost consciousness, so they could drag him to the car driven by their co-conspirator. (Id.).

The defendant and his gang then sought in various ways to force John Doe to pay the defendant the money that the defendant believed had been taken. First, the defendant had John Doe driven to a parking garage, where John Doe was forced to strip. (PSR ¶ 19-20). At the garage, phone calls were placed to John Doe's mother overseas and one other associate of John Doe in an effort to force them to make what was in effect a ransom payment on John Doe's behalf. (Id. at ¶ 20).

The defendant discovered that John Doe had on his person a check made out to a business that John Doe had started; so the defendant had John Doe driven to a Bank of America branch for the purpose of opening an account in the name of the business, depositing the check, and withdrawing cash to pay the defendant. (Id.). The trial evidence showed that John Doe did these things under coercion from the defendant, but that John Doe could not withdraw the cash from the newly opened account because the check would take twenty-four hours to clear. (Id.). The defendant then forced John Doe to write out a check for $1,000 drawn on the account and directed another co-conspirator, Firuz Juraev, to fill in Juraev's name as the payee on the check and to attempt to cash the check at a check-cashing establishment. (Id.). When the check cashing establishment declined to cash the check, the

defendant finally released John Doe, but kept his property, including his green card, as collateral for the sake of extorting John Doe to pay the defendant. (Id.). As proven at trial, Juraev would later deposit the $1,000 check from John Doe into Juraev's own personal account, from which he then withdrew $1,000 in cash, which he gave to Khamrokulov for delivery to the defendant. (GX 216 at 3; Tr. 392-94).

One of the pieces of property that the defendant took from John Doe was his cell phone. (PSR ¶¶ 19, 22). When looking through the phone, the defendant learned that another co-conspirator, Jasur Kamolov, had sent John Doe a text message warning John Doe that the defendant was looking for him. (Id.). The defendant arranged to meet Kamolov in a parking lot in Brooklyn in the evening on the day of the kidnaping. (Id. at ¶ 22). There, the defendant used the gun he possessed to threaten Kamolov, loading the gun in front of him and brandishing it inside the car in which they were meeting. (Id. at ¶ 22). The defendant claimed that Kamolov would now be responsible for John Doe's debt as well as John Doe. (Id.). The defendant's extortion worked, as the trial evidence showed that shortly thereafter John Doe and Kamolov made a payment of $1,000 of John Doe's money to the defendant's mother for delivery to the defendant. (Id. at ¶¶ 21-22).

The defendant was arrested on a criminal complaint on April 18, 2019 and has been detained since then. (PSR ¶ 23). The trial evidence showed that, even though incarcerated, the defendant continued to commit crime. Specifically, the defendant organized a conspiracy to tamper with the witnesses against him. Working with one of his co-conspirators, Murodjon Sultanov, the defendant arranged for a cash payment to be made to John Doe to travel overseas and remain there until the conclusion of the trial against the defendant, which was originally scheduled to occur in December 2019. (Id. at ¶ 25). The defendant later worked with Sultanov and Firuz Juraev to offer Jasur Kamolov a similar payment, which Kamolov ultimately accepted. (Id.). Kamolov was arrested at John F. Kennedy Airport, attempting to board a flight out of the country. (Id. at ¶¶ 25, 28). The evidence showed that the defendant used the telephone accounts of other inmates when speaking with his co-conspirators in an effort to obscure his leadership of the plot to prevent the witnesses against him from testifying, which also involved the assistance of the defendant's brother who resided in Uzbekistan.

As noted above, the defendant was convicted at trial in July 2021 of seven counts of the Superseding Indictment.

II. The Guidelines Calculation

The applicable Guidelines calculation in the PSR is set forth at paragraphs 43 to 78, with additional explanation contained in paragraphs 31 to 35. The Second PSR Addendum reflected some minor edits based on the Court's granting of the government's motion to dismiss Count Seven of the Superseding Indictment, thereby effectively vacating the defendant's conviction on that Count. Those edits do not materially affect the Guidelines calculation in the PSR. The government respectfully submits that the PSR's Guidelines calculation is correct and that the defendant's total offense level is a 43.

4

The PSR also concludes that the defendant falls within Criminal History Category III. The government agrees with this conclusion. The result is that the defendant's advisory range of imprisonment under the Guidelines is life in prison. (Second PSR Addendum ¶ 116).

### III. The Appropriate Sentence

#### A. Legal Standard

The Sentencing Guidelines are advisory, not mandatory. United States v. Booker, 543 U.S. 220, 258-60 (2005). However, the Supreme Court held in Booker that sentencing courts must consider the Guidelines in formulating an appropriate sentence. Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [a district court] may not presume that the Guidelines range is reasonable. [A district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

#### B. Discussion

The defendant's crimes were as serious as they were varied. In organizing the conspiracy to facilitate rampant cheating on the CDL and TLC exams, the defendant knowingly compromised public safety for the sake of enriching himself. As a result of the defendant's actions, numerous applicants received CDLs and TLC licenses who would not otherwise have passed the exams. Accordingly, the defendant is directly responsible for putting unqualified drivers behind the wheels of vehicles that require specialized training and experience to operate safely.

It should be noted that the defendant's prior federal conviction is for engaging in an extremely similar scheme to assist applicants for CDLs in cheating on the necessary exams. (PSR ¶ 80). The defendant received a sentence of 30 months' imprisonment for that first conviction, which reflects the severity of the crime.[2] (Id.). That sentence evidently had

---

[2] As this Court has observed, and the PSR confirms, the defendant had originally been released on pretrial bond in that case, but was remanded upon a finding that

no deterrent effect on the defendant, who returned to the same type of schemes upon his release. If anything, he ramped up the size and scope of his operation.[3]

The defendant also manifested a willingness to turn to violence. That his victims were corrupt participants in his own schemes does not detract from the gravity of the defendant's conduct or excuse the depravity of his decision-making. The defendant organized and personally led the kidnaping of John Doe in broad daylight in the middle of a busy Brooklyn street. The defendant did not hesitate to use a taser to shock John Doe until he could no longer resist. Later he used the gun he had purchased in his mother's name to threaten violence against Jasur Kamolov. When the police came with an arrest warrant to his apartment, the defendant did not surrender; but rather forced the agents to enlist the services of the New York City Police Department's Emergency Services Unit ("ESU"), which had to breach the defendant's door to make entry into the unit. (PSR ¶ 23). Prior to ESU's arrival at the scene, the agents heard the sound of a gun "racking" from inside the apartment. (Id.). While detained pending trial in this matter, the defendant sought to pay off the witnesses against him, enlisting the help of co-conspirators who remained at liberty. The defendant came perilously close to succeeding in his endeavor, with one witness traveling abroad and another arrested at the airport.

At every turn, the defendant has manifested what can only be characterized as deep-seated contempt for the law and the judicial process. His conduct leaves little doubt that, if released, he would immediately return to illegal activity. The government respectfully submits that, while it is not asking this Court to sentence the defendant to life in prison, a lengthy term of incarceration is necessary to ensure that the public is protected from the defendant.

---

he had deliberately cut the bracelet he was required to wear to facilitate GPS monitoring – a condition of his release. (PSR ¶ 80).

[3] The defendant also violated the terms of his supervised release in that case by assaulting his estranged wife. (PSR ¶¶ 80-81). For that violation, the defendant received a sentence of 6 months' incarceration.

Conclusion

        For the reasons stated above, the government requests that the Court impose a sentence that is sufficient, but not greater than necessary to serve the ends of justice and respectfully submits that a sentence that includes a substantial term of incarceration is warranted.

                                                Respectfully submitted,

                                                BREON PEACE
                                                United States Attorney

                By:    /s/ F. Turner Buford
                         F. Turner Buford
                         Assistant U.S. Attorney
                         (718) 254-6483

cc:    Peter Guadagnino, Esq. (by E-mail and ECF)
       Senior U.S. Probation Officer Shayna Bryant (by E-mail)